UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| STATE OF NEW YORK, STATE OF ILLINOIS, STATE OF MARYLAND, STATE OF WASHINGTON, | ECF CASE |
| Plaintiffs, | |
| - against - | 07-CV-8621 (PAC) (RLE) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| Defendant. | **DECLARATION OF** |
| | **CYNTHIA R. MANN** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


Cynthia R. Mann hereby declares the following to be true and correct under penalty of perjury pursuant to 29 U.S.C. § 1746.

**Education and Background**

1.      My name is Cynthia R. Mann.  I hold a JD degree from New York University School of Law, and I am admitted to the bar in New York and Massachusetts.  I am not currently engaged in the practice of law.  Since 2002, I have been a Research Professor at Georgetown University's Health Policy Institute.  At the Institute, I also serve as the Executive Director of the Center for Children and Families.  In these capacities, I conduct research and policy analysis on issues relating to children and family's health coverage and work with state and federal policymakers and program administrators on these matters.  Prior to joining the faculty of

Georgetown University, I was a senior fellow at the Kaiser Commission on Medicaid and the Uninsured. I continue to be an Associate of the Kaiser Commission.

2.      Between 1999 and early 2001, I served as the director of the Family and Children's Health Programs Group at the Health Care Financing Administration (HCFA), the federal agency that is now known as the Centers for Medicare and Medicaid Services (CMS). In that capacity I was responsible to the Medicaid Director, the CMS Administrator, and the Secretary of Health and Human Services on matters relating to the federal administration of the State Children's Health Insurance Program (SCHIP) as well as those aspects of the Medicaid program that pertain to children, parents, and pregnant women. My program group had primary responsibility for the development of the federal regulations governing SCHIP and for the review of all SCHIP state plans, state plan amendments, and waiver requests. Based on these reviews, I was responsible for preparing decision memos for the Director, Administrator, and Secretary with respect to actions that they might need to take on such matters consistent with the applicable law and regulations.

3.      During my tenure at HCFA, I oversaw and was deeply involved in the development of the SCHIP regulations that were issued in 2001 as well as the development of sub-regulatory guidance, including numerous official state Medicaid director and SCHIP state health official letters. (The August 17, 2007 CMS directive that is the subject of this litigation was issued as a state health official letter.)

4.      Since leaving HCFA, while at the Kaiser Commission on Medicaid and the Uninsured and subsequently at Georgetown University, I have continued to closely monitor SCHIP policy development and implementation, including state plan amendments, regulatory

and sub-regulatory guidance, and waiver documents, as well as program evaluations and research findings.  I have written extensively on SCHIP and Medicaid policies, have testified on these topics before Congress on several occasions, have presented research findings and policy analyses to national and state-level organizations and conferences, and have advised state policymakers and program administrators with respect to a range of issues pertaining to their Medicaid and SCHIP programs. My curriculum vitae is attached to this declaration as Exhibit A**.**

5.     The information provided in this declaration is based on my personal knowledge and on my research and review of other relevant research in this area.

## Federal SCHIP Policy Prior To The August 17th Directive

6.     The August 17th directive represents a sharp departure from longstanding SCHIP policy as demonstrated by an examination of federal SCHIP law and regulations and federal agency practice with respect to the review and approval of SCHIP state plans and plan amendments.

### Federal Law and Regulations

7.     SCHIP was specifically designed to afford states considerable flexibility to set their own income eligibility levels, establish their own rules for cost sharing, and design state-specific crowd out or substitution policies, subject to broad federal guidelines and available federal funding.

*Income eligibility*

8.     Through the combined flexibility provided to states to set income standards and methods for counting income (including income deductions, exclusions and disregards), the

SCHIP law permits states to set the effective income eligibility levels for SCHIP-funded programs, subject to available federal and state funds.[1]  There is no requirement in the SCHIP law or regulations that states demonstrate either that they have met a particular participation rate among eligible lower income children or that they show that their employer-sponsored coverage rates for lower income children have not declined by more than a certain amount in order to gain approval for covering higher income children.

*Cost sharing*

9.    As with other aspects of SCHIP, the federal SCHIP cost sharing rules provide states significant flexibility.  States decide what levels of cost sharing (such as premiums, deductibles, or copayments), if any, to charge families. There is no federal requirement for a state to impose cost sharing, but if a state chooses to do so the costs borne by families cannot exceed maximum amounts set by the law and regulations.  For families with incomes above 150 percent of the federal poverty level (FPL), families cannot be required to pay costs (considering, in the aggregate, premiums, copayments, deductibles, and any other charges that the program might impose) that exceed five percent of family income.[2]

*Substitution of other public coverage and private group insurance*

10.    The SCHIP law targets SCHIP funds to uninsured children.[3]  As such, it requires states to ensure that SCHIP funds are not used to cover children who have other sources of coverage, including Medicaid or private insurance.[4]  On the private insurance side, the law requires states to describe in their state plans the procedures they will use to prevent SCHIP coverage from substituting for private group health insurance.  The law does not require states to adopt any particular substitution prevention strategy, except in the limited situation where a state

4

is using SCHIP funds to subsidize the purchase of group health insurance (an option known as premium assistance).[5]

11.   The initial proposed SCHIP regulations issued in November 1999 sought to balance state flexibility with concern over the potential for substitution. The proposed rules, at section 457.808, would have required each state to describe the procedures the state would use to prevent substitution, leaving the specifics to the states, while the preamble to the rule announced HCFA's intention to review state plans and outlined the substitution procedures that HCFA would find reasonable.  A three-tier structure for reviews was proposed. States that covered children with incomes below 150 percent of the FPL would have been expected, at a minimum, to monitor the extent of substitution; states covering children with incomes between 150 and 200 percent of FPL would have been required, at a minimum, to study the extent of substitution and to specify the steps they would take if substitution reached an "unacceptable level."  If the Secretary (rather than the state) found an unacceptable level of substitution, the state would have been required to implement that strategy.  States that covered children with incomes above 200 percent of the FPL would have been expected to implement procedures to prevent substitution.[6]

12.   Even with this relatively prescriptive regime, the agency noted that it did not have the legal authority to mandate states to adopt any particular substitution procedure.  The preamble stated: "The other option that we considered was to require a set of specific procedures that each State would have to use to address substitution.  We rejected this option because the statute authorizes States to design approaches to prevent substitution, not the Federal government."[7]

13.   In response to comments received and in light of state reports of less substitution than had been anticipated, the final regulations promulgated in January 2001 revised the initial

approach in the proposed rules to provide states with additional flexibility in this area.[8]   Like the proposed rules, the January 2001 regulations simply require states to describe their substitution policies in their state plans.  No specific strategy was mandated except with respect to premium assistance.[9]  The three-tier approach was retained but revised to allow states more flexibility relative to the proposed rules.  States with income eligibility levels below 200 percent of the FPL (as opposed to 150 percent of the FPL) were required only to monitor substitution.  States with eligibility levels between 200 and 250 percent of the FPL were required to specify the substitution mechanisms they would rely on if monitoring showed unacceptable levels of substitution. Language that had been in the prior version of the preamble to the proposed regulations about the Secretary making the finding about what level of substitution was unacceptable was dropped.  Above 250 percent of the FPL, states were required to have substitution mechanisms in place but no particular policy was required.  The preamble to the adopted regulations specifically encourages states "to use other strategies than waiting periods."[10]  In the case of premium assistance, where the possibility of substitution was thought to be most likely, waiting periods of at least six months, but no longer than 12 months were required, although even in this context states were specifically permitted to design and adopt exceptions to the waiting periods.[11]

Program Implementation

*Income eligibility*

14.    State income eligibility levels in SCHIP have always varied across the nation. While most states, in the early years, set their eligibility levels at 200 percent of the FPL, others

adopted higher standards.  For example, New Hampshire's plan to cover children in SCHIP up to 300 percent of the FPL was approved in September 1998.[12]

15.    Over the years, as health insurance costs grew the health insurance affordability gap for families widened.  In response, more states expanded the reach of their SCHIP-funded programs to cover uninsured children with more moderate incomes. By July 2007, 42 states (including the District of Columbia) had SCHIP income eligibility levels at or above 200 percent of the FPL compared to 39 states in April 2003 and 22 states in October 1998 (Exhibit B). Immediately before August 17, 2007, at least 14 states covered children with gross family incomes above 250 percent of the FPL with SCHIP funds under CMS-approved plans or waivers (Exhibit C).

16.    I know of no instance prior to August 17, 2007 in which CMS denied approval for state SCHIP eligibility expansion for any reason.  None of 14 states that covered children above 250 percent of the FPL under plans approved by CMS before August 17, 2007 (identified in Exhibit C) were required to meet a specific participation rate requirement or show that employer-based coverage had not declined by more than two percent as a condition to receiving federal SCHIP approval of their plans, plan amendments, or waivers.

*Cost sharing*

17.    Since the beginning of the program, states have adopted different strategies with respect to cost sharing.  As of July 2007, 34 states charged premiums (including enrollment fees) (Exhibit D, Column 2).  In states that charge premiums, the annualized level of the premiums for two children in a family of three with income at 200 percent of the FPL range from a low of $35 in Colorado to a high of $3,000 in Tennessee.   Of the 14 states that cover children with incomes

above 250 percent of the FPL, all but Hawaii and the District of Columbia charge premiums, but the amount of the premiums for this group of states also varies widely (Exhibit C).

18.     To my knowledge, prior to August 17, 2007, CMS had not required cost sharing or prescribed any particular level of cost sharing as a condition of its approval of a SCHIP state plan or plan amendment.

*Substitution*

19.     As a disincentive to substitution of SCHIP for private insurance, most states adopted waiting periods (i.e. periods without coverage before becoming eligible for SCHIP) in their initial SCHIP plans.  However, there was considerable variation across states.  Five states had 12-month waiting periods; 17 states had six-month waiting periods; 18 states had waiting periods of four months or less; and 11 states had no waiting period at all (Exhibit E).  In general, states with higher income eligibility levels had longer waiting periods but even for these states 12-month waiting periods were not required by CMS.  For example, when CMS approved New Hampshire's initial plan in September 1998 to cover children up to 300 percent of the FPL, the approved plan included a six-month waiting period (which remains in place today).[13]

20.     Over time, several states dropped or shortened their waiting periods with federal approval (Exhibit E, column 4).  New Jersey's original plan covered children up to 200 percent of the FPL and included a 12-month waiting period.[14]  An amendment submitted in 1999 sought to reduce the waiting period from 12 months to six months because, according to the state, program experience and a review of demographic data indicated that the state could shorten its waiting period without crowding out private coverage and, by doing so, could cover more uninsured children. CMS approved the amendment in May 1999.[15]  In April of that same year,

8

New Jersey submitted another state plan amendment to raise income eligibility levels to 350 percent of the FPL, retaining the six-month waiting period; that plan was approved in August 1999.[16]  In the following year, CMS approved New Jersey's request to add exceptions to the waiting period[17] and in 2005, CMS approved another New Jersey plan amendment to reduce the waiting period to three months, where it remains today.[18]

21.    Some states relied on substitution prevention strategies other than waiting periods. For example, Rhode Island has a premium assistance program that uses Medicaid and SCHIP funds to subsidize the purchase of employer based insurance plans, which it believes helps limit substitution.[19] California has made it an unfair labor practice for employers to refer employees to SCHIP when the employer offers dependent coverage or for employers to change the employee cost sharing for such coverage.[20]  Federal approval of these different approaches was consistent with the emphasis in the SCHIP program on permitting states flexibility to design their individual state programs. Approval was also consistent with state and federal evaluations that generally concluded that states were not finding substitution of private insurance to be a significant problem in their SCHIP programs.[21]

22.    To my knowledge, prior to August 17, 2007, CMS had not denied any state plan or plan amendment based on a determination that the state's substitution prevention strategies were insufficient.  Although states have adopted various crowd out methods, including waiting periods of different lengths and a variety of cost sharing approaches, no state plan expanding SCHIP coverage approved by CMS prior to the August 17th directive included all of the exact directive requirements.

**The Change in Federal Policies on August 17, 2007**

23.     The August 17th directive made sweeping changes in each of the key areas described above: income eligibility, cost sharing, and substitution of coverage.  The directive imposes very specific new requirements on states in each of these areas leading to very different policy outcomes for states and children.  The difference in the federal policies applied before and after the issuance of the August 17, 2007 directive is illustrated by comparing the experience of two states:  Pennsylvania, one of the last states to submit an eligibility expansion plan to CMS for approval prior to August 17, 2007, and Louisiana, one of the first states to seek federal approval to expand coverage through SCHIP after August 17, 2007.

24.     Pennsylvania's state plan amendment to expand its SCHIP program from 200 to 300 percent of the FPL was submitted on November 20, 2006.[22] The 300 percent income eligibility level is calculated based on a net income, allowing deductions for work-related and childcare expenses.  Premiums are charged, but not as high as five percent of family income.  The state's plan included a six-month waiting period for the expansion group; however, Pennsylvania chose not to apply any waiting period for children under age two or for children whose parents lost their jobs.  CMS approved Pennsylvania's plans with these components on February 20, 2007.

25.     Like Pennsylvania, Louisiana adopted legislation to expand its SCHIP program from 200 to 300 percent of the FPL, but Louisiana had not submitted its state plan amendment to CMS for approval before August 17, 2007.  Once the August 17, 2007 directive was issued, Louisiana determined that it could not meet the new requirements.  Consequently, on September 4, 2007, Louisiana submitted its state plan amendment requesting federal approval for an

expansion only up to 250 percent of the FPL.[23]  The amendment included a 12-month waiting period, with exceptions for children who lost private insurance for specified reasons that the state deemed involuntary (for example, due to parent death or job loss).  It also assumed the continuation of Louisiana's longstanding income deductions for work related expenses similar to the ones in Pennsylvania's approved plan.

26.     Because Louisiana was planning to apply work-related deductions, some children with gross incomes above 250 percent of the FPL might have qualified for coverage under the Louisiana plan.  CMS determined that the August 17, 2007 directive applied to the Louisiana plan amendment, and sent the state a letter with questions relating to the provisions in the directive, including questions about participation rates and employer-sponsored coverage rates.[24] Louisiana responded by revising its state plan amendment to drop its work-related deductions. After months of back and forth between CMS and the state, CMS approved the much-restricted Louisiana plan on February 28, 2008.[25]

Status and Outstanding Issues

27.     At the time the August 17, 2007 directive was issued, nine other states were in Louisiana's position of having to seek federal approval for expansions that were enacted before the directive to cover children with family incomes up to 300 percent of the FPL (Exhibit F). These expansions were all adopted by the states' legislatures in reliance of longstanding federal rules.  To date, none of these states has received federal approval for an expansion over 250 percent of the FPL.  Some states, like Louisiana, have determined that they cannot meet the August 17, 2007 directive requirements and have limited their coverage expansions, while other states have proceeded with their expansion but without federal financial participation (Exhibit F).

28.     At least 14 states that already covered children above 250% of the FPL under SCHIP plans or waivers approved before the August 17, 2007 directive (e.g., Pennsylvania) must modify their state plans and SCHIP coverage by August 2008 to comply with the directive (Exhibit C). At this point, states are not clear what data will be acceptable to CMS with respect to the various elements of the directive, including calculations of the participation rates, employer-sponsored insurance coverage rates, and the cost sharing imposed under "competing" private insurance plans. CMS has not provided written guidance on whether states that are found to meet the participation rate and employer coverage requirements will be permitted to allow any exceptions to the 12-month waiting period. There is also no written guidance as to whether the new cost sharing requirements will apply to the children who are already enrolled in coverage in this income range or just to newly enrolled children.[26]   In my experience, these are matters that would have been clarified had the agency attempted to implement these new rules through the regulatory process with the opportunity for notice and comment.

29.     The August 17, 2007 CMS directive has changed the rules of the program in sweeping ways, resulting in the loss of SCHIP coverage for children and a high level of uncertainty for states.[27]   Perhaps most striking is that these major policy changes were imposed on the program through a letter written to state agencies, without any advance notice to the public, without any opportunity for stakeholders and other members of the public to comment, and without any new authorizing legislation.

Dated: Washington, D.C.
        April 14, 2008

Cynthia R. Mann

12

[1] 42 U.S.C. § 1397bb(b)(1); 42 U.S.C. § 1397jj(b); 42 *CFR* §§ 457.310, 457.320. (See also, the preamble to the proposed program rules explaining that states have the flexibility to define income and to use gross or net income standards. 64 *Fed. Reg.* 60897-60898 (November 8, 1999).)

[2] 42 U.S.C. § 1397cc(e); 42 *CFR* § 457.500 et seq.; and 66 *Fed. Reg.* 2574 (January 11, 2001).

[3] 42 U.S.C. § 1397aa(a); 42 U.S.C. § 1397jj(b)(1)(C).

[4] 42 U.S.C. § 1397bb(b)(3) and (c)(2).

[5] 42 U.S.C. § 1397bb(b)(3)(C); 42 U.S.C. § 1397ee(c)(3)(B).

[6] 64 *Fed. Reg.* 60922 (November 8, 1999).

[7] *Ibid.*

[8] These final program rules were suspended and then reissued with modifications on June 25, 2001 as an interim final rule. The substitution rules discussed here were not modified by the later promulgation. See, *Fed. Reg.* 33810 et. seq., June 25, 2001.

[9] 42 *CFR* §§ 457.805, 457.810.

[10] 66 *Fed. Reg.* 2493, 2603 (January 11, 2001).

[11] 66 *Fed. Reg.* 2493, 2605 (January 11, 2001).

[12] New Hampshire Original State Plan, (Approved September 15, 1998).

[13] *Ibid.*

[14] New Jersey Original State Plan, (Approved April 27, 1998).

[15] New Jersey State Plan Amendment 1, (Approved May 7, 1999).

[16] New Jersey State Plan Amendment 2, (Approved August 3, 1999).

[17] New Jersey State Plan Amendment 3, (Approved July 7, 2000).

[18] New Jersey State Plan Amendment 11, (Approved November 22, 2005).

[19] Rhode Island State Plan Amendment 2, Section 2.2.2, (Approved September 19, 2002).

[20] California Original State Plan, Section 4.4.3, (Approved March 24, 1998).

[21] S. Limpa-Amara, A. Merrill, & M. Rosenbach, "SCHIP at 10: A Synthesis of the Evidence on Substitution of SCHIP for Other Coverage," Mathematica Policy Research, Inc., (September 2007); A. Sommers, et al., "Substitution of SCHIP For Private Coverage: Results From A 2002 Evaluation in Ten States," Health Affairs, 26: 529-537 (2007); E. Shenkman, et al., "Crowd-out: Evidence from the Florida Healthy Kids Program," Pediatrics 104: 507-513 (1999); E. Feinberg, et al., "Family Income and Crowd Out Among Children Enrolled in Massachusetts Children's Medical Security Plan," Health Services Research, 36: 45-63 (December 2001); D. Hughes, J. Angeles, & E. Stilling, "Crowd-Out in the Healthy Families Program: Does It Exist?," Institute for Health Policy Studies, University of California, San Francisco, (August 2002); and L. Shone, et al., "Crowd-Out in the State Children's Health Insurance Program (SCHIP): Incidence, Enrollee Characteristics and Experiences, and Potential Impact on New York's SCHIP," Health Services Research, 43: 419-434 (February 2008).

[22] Pennsylvania State Plan Amendment 7, (Approved February 20, 2007).

[23] Louisiana State Plan Amendment 5, (Approved February 27, 2008).

[24] Letters from Kathleen Farrell, Director, Division of State Children's Health Insurance at the Centers for Medicare and Medicaid Services, to Jerry Phillips, Louisiana Medicaid Director, on September 27, 2007, November 14, 2007, November 30, 2007, and December 14, 2007.

[25] *op. cit.* (23).

[26] J. McInerney, M. Hensley-Quinn, and C. Hess, "The CMS August 2007 Directive: Implementation Issues and Implications for State SCHIP Programs," National Academy for State Health Policy (April 2008).

[27]  Testimony of Cindy Mann and Testimony of Alan Weil, JD, MPP, Executive Director National Academy for State Health Policy (NASHP) before Senate Finance Committee, Subcommittee for Health Care, April 9, 2009, accessible at http://www.senate.gov/~finance/sitepages/hearing040908.htm.

**Exhibit A**
Curriculum Vitae

Cynthia Mann, J.D.
1439 Corcoran Street, NW
Washington DC 20009

**Education**
New York University School of Law
New York, New York
J.D. Degree, with honors, 1975

Cornell University
Ithaca, New York
B.S. Degree, with honors, 1972

**Professional Experience**
Research Professor and Executive Director, Center for Children and Families
Georgetown University
Health Policy Institute
Washington DC
September 2002 – present
The Center on Children and Families is a research and policy center focused on improving health coverage for children and families. I direct the Center and conduct research and policy analysis principally on issues relating to the Medicaid and State Children's Health Insurance programs, strategies to maximize participation in Medicaid and SCHIP, and the integration of public and private financing.

Senior Fellow
Kaiser Commission on Medicaid and the Uninsured
Washington DC
April 2001 – August 2002
As a Senior Fellow with the Kaiser Commission on Medicaid and the Uninsured, I played a leading role contributing to the Commission's research and analysis of Medicaid and SCHIP policy issues and related efforts to expand health coverage to the uninsured, prepared a number of reports on Medicaid and SCHIP, and regularly presented on these issues at national and state-based forums.

Director
Family and Children's Health Programs
Center for Medicaid and State Operations
Centers for Medicare and Medicaid Services (formerly, Health Care Financing Administration)
U.S. Department of Health and Human Services
Baltimore, Md.
December 1999 - April 2001

As Director of the division that oversees the family and children's public health programs at the U.S. Department of Health and Human Services, I provided leadership and executive direction for the Medicaid and the State Children's Health Insurance Program at the federal level.  I supervised a staff of 95 employees, set overall policy direction for the division, contributed to the development of Administration policies and priorities, and ensured that the initiatives of the Health Care Financing Administration and the Secretary of the Department of Health and Human Services were carried out. I worked closely with State agencies, other agencies within the Department of Health and Human Services, the Office of Management and Budget, and with national policy experts on all matters affecting the policies and implementation of Medicaid and SCHIP with respect to families, children and pregnant women.

<u>Senior Fellow</u>
Center on Budget and Policy Priorities
Washington DC
1994 - December 1999
As Senior Fellow with the Center on Budget and Policy Priorities, a nonpartisan, nonprofit research and policy institute focusing on issues relating to low-income individuals and families, I led the Center's federal and state health care policy work, which included analyzing and writing on federal and state Medicaid and child health policy and working directly with policymakers, administrators and nonprofit organizations on policy options and program implementation issues.  Between 1996 and 1998, I directed the state program work at the Center on Budget, supervising staff and projects with respect to health care, public assistance, child care, and related programs.

<u>Senior Staff Attorney</u>
Massachusetts Law Reform Institute
Boston, MA
1988 - 1994
At the Massachusetts Law Reform Institute, a statewide poverty law center, I was primarily responsible for the Institute's health-related work and also contributed to work on cash assistance and tax and budget matters.

<u>Executive Director</u>
Massachusetts Legislative Special Commission on Tax Reform
Boston, MA.
1987 - 1988
As Executive Director of this legislatively established Commission, I oversaw the development of the Commission's comprehensive tax reform agenda for the Commonwealth.

<u>Senior Attorney</u>
Rhode Island Legal Services
Providence, R.I.
1982 – 1987

<u>Unit Director and Staff Attorney</u>
Brooklyn Legal Services Corporation A
Brooklyn, New York
1976 - 1979; 1980 – 1981

<u>General Counsel</u>
Downtown Welfare Advocate Center
New York, New York
1979 – 1980

<u>Staff Attorney</u>
Food Law Project
New York, New York
1975 - 1976

**Professional Activities**
2002 -  present
Associate Commissioner, Kaiser Commission on Medicaid and the Uninsured

1998- 1999
Member, National Advisory Committee, Robert Wood Johnson Covering Kids Initiative

1994
Member, Massachusetts Task Force on Health Care Reform, organized by Senator
Kennedy to advise the Senator on a range of issues relating to national health care reform
(Boston, Ma)

1993 - 1994
Member, Joint (Senate and House of Representatives) Committee on Health Care,
Subcommittee on Adolescent Health, Commonwealth of Massachusetts (Boston, Ma.)

1992 - 1993
Commissioner, Massachusetts Special Commission on Business Taxes (Boston, Ma.)

1991 - 1994
Member, Massachusetts Department of Public Health, Bureau of Family and Community
Health, Advisory Council (Boston, Ma.)

1983 - 1988
Board of Directors, Center on Social Policy and Law (New York, N.Y.)

**Exhibit B**

**Medicaid/SCHIP Income Eligibility Level for Children as a Percent of the Federal Poverty Level**

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| State | October 1998[1] | April 2003[2] | July 2007[3] |
| Alabama | 200% | 200% | 200% |
| Alaska | 100% | 200% | 175% |
| Arizona | 100% | 200% | 200% |
| Arkansas | 200% | 200% | 200% |
| California | 200% | 250% | 250% |
| Colorado | 185% | 185% | 200% |
| Connecticut | 300% | 300% | 300% |
| Delaware | 100% | 200% | 200% |
| District of Columbia | 200% | 200% | 300% |
| Florida | 200% | 200% | 200% |
| Georgia | 200% | 235% | 235% |
| Hawaii | 100% | 200% | 300% |
| Idaho | 150% | 150% | 185% |
| Illinois | 185% | 185% | 200% |
| Indiana | 150% | 200% | 200% |
| Iowa | 133% | 200% | 200% |
| Kansas | 100% | 200% | 200% |
| Kentucky | 100% | 200% | 200% |
| Louisiana | 133% | 200% | 200% |
| Maine | 185% | 200% | 200% |
| Maryland | 200% | 300% | 300% |
| Massachusetts | 200% | 200% | 300% |
| Michigan | 200% | 200% | 200% |
| Minnesota | 275% | 275% | 275% |
| Mississippi | 100% | 200% | 200% |
| Missouri | 300% | 300% | 300% |
| Montana | 150% | 150% | 175% |
| Nebraska | 185% | 185% | 185% |
| Nevada | 200% | 200% | 200% |
| New Hampshire | 185% | 300% | 300% |
| New Jersey | 200% | 350% | 350% |
| New Mexico | 185% | 235% | 235% |
| New York | 222% | 250% | 250% |
| North Carolina | 200% | 200% | 200% |
| North Dakota | 100% | 140% | 140% |
| Ohio | 150% | 200% | 200% |
| Oklahoma | 185% | 185% | 185% |
| Oregon | 170% | 185% | 185% |
| Pennsylvania | 235% | 200% | 300% |
| Rhode Island | 250% | 250% | 250% |
| South Carolina | 150% | 150% | 150% |
| South Dakota | 133% | 200% | 200% |
| Tennessee | 400% | 100% | 250% |
| Texas | 100% | 200% | 200% |
| Utah | 200% | 200% | 200% |
| Vermont | 300% | 300% | 300% |
| Virginia | 185% | 200% | 200% |
| Washington | 200% | 250% | 250% |
| West Virginia | 100% | 200% | 220% |
| Wisconsin | 100% | 185% | 185% |
| Wyoming | 100% | 133% | 200% |
| **States at or above 200% FPL** | **22** | **39** | **42** |

[1] Eligibility levels shown are for children age six and older, from the National Governor's Association, Center for Best Practices, Health Policy Studies Division, "States Have Expanded Eligibility Through Medicaid and the State Children's Health Insurance Program," (February 10, 1999).

[2] D. Cohen Ross & L. Cox, "Preserving Recent Progress on Health Coverage for Children and Families: New Tensions Emerge," Kaiser Commission on Medicaid and the Uninsured (July 2003).

[3] D. Cohen Ross, A. Horn, & C. Marks, "Health Coverage for Children and Families in Medicaid and SCHIP: State Efforts Face New Hurdles," Kaiser Commission on Medicaid and the Uninsured (January 2008).

**Exhibit C**

**Medicaid/SCHIP Program Features in States With Children's Coverage Above 250 Percent of the Federal Poverty Level**

| State | Medicaid/SCHIP Eligibility Level (July 2007)[1, 2] | Date of Plan Approval from CMS[3] | Medicaid/SCHIP Waiting Period (July 2007)[1] | Income Level at which State Begins Requiring Premiums[1] | Effective Annual Premium Amount at 200% of the FPL[1,4] |
|---|---|---|---|---|---|
| California | 250% | 11/23/99 | 3 months | 101% | $144/$216 |
| Connecticut | 300% | 4/27/98 | 2 months | 235% | $0 |
| District of Columbia | 300% | 3/15/07 | None | - - | - - |
| Hawaii | 300% | 1/30/06 | None | - - | - - |
| Maryland | 300% | 11/7/00 | 6 months | 201% | $0 |
| Massachusetts | 300% | 7/20/06 | 6 months (200-300% FPL) | 150% | $288 |
| Minnesota | 275% | 4/27/95 | 4 months (only applies to children under Medicaid 1115 waiver) | all waiver families | $1,464 |
| Missouri | 300% | 4/29/98 | 6 months (150-300% FPL) | 150% | $792 |
| New Hampshire | 300% | 9/15/98 | 6 months | 186% | $600 |
| New Jersey | 350% | 8/3/99 | 3 months | 150% | $222 |
| Pennsylvania | 300% | 2/20/07 | 6 months (200-300% FPL; children under 2 are exempt) | 201% | $0 |
| Rhode Island | 250% | 5/8/98 | None | 150% | $924 |
| Vermont | 300% | 12/15/98 | 1 month | 186% | $180 |
| Washington | 250% | 9/8/99 | 4 months | 201% | $0 |

[1] D. Cohen Ross, A. Horn, & C. Marks, "Health Coverage for Children and Families in Medicaid and SCHIP: State Efforts Face New Hurdles," Kaiser Commission on Medicaid and the Uninsured (January 2008).

[2] California, Rhode Island, and Washington have nominal income eligibility levels set at 250% of the FPL, but allow for some income disregards or deductions to effectively cover some children with gross incomes above 250% of the FPL.

[3] Center for Children and Families analysis of state programs, legislation, and SCHIP state plans.

[4] Premium amounts shown are annualized premiums for two children in a family of three.

**Exhibit D**

**Premium Payments in Medicaid and SCHIP[1] as of July 2007**

| 1 | 2 | 3 |
|---|---|---|
| **State** | **Income Level as a Percentage of FPL at which State Begins Requiring Premiums** | **Effective Annual Premium Amount at 200% of the FPL** |
| **Alabama** | 101% | $200 |
| Alaska | – – | – – |
| **Arizona** | 101% | $420 |
| Arkansas | – – | – – |
| **California[2]** | 101% | $144/$216 |
| Colorado | 151% | $35 |
| **Connecticut** | 235% | $0 |
| Delaware | 101% | $300 |
| **District of Columbia** | – – | – – |
| Florida | 101% | $240 |
| **Georgia[3]** | 101% | $672 |
| Hawaii | – – | – – |
| **Idaho[4]** | 134% | N/A |
| Illinois | 151% | $300 |
| **Indiana** | 150% | $600 |
| Iowa | 151% | $240 |
| **Kansas** | 151% | $360 |
| Kentucky | 151% | $240 |
| **Louisiana** | – – | – – |
| Maine | 151% | $768 |
| *Maryland* | 201% | $0 |
| *Massachusetts[5]* | 150% | $288 |
| **Michigan** | 151% | $120 |
| *Minnesota[6]* | all waiver families | $1,464 |
| **Mississippi** | – – | – – |
| *Missouri* | 150% | $792 |
| **Montana** | – – | N/A |
| Nebraska | – – | N/A |
| **Nevada[7]** | 101% | $280 |
| New Hampshire | 186% | $600 |
| **New Jersey** | 150% | $222 |
| New Mexico | – – | – – |
| **New York** | 160% | $216 |
| North Carolina | 151% | $100 |
| **North Dakota** | – – | N/A |
| Ohio | – – | – – |
| **Oklahoma** | – – | N/A |
| Oregon | – – | N/A |
| **Pennsylvania[8]** | 201% | $0 |
| *Rhode Island[9]* | 150% | $924 |
| **South Carolina** | – – | N/A |
| South Dakota | – – | – – |
| *Tennessee* | 101% | $3,000 |
| Texas | 150% | $50 |
| **Utah** | 101% | $240 |
| *Vermont[10]* | 186% | $180 |
| **Virginia** | – – | – – |
| Washington | 201% | $0 |
| **West Virginia[11]** | 200% | $852 |
| *Wisconsin[12]* | 151% | $1,500 |
| **Wyoming** | – – | – – |
| **States with premium** | 34 | |

Source: D. Cohen Ross, A. Horn, & C. Marks, "Health Coverage for Children and Families in Medicaid and SCHIP: State Efforts Face New Hurdles," Kaiser Commission on Medicaid and the Uninsured (January 2008).

[1] Premium payments are shown for two children in a family of three. States in *italics* require the premiums noted in their children's Medicaid programs. All other states require premiums in their separate SCHIP programs only. Dashes (– –) indicate that no premiums are required in the program; $0 indicates that no premium is required at this income level; N/A indicates that coverage is not available at this income level.

[2] In California, premiums vary based on whether the family uses the discounted community provider plan. The first amount noted is the premium required under the community provider health plan.

[3] In Georgia, premiums are required only of families with children age six and older.

[4] In Idaho, families with children covered under the state's new "enhanced" plan are not required to pay premiums.

[5] Massachusetts requires premiums in children's Medicaid (children under six are exempt) and SCHIP.

[6] The figures noted for Minnesota are for two people, which could include a parent, and apply only to children covered under the Section 1115 waiver.

[7] In Nevada, although Medicaid covers children in families with income up to 100% or 133% FPL (depending on age), some children with incomes below this level may qualify instead for SCHIP based on the source of income and family composition. These families with incomes of 36% FPL or higher are required to pay premiums.

[8] In Pennsylvania, the premium varies by health plan. The amount notes is an average of the monthly premiums required by the various health plans.

[9] The figures noted for Rhode Island may include coverage for parents.

[10] Vermont requires premiums in children's Medicaid and its separate SCHIP program.

[11] In West Virginia, the premiums noted apply only to children in families with income between 200% and 220% FPL.

[12] The figures noted for Wisconsin may also include coverage for parents. Recipients may have income up to 200% FPL.

Exhibit E

**Waiting Periods[1] for Children in Medicaid/SCHIP**

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| State | At Implementation | July 2007 | Change in Waiting Period since implementation |
| Alabama | 3 months | 90 days | decrease |
| Alaska[2] | 12 months | 12 months | no change |
| Arizona[2] | 6 months | 3 months | decrease |
| Arkansas[2] | 12 months | 6 months | decrease |
| California | 3 months | 3 months | no change |
| Colorado | 3 months | 3 months | no change |
| Connecticut | 6 months | 2 months | decrease |
| Delaware | 6 months | 6 months | no change |
| District of Columbia | None | None | no change |
| Florida | None | 6 months | increase |
| Georgia | 3 months | 6 months | decrease |
| Hawaii | None | None | no change |
| Idaho | 6 months | 6 months | no change |
| Illinois[2] | 3 months | None | decrease |
| Indiana | 3 months | 3 months | no change |
| Iowa | 6 months | None | decrease |
| Kansas | 6 months | None | decrease |
| Kentucky | 6 months | 6 months | no change |
| Louisiana | 3 months | None | decrease |
| Maine | 3 months | 3 months | no change |
| Maryland | 6 months | 6 months | no change |
| Massachusetts[2] | None | 6 months | increase |
| Michigan | 6 months | 6 months | no change |
| Minnesota[2] | 4 months | 4 months | no change |
| Mississippi | 6 months | None | decrease |
| Missouri[2] | 6 months | 6 months | no change |
| Montana | 3 months | 1 month | decrease |
| Nebraska | None | None | no change |
| Nevada | 6 months | 6 months | no change |
| New Hampshire | 6 months | 6 months | no change |
| New Jersey | 12 months | 3 months | decrease |
| New Mexico | 12 months | 6 months | decrease |
| New York | None | None | no change |
| North Carolina | 6 months | None | decrease |
| North Dakota | 6 months | 6 months | no change |
| Ohio | None | None | no change |
| Oklahoma | None | None | no change |
| Oregon | 6 months | 6 months | no change |
| Pennsylvania[2] | None | 6 months | increase |
| Rhode Island | 4 months | None | decrease |
| South Carolina | None | None | no change |
| South Dakota | 3 months | 3 months | no change |
| Tennessee | None | 3 months | increase |
| Texas | 3 months | 90 days | decrease |
| Utah | 3 months | 90 days | decrease |
| Vermont | 1 month | 1 month | no change |
| Virginia | 12 months | 4 months | decrease |
| Washington | 4 months | 4 months | no change |
| West Virginia[2] | 6 months | 12 months | increase |
| Wisconsin[2] | 3 months | 3 months | no change |
| Wyoming | 1 month | 1 month | no change |
| States with 12-month waiting periods | 5 | 2 | |
| States with 6-month waiting periods | 17 | 16 | |
| States with waiting periods of 4 months or less | 18 | 19 | |
| States with no waiting periods | 11 | 13 | |

Source: D. Cohen Ross, A. Horn, & C. Marks, "Health Coverage for Children and Families in Medicaid and SCHIP: State Efforts Face New Hurdles," Kaiser Commission on Medicaid and the Uninsured (January 2008).

[1] "Waiting period" refers to the length of time a child is required to be uninsured prior to enrolling in health coverage. Exceptions to the waiting period vary by state. They generally apply to separate SCHIP programs only, unless otherwise noted. Waiting periods are not permitted in Medicaid without a waiver.

[2] Waiting periods noted do not apply to the entire program and apply to a subset of children, generally those with higher incomes; note that Illinois has a 12-month waiting period in the state-funded portion of its program for children above 200% of the FPL.

**Exhibit F**

**States That Enacted But Had Not Received Federal Approval  for Medicaid/SCHIP Coverage Expansions Above 250 Percent of the Federal Poverty Level Prior to August 17, 2007**

| State | Eligibility as of 8/17/07 | Enacted Eligibility | | Status as of 4/1/08 |
|---|---|---|---|---|
| | | Income Level | Date Enacted | |
| Illinois | 200% | 300% | 11/15/05 | Coverage from 200-300% FPL is state-funded |
| Indiana | 200% | 300% | 5/10/07 | Expansion plan limited to children up to 250% FPL due to the directive |
| Louisiana | 200% | 300% | 7/10/07 | Received approval from CMS to expand coverage only up to 250% |
| New York | 250% | 400% | 4/9/07 | CMS denied expansion 9/7/07; coverage from 250-400% FPL will be state-funded |
| North Carolina | 200% | 300% | 7/31/07 | Due to the directive, the state is exploring options for expansion |
| Ohio | 200% | 300% | 6/30/07 | CMS denied Medicaid expansion to 300% FPL on 12/20/07; on 2/5/08 the state submitted a SCHIP state plan amendment limiting the expansion to 250% due to the directive |
| Oklahoma | 185% | 300% | 6/4/07 | Due to the directive, the state plans to limit premium assistance coverage up to 250% FPL through an 1115 waiver |
| Washington | 250% | 300% | 3/13/07 | Implementation is scheduled to begin in January 2009; no state plan amendent has yet been filed |
| West Virginia | 200% | 300% | 4/3/06 | Implemented a limited expansion to 220% in January 2007, in part due to the directive |
| Wisconsin | 185% | 300% | 10/26/07 | Received CMS approval to 250% FPL; due to the directive, coverage from 250-300% FPL is state-funded |

Source: Center for Children and Families analysis of state programs, legislation, and SCHIP state plans.