UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :

STATE OF NEW YORK, STATE OF ILLINOIS, STATE OF     ECF CASE
MARYLAND, STATE OF WASHINGTON,
                           Plaintiffs,     :   07-CV-8621 (PAC) (RLE)

                 :

          - against -                     : **DECLARATION OF**

UNITED STATES DEPARTMENT OF HEALTH AND        **JUDITH ARNOLD**
HUMAN SERVICES,
                 :

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JUDITH ARNOLD hereby declares the following to be true and correct under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am now, and have been since January 2007, the Director of the Division of Coverage and Enrollment, Office of Health Insurance Programs, of the New York State Department of Health ("NYSDOH") . In that position, I am responsible for supervising all aspects of New York State's coverage and enrollment policy and operations under the State Children's Health Insurance Program, Title XXI of the Social Security Act, 42 U.S.C. §§ 1397aa-jj ("SCHIP"), as well as its submissions to and communications with the Center for Medicare and Medicaid Services ("CMS"), the office of the United States Department of Health & Human Services ("HHS") that is responsible for the federal government's role in SCHIP. Before assuming my present position, from November 1995 through December 2006, I was the Director of the Division of Policy, Planning and Resource Development of NYSDOH, where I directed New York's Child Health Plus ("CHPlus") Program after it became a federally approved SCHIP program in 1998.

2. I have devoted my entire professional career - approximately 25 years - to the field of public health, after obtaining a B.A. degree in Political Science and Community Health from the University of Rochester in 1981 and a Masters of Public Policy from the University of Michigan Institute for Public Policy Studies in 1983. From 1983 to 1985, I served as a Policy Research Associate at the Office of the Assistant Secretary for Planning and Evaluation of the defendant HHS. Thereafter, from 1985 to 1995, I was Vice President of the Lewin Group in Fairfax, Virginia, where I directed policy analysis and research projects for federal and state government and private sector clients on strategies for expanding coverage for the uninsured and other health care financing delivery issues.

3. I make this declaration in opposition to the motion by the defendant, HHS, for judgment dismissing the complaint and in support of plaintiffs' motion for partial summary judgment. The facts contained in this declaration are derived from my own knowledge, the records of NYSDOH kept in the ordinary course of its operations and information provided to me by NYSDOH personnel.

## SCHIP AND THE FEDERAL POVERTY LEVEL (FPL)

4. SCHIP is a joint federal-state program that was first enacted by Congress in 1997. Under SCHIP, states provide health coverage to uninsured children in families whose incomes are too high to be eligible for Medicaid but still too low to afford other health insurance, and the federal government reimburses the states for a substantial portion of their expenditures. The federal government makes matching funds available to states with approved SCHIP plans through capped allotments, based on a formula that takes into account the number of low-income children in a state. 42 U.S.C. § 1397dd. To be eligible for matching funds under SCHIP, a state

2

must submit a state child health plan for approval by CMS. A state may amend its approved state
child health plan in whole or in part at any time by submitting a state plan amendment to CMS for
approval.

      5.  In general, the SCHIP statute permits a state to cover a child who is either (a) a
"low income child" or (b) a child whose family income, "as determined under the State child
health plan," exceeds, but is no more than 50 percentage points above, the state's medicaid
eligibility standard. A "low income child" is in turn defined in 42 U.S.C. § 1397jj(c)(4) as
children "whose family income is at or below 200 percent of the poverty line for a family of the
size involved." As indicated in 42 U.S.C. § 1397jj(c)(5) and by reference in the Community
Service Block Grant Act, 42 U.S.C. § 9902(2), the "poverty line" refers to the figures annually
updated by HHS in January or February of each year in the Federal Register. Although  HHS
prefers to refer to them officially as "poverty guidelines," they are commonly referred to in both
federal and state agencies and the literature as the "federal poverty level" (FPL) and for any year
they are the same throughout the contiguous 48 states and the District of Columbia, with separate
guidelines only for Hawaii and Alaska. For 2007 the FPL  was fixed by HHS for a family of three
at $17,170 and for a family of four at $20,650;  in January of 2008, these figures were increased to
$17,600 and $21,200 respectively. 72 Fed. Reg. 147; 73 Fed. Reg. 3971.

## NEW YORK'S PARTICIPATION IN SCHIP
## AND ITS RESULTS

      6.  The state enacted the program that New York calls Child Health Plus
("CHPlus"), which is contained in Sections 2510 and 2511 of the New York Public Health Law,
in 1991, before enactment of the federal SCHIP program. CHPlus became a federally approved

3

SCHIP plan in 1998. As of August 2007, nearly 400,000 children were enrolled in CHPlus. Based on CMS reports of children enrolled at any time in the federal fiscal year 2007, ours is the third largest SCHIP program in the nation.

7. Since July 1, 2000, New York's CHPlus plan, with the approval of CMS, has provided coverage to children whose families' effective income is at or below 250 percent of FPL. NY Public Health Law, § 2511(2)(a)(ii). New York is one of 20 states that have extended eligibility under their SCHIP plans to children whose family effective income exceeds 200 percent of FPL, with CMS' approval. We have accomplished this expansion of coverage by disregarding a portion of a family's effective income when determining program eligibility. This practice, commonly used by many states throughout the years that SCHIP has been in effect, is based on the discretion afforded the states by the statute to determine how to calculate family income and to disregard income in making the calculation. See, 42 U.S.C. § 1397bb(b); 42 C.F.R. § 457.320.

8. Although the CHPlus program is distinct from New York's Medicaid program, they are related: children who are in families with incomes below 200 percent of FPL for children under age one, 133 percent for children aged one through five and 100 percent for children aged six through eighteen qualify for Medicaid in New York. These eligibility levels reflect net income, after deductions from gross income for certain expenses and disregards. Thus, pursuant to the mandate in the SCHIP statute of procedures to ensure that children eligible for Medicaid be enrolled in that plan [42 U.S.C. § 1397bb(b)(3)(B)], in 2007 more than 80% of the children insured by the New York Medicaid and CHPlus programs combined were covered by Medicaid, rather than CHPlus. As a result, 97% of all enrolled children, either in Medicaid or CHPlus, were from families with incomes below 200% of the federal poverty level, as illustrated in the chart

4

attached to this declaration as Exhibit 1.

      9.  From 1997 (the year before SCHIP implementation) to 2006 (the most recent data available), New York reduced the number of uninsured children in the state by 41 percent, according to data from the Current Population Survey as revised by the United States Census Bureau.[1]  Annexed hereto as Exhibit 2 is an "Issue Brief" entitled New York's SCHIP Program Improves Health Care Access, Continuity, and Quality, published in 2007 by the Child Health Insurance Research Initiative, a research collaborative partially funded by the Agency for Healthcare Research and Quality and the Health Resources and Services Administration (both of them divisions of the defendant HHS).  Among other things, its authors found that during SCHIP enrollment in New York, the proportion of enrollees with a regular source of care increased from 86% to 97%;  the proportion of children receiving preventative health care visits increased from 74% to 82%; and the unmet health care needs among enrollees decreased by more than one-third.  Moreover, the authors of this study also found that the long-term uninsured and lowest-income children, who were most disenfranchised before SCHIP enrollment, demonstrated the most dramatic gains after enrollment.

### NEW YORK'S 2007 EXPANSION OF ITS PROGRAM AND ITS PROPOSED PLAN AMENDMENT

      10.  In early 2007, the New York Legislature enacted, and on April 9, 2007, the

---

[1]  This calculation is derived from supporting statistics published by the United States Census Bureau as part of the Current Population Survey (CPS), which is found (with some technological difficulty) at http://www.census.gov/hhes/www/hlthins/historic.hihistt5.html and . http://www.census.gov/hhes/www/hlthins/historic/hlthin05/hihistt5 and is adjusted to account for a Census Bureau revision in its data in March 2007.

Governor signed into law, an amendment of the New York Public Health Law, §§ 2510-2511, that extended eligibility under the CHPlus program to uninsured children whose families' gross income is at or below 400 percent of the FPL, contingent upon the availability of federal financial participation. On or about April 12, 2007, in accordance with the newly enacted state law, the NYSDOH submitted a state plan amendment to CMS, referred to as "SPA (i.e., State Plan Amendment) #10."

**The Expansion of Coverage**

11. Included in SPA #10 was a provision to expand coverage for children with family gross income up to 400 percent of FPL, primarily by using income disregards: for example, for a family whose gross income was 250 percent of FPL, an income disregard of 50 percent of the FPL would be applied, but for a family whose gross income was 400 percent of the FPL, the income disregard would be 200 percent of FPL. Coverage was not free, however. Families were required to pay monthly premium amounts per child that rose with family income.

12. I and my office played an important role in the development and submission of SPA #10. We chose to expand the SCHIP program to 400% of FPL as a way to ensure that all uninsured children in the state had access to affordable health insurance. The 2007 Current Population Survey (CPS) compiled by the United States Census Bureau had showed us that the fastest growing group of uninsured children in New York was the group between 250% and 400% of the FPL. More specifically, based on data in the CPS,[2] my office has calculated not only that the overall number of uninsured children under 19 in New York had increased from 2005 to 2006 by 5 percent, but also that the number of uninsured children between 250% and 400% of the FPL

---

[2] http://www.bls.census.gov/cps_ftp.html#cpsmarch

6

had increased by 33 percent. Our calculations, all based on data from the CPS, are shown in
Exhibit 3.

13. Another important factor that led us to the conclusion that expanding coverage
of New York's CHPlus Plan up to 400 percent of the FPL was necessary was the significant
disparity between the cost of living in New York and that in other states. It has always been my
understanding that one reason that the SCHIP statute on its face, and CMS in its past approval
procedures, permitted the states flexibility in calculating income for eligibility purposes was the
different purchasing power represented by the nationally uniform FPL in different states. In our
dealings with CMS over the years (until last year), there was a consensus that a national program
such as SCHIP that targets low-income children must recognize this gradient in purchasing power
among states and permit states to translate the income-level requirements into terms that are
locally appropriate.

14. The cost of living in New York State is among the highest in the nation, and
the downstate New York counties are even higher. For example, annexed hereto as Exhibit 4 is a
comparison of the recent cost of living, both overall and in various categories of goods and
services, in Milwaukee, Wisconsin, and various parts of the State of New York, derived from the
commonly used "ACCRA" Cost of Living Index from the website of the Council for Community
and Economic Research.[3] Even putting aside Manhattan, in which the composite cost of living is
more than 214 percent of the national average, Queens County is more than 149 percent and
Nassau County is almost 154 percent of the national average. Because New York City and the
suburban counties of Nassau and Westchester account for more than half the population of New

_____

[3] http://www.coli.org/

7

York State and two thirds of uninsured children, the flexibility in determining income that was built into the SCHIP statute and regulations (and that CMS had long sanctioned) has been critical to the operation of New York's CHPlus Plan.

15. A graphic illustration of how the disparity among states in the cost of living affects SCHIP can be derived from Exhibit 4 and Exhibit 5, which contain the cost of living in other cities across the country, ranging from Grand Rapids, Michigan at 2.9 percent above to Columbia, South Carolina at 10.5 percent below the national average. Taking as an example Tennessee, which has an approved SCHIP plan that covers up to 250% of the FPL, that 250% coverage would apply to children in Memphis whose family income (at 2008 FPL figures) is $44,000 for a family of three and $53,000 for a family of four. Since the Memphis cost of living is 89.7 percent of the national average (Exhibit 5), and the cost of living in Queens County, New York, is 149.4 percent of the national average, to obtain the same purchasing power in Queens would require an income of $73,282 for a family of three and $88,272 for a family of four.

**Substitution and Crowd-Out**

16. The federal SCHIP statute requires that a state plan include, among other things, descriptions of procedures to ensure that insurance provided under the plan "does not substitute for coverage under group health plans." 42 U.S.C. § 1397bb(b)(3)(c). Substitution is not defined in the statute, but it is most commonly understood to refer to the explicit dropping of private coverage in favor of public coverage. The term substitution is sometimes used loosely and imprecisely as if it referred to the more general "crowding out" of private coverage, which can occur for any number of reasons, unrelated to an applicant's own actions. While the SCHIP statute does not define substitution, my understanding is that the direction in the SCHIP statute,

8

which does not use the term "crowd-out," is intended to address the narrower "substitution." [4]
New York had not found in its past experience with SCHIP that such substitution has been a
problem : the most recent data available when we filed SPA#10 showed that only 1.3 percent of
our new SCHIP enrollees had dropped insurance from group health plans to enroll in CHPlus.[5]  In
its new plan, New York proposed to deal with potential substitution in two ways: (a) by providing
that to be eligible for benefits, an applicant must not have had private employer-based coverage
during the preceding six months unless that coverage had been dropped because of certain listed
factors beyond the applicant's control, such as involuntary loss of employment or death of a
family member; and (b) by requiring families to contribute a monthly premium toward the cost of
their coverage in higher amounts as they move up the income scale, on a per child basis up to a
family cap.

**Our Reliance on CMS' Past Practice**

17. When we drafted the revisions of the New York CHPlus law that were enacted
in April 2007, and when we filed New York's SPA#10 application, we were confident that CMS
would approve the expansion of coverage we envisioned,  based on the prior ten-year history of
approvals in other states.  Exhibit 7 attached hereto shows the SCHIP plans that CMS has

---

[4] See Exhibit 6, an article published by the Center on Budget and Policy Priorities in
September 27, 2007, explaining the distinction.

[5] New York's current plan, which CMS approved, monitors substitution rates statewide
and would require a six- month "period of uninsurance" for a family that has dropped private
coverage only if the rate of substitution is found to exceed eight percent.  Since the rate of
substitution has been consistently lower than eight percent, New York has never had to impose
such a period of uninsurance.  In agreeing to an 8 percent trigger, CMS acknowledged that some
level of substitution is acceptable in SCHIP.

9

approved over the last ten years and that provide for eligibility above 250% of FPL, as assembled

from the information available to us. Although we prepared this chart more recently, we were

generally aware of these approvals and the outlines of the plans approved in other states prior to

the submission of SPA#10. As indicated on Exhibit 7, CMS has approved SCHIP eligibility

expansions in 17 states at "effective" income levels higher than 250% of FPL (the term

"effective" income is used by CMS to mean gross income before any permissible income

deductions). States have been permitted to allow deductions to income for certain expenses (e.g.,

child care) and also to disregard certain income. Exhibit 7 also shows a history of CMS approval

of crowd-out procedures more lenient than that proposed by New York. For example, of the 17

states approved with effective eligibility over 250% of poverty, 10 have approved periods of

uninsurance of less than six months; none require such a period of more than six months. Indeed,

in 2005, CMS allowed several states to reduce the length of their waiting periods.

18. Since such flexibility was consistent with the SCHIP statute and regulations,

we did not anticipate a serious problem in obtaining CMS' approval. When CMS posed

voluminous questions directed at our application throughout May, June and July 2007 (see, e.g.,

Exhibit 8, a letter dated July 19, 2007, from Kathleen Farrell, CMS' SCHIP Director), we

hastened to respond promptly, both orally and in writing, in order to expedite the anticipated

approval. We were therefore surprised when we received the letter dated August 17, 2007, from

Dennis G. Smith of CMS addressed to "State Health Official" (Exhibit 9, "the August 17 Letter").

### CMS' AUGUST 17, 2007 DIRECTIVE AND
### ITS REJECTION OF NEW YORK'S PLAN
### AMENDMENT

19. In the August 17 Letter, CMS decreed substantial - indeed, startling - changes

10

in the flexibility afforded the states in the SCHIP statute and regulations and that had been the *modus operandi* under SCHIP at least during the ten years I have been directly responsible for administration of New York's CHPlus Program. For example, it stated that any state that now covers or plans to cover children in families whose effective income is above 250 percent of the FPL must as a precondition provide CMS with mandatory "assurances" (a) that it has already enrolled at least 95 percent of the children in the state below 200 percent of FPL who are eligible for either SCHIP or Medicaid, and (b) that the number of children in the "target population" who are currently insured through private employers has not decreased by more than two percentage points over the past five years. In addition, the August 17 Letter announced that for states that expand eligibility beyond 250 percent of the FPL, CMS "will expect" that not one, or even two or three, but five different strategies be employed to prevent crowd-out and that as part of those strategies (c) the cost sharing requirement of the public plan "must not" be more favorable than competing private insurance plans by more than one percent of the family income unless it is fixed at the maximum figure allowed of five percent of the family's income, and (d) the state "must" establish a minimum period of uninsurance for a child receiving coverage of at least one year. Neither the SCHIP statute nor its regulations contain these requirements.

20. After the receipt of the August 17 Letter, we again conferred by telephone with the CMS staff on August 20 and were told by Kathleen Farrell, Director of CMS' SCHIP Division, that New York's proposed amendment would be expected to comply with the requirements of that letter, which were now mandatory, and that although CMS would consider alternative methods of implementing them, it would adhere to these requirements. Thereafter, we submitted written responses to CMS' most recent questions addressed to New York's plan, as well

11

as objections to the requirements of its August 17 Letter. Included in our submission were a number of adjustments designed to accommodate CMS' concerns without sacrificing the Plan's objectives, such as increasing the premium contributions to be required from families of covered children to meet the new requirement that cost-sharing not be more favorable to the public program by more than one percent of the average cost of employer coverage. In our submission, we eliminated most of the exceptions to the period of uninsurance.

21. By letter dated September 7, 2007 (Exhibit 10), CMS advised us that it was disapproving New York's SPA#10, on the grounds

(a) that New York "has failed to provide assurances that the State has enrolled at least 95 percent in the core targeted low-income child population, those with family incomes below 200 percent of the FPL" (a requirement that appears nowhere in the SCHIP statute or regulations) and that "[s]uch assurances are necessary" as "outlined in an August 17, 2007, letter to State Health Officials;" and

(b) that New York has not met the requirement for "reasonable procedures" to prevent substitution because (i) its proposal does not include procedures to prevent such substitution that include a 1-year period of uninsurance for populations over 250 percent of FPL, and (ii) its proposed cost-sharing is more favorable to the public plan than competing private plans by more than one percent of the family income and is not set at the 5 percent family cap. The September 7, 2007 Letter then states that its disapproval of New York's Plan is "consistent with the August 17, 2007, letter to State Health Officials."

### NEW YORK'S REQUEST FOR RECONSIDERATION

22. By letter dated October 31, 2007 (attached as Exhibit 11), we requested

reconsideration of CMS' disapproval, because its sole basis was New York's failure to meet

newly imposed standards and required assurances set forth in the August 17 Letter, the legality of

which we challenged. In response, we received a letter from Kerry Weems, Acting Administrator

of CMS, dated November 30, 2007 (Exhibit 12), that ignored our proposed grounds for

reconsideration. Rather, Ms. Weems framed the issues to be determined at the reconsideration

hearing without any mention of the August 17 Letter or its requirements. On December 6, 2007, a

notice of hearing appeared in the Federal Register, 72 Fed Reg. 68888, that stated the issues at the

hearing as framed by Ms. Weems. The administrative hearing arising from this notice was

postponed by the hearing officer without date to permit discovery and briefing, and a new date for

the hearing has not yet been set.

## THE IMPACT OF THE AUGUST 17, 2007
## DIRECTIVE ON NEW YORK

23. New York cannot comply with the conditions imposed in the August 17 Letter

and upon which CMS relied in rejecting New York's plan:

(a) First, 95 per cent participation is an unrealistic standard for programs

that are means-tested and for which people have to apply and be regularly reviewed for eligibility.

Indeed, even Medicare, which automatically enrolls people without any means-testing, only has a

participation rate of about 95 percent of those eligible.

(b) Second, I am aware of no data that provides information on

immigration status, family composition, Medicaid-allowed deductions, and other variables that are

required to estimate the SCHIP-eligible population of children. No state has ever to my

knowledge demonstrated that it has achieved SCHIP enrollment of 95 percent of eligible children

13

who are below 200 percent of FPL. New York's very active efforts to reach and cover all eligible people has produced an SCHIP enrollment that is a high percentage of our low-income population. However, demonstrating that we have enrolled a specified percentage of the eligible population requires information that is unavailable to us and the other states. Using the incomplete information available from CPS, we can demonstrate a participation rate of only approximately 88 percent, under certain assumptions.

(c ) Third, a major reason we proposed expanding coverage significantly beyond 200 percent of FPL is that making eligibility available to children with higher family income is often an effective way of reaching more low-income children because an inclusive coverage raises awareness of the programs and brings in families who are eligible for a government program but did not perceive themselves as eligible. We had that experience in New York when we increased the eligibility level for SCHIP (to 250 percent of the FPL) and Medicaid enrollment increased by 30 percent. Similarly, Mathematica Policy Research, Inc. (a leading source of statistical data and research in this field that is frequently commissioned by CMS) studied the Santa Clara, California, Children's Health Initiative (CHI), which combined state and federally funded Medicaid with another program funded by county and local dollars to open health insurance enrollment to all children with household incomes below 300 percent of FPL. It found that the expanded effort led not only to a 28-percent increase in new enrollments in the two programs together, but a 23-percent increase in new enrollments in Medicaid alone.[6] I have also

---

[6] Mathematica Policy Research, Inc., *The Impact of Children's Health Initiative (CHI) of Santa Clara County on Medi-Cal and Healthy Families Enrollment*, September 2004. http://www.mathematica-mpr.com/publications/redirect_pubsdb.asp?strSite=PDFs /impactchildrens.pdf.

14

been advised that Illinois had a similar experience when it introduced a universal children's coverage program, initially enrolling 166,000 children, 70 percent of whom had been previously eligible but uninsured. Thus, it is New York's empirically informed view that expansion to a higher-income population will be an effective step toward enrolling more children in families with effective income below 200 percent of FPL. We share the goal of enrolling all low-income children in SCHIP, and we believe the choice of an effective strategy to achieve that goal rests with the states.

24. CMS' insistence on a one-year period of uninsurance for children over 250 percent of FPL before they can be covered by the state's plan, especially if exceptions are prohibited or limited, is impossible for New York to adopt for generally accepted public health reasons: requiring children to remain uninsured for such a long period increases the risk to their health and development. A recently published study that focused on New York's SCHIP program indicates that children insured by SCHIP are more likely than the uninsured to have a usual source of care and that children without such a usual source of care are more likely to have unmet care needs and/or inappropriate visits to the emergency room.[7] Additional research indicates that gaps in insurance coverage result in children delaying care, and obtaining inappropriate care and costlier care; children with gaps in health care coverage greater than six months have been shown to have the highest rates of unmet needs; compared with those insured for a full year, children with gaps in coverage are less likely to report that they have a usual source of care other than an emergency room; and research done in Washington State indicates that uninsured children visited

---

[7] Klein, et al., "Impact of the State Children's Insurance Program on Adolescents in New York," *Pediatrics*, Vol. 119, No. 4, April 2007.

15

an emergency room more than twice as often during a 6-month period as children with no gap in coverage.[7] I am aware of no state with eligibility levels above 250 percent of FPL that imposes a one-year waiting period and neither the SCHIP statute nor regulations require it. Nor does any state SCHIP program require cost-sharing by the covered child's family as high as the August 17 Letter requires, which is the very maximum permitted to the states by the statute.

25. CMS' imposition of the requirements of the August 17 Letter means that New York will be unable to obtain federal funding for the expansion of its CHPlus Program that is now contained in Sections 2510-2511 of the New York Public Health Law. In the Governor's original budget message in January 2008, he proposed to provide for State-only funds to fully finance the planned expansion in the event that federal funds continued to be unavailable. In April 2008, the New York Legislature enacted this provision at an additional cost to the state of $118 million over the next two and a half years. CMS' introduction of the requirements of the August 17 Letter has delayed health insurance coverage to the estimated 72,000 children in New York families with income between 250 and 400 percent of FPL by one year. If CMS had approved the state plan amendment, the expansion would have been effective in September 2007; now it will be effective with state funding in September 2008.

## HHS' MOTION PAPERS

26. I have read the Memorandum of Law submitted by the attorneys for HHS in support of their motion to dismiss this action. It contains a number of factual statements and

---

[7] Summer and Mann, *Instability of Public Health Insurance Coverage for Children and Their Families: Causes, Consequences, and Remedies* (Georgetown University Health Policy Institute: Washington, DC & The Commonwealth Fund: New York, NY, June 2006) 14-15.

16

assumptions that are incorrect or misleading. Most striking is its effort to portray the August 17

Letter as a general statement of policy - that is, a course CMS intends to follow in the future -

rather than a final agency action and its argument that CMS would be flexible in working out

exceptions with the states. See, e.g., Defendant's Memorandum of Law, pp. 14-17. However, this

view of the Letter as if it were mere "talking points" is inconsistent with the position clearly stated

to us and to other states by the CMS staff itself. When in the course of processing New York's

SPA#10 we complained to CMS about the new requirements in the August 17 Letter, CMS did

not "stop the clock" on the processing procedure (a common practice of CMS in the past), or ask

us more questions or explore alternatives; rather, it simply denied the approval outright. Jean

Sheils of the CMS staff advised me and one of my colleagues by telephone that by order of CMS'

Director, Dennis Smith, there could be no exceptions to the new waiting-period requirements. Mr.

Smith said the same thing on a conference call with the National Association of Medicaid

Directors in which I participated. During the discussions, we even offered to consider a twelve-

month waiting period if certain exceptions could be included; Kathleen Farrell and Jean Sheil told

us that there would be no exceptions allowed. That CMS' disapproval of New York's SPA#10

was based on the specific requirements of the August 17 Letter, rather than the more general

standards of the statute and regulations, is demonstrated by Exhibit 13, an internal CMS e-mail

dated September 6, 2007, containing "talking points" on the planned disapproval (the next day)

that included New York's failure to comply with the 95%, twelve-month period of uninsurance

and cost-sharing requirements. We received a copy of this letter from CMS in discovery in our

pending administrative proceeding.

27. In January 2008, CMS sent to the SCHIP directors of states that covered

17

children above 250 percent of FPL a letter (Exhibit 14) that reaffirmed that such states "have 12 months or until August 16, 2008, to come into compliance with the required crowd-out strategies and assurances laid out in the August 17[th] SHO for new enrollees." This letter (signed by Susan Cuerdon, Acting Director of CMS) assured the states of CMS' intention to "work cooperatively" to permit enrollment of higher income children, but only "if the reasonable standards of the August 17th guidance are met."

      28. At no time in its dealings with us in New York did CMS ever suggest that the requirements of the August 17 Letter were anything less than mandatory and an absolute condition to the approval of any expansion of our SCHIP plan to families above 250 percent of FPL.

Dated: Albany, New York
    April _10_, 2008

                                      JUDITH ARNOLD

# EXHIBIT 1



**NYS CHILDRENS HEALTH INSURANCE ENROLLMENT by FEDERAL POVERTY LEVEL**

160-200% FPL
4%

201-250% FPL
3%

<160% FPL
93%

Source: New York State Department of Health program data: CHPlus - KIDS October 2007; Medicaid - eMedNY Data Warehouse October 2007 as of 1/31/2008

# EXHIBIT 2

# New York's SCHIP Program Improves Health Care Access, Continuity, and Quality



Since 1997, States have used the State Children's Health Insurance Program (SCHIP) to provide health insurance coverage to low-income children who are ineligible for Medicaid but lack private health insurance. SCHIP provided health care coverage to over 5.3 million children nationwide in fiscal year 2002, 15 percent of whom were enrolled in New York. Policymakers are interested in understanding the impact of SCHIP on the health care children receive.

This Issue Brief summarizes findings from a Child Health Insurance Research Initiative (CHIRI™) project that examined the impact of the New York SCHIP program on access, quality and utilization of health care services for SCHIP enrollees.

Overall highlights include:

- The proportion of enrollees with a regular source of care reached nearly universal levels as a result of SCHIP (an increase from 86% to 97%).

- A greater proportion of children received preventive health care visits (an increase from 74% to 82%).

- Unmet health care needs among enrollees decreased by more than one-third (from 31% to 19%) after SCHIP enrollment.

- The proportion of enrollees who used their regular source of care for all health care visits nearly doubled (from 40% to 77%).

- Families of SCHIP enrollees gave higher ratings of satisfaction with health care after SCHIP enrollment compared with before.

Highlights for particularly vulnerable children include:

- Racial disparities in access, unmet need, and continuity of care were eliminated.

- The long-term uninsured and lowest-income children, who were most disenfranchised before SCHIP enrollment, demonstrated the most dramatic gains after enrollment.

- Parents of children with asthma or special health care needs were more satisfied and better able to afford care and medications for their child's condition.



"Enrollees were more likely to obtain their health care from a regular source during enrollment in SCHIP."

## WHAT WAS LEARNED

Researchers interviewed families of SCHIP enrollees about their child's health care experiences one year before and one year after enrollment in the New York SCHIP program – Child Health Plus. The study included a special focus on racial disparities, children with asthma, and children with special health care needs (CSHCN).

### SCHIP Improved New Enrollees' Access to Care

Most SCHIP enrollees (97%) had a regular source of care after SCHIP enrollment. Fewer families of SCHIP enrollees reported problems in accessing a health care provider by phone or in getting an appointment after enrollment compared with before enrollment. More children used preventive care services as a result of SCHIP (an increase from 74% to 82%). There were no significant changes in utilization of emergency rooms or in mental health, specialty, acute, or dental care.

The proportion of enrollees who had any unmet health care need decreased from 31% before to 19% after SCHIP enrollment for all three racial/ethnic groups studied; to levels commonly found for other types of health insurance. Despite reductions, unmet needs remained high for mental health care (24% of children still reporting an unmet need after SCHIP enrollment), dental care (15%), specialty care (11%), and vision care (11%) (see Figure 1).

### SCHIP Families Reported Improved Continuity and Quality of Health Care

More SCHIP enrollees utilized their regular source of care for health care services instead of going to other or multiple sources of care. The proportion of enrollees who used their regular source of care for all or most of their health care visits nearly doubled (from 47% to 89%). Here, too, racial disparities that were present before SCHIP were eliminated during SCHIP, with large improvements among Hispanic children (See Figure 2).

Families of SCHIP enrollees rated the quality of interactions with their child's primary care provider more highly after SCHIP enrollment as compared with before enrollment. One year after SCHIP enrollment, there was a significant increase in the percentage of families who indicated that their provider regularly or always: listens carefully to them; explains things in understandable terms; respects what they have to say; and spends enough time with them. Racial disparities in satisfaction persisted, however, with lower reported satisfaction among parents of Hispanic children relative to their black or white counterparts.

#### Figure 1: Unmet Needs by Service Before and After SCHIP Enrollment



#### Figure 2. Most/All Visits to Regular Source of Care by Race Before and After SCHIP Enrollment



Parent's overall ratings of their child's health remained largely unchanged — most children were reportedly healthy before SCHIP and remained that way. A small percentage of parents reported that their child's health improved, whereas less than 1% reported that the child's health was worse. Consistent with other studies, fewer parents worried about their child's health after enrollment as compared with before. Indeed, other studies confirm that having health insurance can reduce family stress and ease family burdens.

### The Most Vulnerable Children Experienced Important Gains from SCHIP

In addition to the overall improvements noted above, health insurance programs face added challenges in meeting the needs of particularly vulnerable children. SCHIP demonstrated success in meeting some of the specialized needs of children with asthma or other special health care needs.

### (AFTER ENROLLING IN SCHIP)

#### Children with asthma experienced:

- Fewer asthma-related attacks (decreasing from 9.5 to 3.8 per year)
- Fewer medical visits for asthma (from 3.0 to 1.5)
- Fewer difficulties getting to their usual doctor's office for asthma care (from 13% to 1% having problems)

#### Children with special health care needs (CSHCN) experienced:

- Fewer unmet healthcare needs for specialty care (from 40% to 19%)
- Improved continuity with their usual doctor's office (53% to 81%)
- Higher parent rating of healthcare

## CONCLUSION

During SCHIP enrollment, families had better access to care and were more likely to use a regular source of care. Other studies have found that such continuity with a single source of care is associated with higher quality care and with greater parent satisfaction.

The proportion of families reporting unmet medical needs dropped overall, yet remained at nearly 20% even after SCHIP, with notable need for mental health, dental and vision care. Although more efficient care delivery and reduced fragmentation of care across multiple sites may contribute to reduced unmet need, the remaining unmet need highlights that families face continued non-financial barriers to care and that efforts beyond the provision of health insurance may be needed.

"More children received preventive care, but unmet needs for mental health, dental, and vision care remained equivalent to those found with other types of insurance."

## POLICY IMPLICATIONS

These findings highlight several benefits of SCHIP and suggest strategies that other states can use to improve health care access and quality for low-income children.

- Investments in public health insurance programs for low-income children produce significant improvements in health care access and quality, especially for the most the most vulnerable.

- Low-income children are likely to enroll in SCHIP with significant unmet health care needs. SCHIP benefit packages and delivery systems should be designed to accommodate a variety of health care needs among enrollees to help ensure that the needs of enrollees are adequately met.

- Specialty services, particularly dental, mental health and vision care may warrant focused programmatic efforts and strategies to reduce barriers to care.

## STUDY METHODOLOGY

This CHIRI Issue Brief is based on a pre/post-study of children enrolled in the New York SCHIP program – Child Health Plus – between 2001 and 2002. Families of first-time SCHIP enrollees were interviewed soon after enrollment and again 13 months after enrollment. Baseline interviews reflect the child's health care experiences one year prior to SCHIP enrollment; follow-up interviews reflect health care experiences during the first year of SCHIP enrollment. One child was randomly selected as the "study" child from each family. Researchers used a comparison group to establish that SCHIP, instead of other influences, was responsible for the changes between the two time periods.

Telephone interviews were conducted in 2001 with the adult in the household most knowledgeable about the child's health insurance and medical care.

Children whose parents completed both surveys (87% of baseline respondents also completed the follow-up for a total of 2,290 families) were included in the analyses. Participation in the study was limited to non-Hispanic white, non-Hispanic black, and Hispanic SCHIP enrollees.

Measures of health care access, utilization and quality were tabulated separately for the year before enrollment and the year after enrollment in SCHIP. Statistical significance was tested using both bivariate and multivariate statistical analyses to assess the change in outcome measures from the year before SCHIP to the one-year period after enrollment in SCHIP. Multivariate analyses to assess SCHIP's impact controlled for demographic and socioeconomic measures.

## SOURCES

Brach C, Lewit EM, VanLandeghem K, et al,.2003. Who's enrolled in SCHIP? Findings from the Child Health Insurance Research Initiative (CHIRI™). *Pediatrics*; 112(6):e499-507.

Damiano PC, Willard JC, Momany ET, Chowdhury J, 2003. The impact of the Iowa S-SCHIP program on access, health status, and the family environment. Ambul Pediatr; 3:263-269.

Dick AW, Klein JD, Shone LP, Zwanziger J, Yu H, Szilagyi PG, 2003. The evolution of SCHIP in New York: changing program features and enrollee characteristics. *Pediatrics* 112(6 pt2):e542

Dick AW, Brach C, Allison RA, et al, 2004. SCHIP's impact on three States: How do the most vulnerable children fare? *Health Affairs*; 23(5):63-75.

Guendelman S, Pearl M, 2001. Access to care for children of the working poor. *Arch Pediatr Adolesc Med; 155:651-658.*

Rosenbaum S, Budetti P, 2003. Low-income children and health insurance: old news and new realities. *Pediatrics* 112:551-553.

Shone LP, Dick AW, Klein JD, Zwanziger J, Szilagyi PG., 2005. Reduction in racial and ethnic disparities after enrollment in the State Children's Health Insurance Program. *Pediatrics* Jun;115(6):e697-705.

Szilagyi PG, Dick AW, Klein JD, Shone LP, Zwanziger J, McInerny T, 2004. "Improved access and quality of care after enrollment in the New York State Children's Health Insurance Program (SCHIP)", *Pediatrics*, 2004;113;395-404.

Szilagyi PG, Dick AW, Klein JD, Shone LP, Zwanziger J, Bajorska A, Yoos HL, 2006. "Improved asthma care after enrollment in the State Children's Health Insurance Program in New York", *Pediatrics* 117:486-496.

## ABOUT CHIRI™

The Child Health Insurance Research Initiative (CHIRI™) is an effort to supply policymakers with information to help them improve access to, and the quality of, health care for low-income children. Nine studies of public child health insurance programs and health care delivery systems were funded in the fall of 1999 by the Agency for Healthcare Research and Quality (AHRQ), The David and Lucile Packard Foundation, and the Health Resources and Services Administration (HRSA). These studies seek to uncover which health insurance and delivery features work best for low-income children, particularly minority children and those with special health care needs.

This Issue Brief is based on the work from the CHIRI™ project, "New York's SCHIP: What Works for Vulnerable Children" (Principal Investigator: Peter Szilagyi).

## CHIRI™ FUNDERS

The Agency for Healthcare Research and Quality, part of the U.S. Department of Health and Human Services, is the lead agency charged with supporting research designed to improve the quality of health care, reduce its costs, address patient safety and medical errors, and broaden access to essential services. AHRQ sponsors and conducts research that provides evidence-based information on health care outcomes; quality; and cost, use and access.

The David and Lucile Packard Foundation is a private family foundation that provides grants in a number of program areas, including children, families and communities, population, and conservation and science.

The Health Resources and Services Administration, also part of the U.S. Department of Health and Human Services, directs national health programs that provide access to quality health care to underserved and vulnerable populations. HRSA also promotes appropriate health professions workforce supply, training and education.

Credits: This CHIRI™ Issue Brief was written by Karen VanLandeghem, Jennie Bonney, Cindy Brach, Lisa Kretz, Peter Szilagyi and Laura Shone.

For a full literature review of SCHIP nationally, see: Shone LP, Szilagyi PG, 2005. The State Children's Health Insurance Program. *Current Opinion in Pediatrics* 17 (December,):764-772.

# EXHIBIT 3

# Uninsured Children under Age 19 in NYS
## by Simulated Eligibility and Family Income

| | 2006 | 2007 | % Change |
|---|---|---|---|
| CPS Survey Conducted: | 2006 | 2007 | |
| Uninsured in Calendar Year: | 2005 | 2006 | |
| | | | % |
| Potentially MA Eligible | 190,681 | 194,155 | |
| CHP Eligible | 104,735 | 89,240 | |
| 251-300% FPL | 17,560 | 16,873 | |
| 301-400% FPL | 38,524 | 55,404 | |
| >400% FPL | 43,247 | 59,445 | |
| **All** | 394,747 | 415,117 | 5% |
| **250% to 400%** | 99,331 | 131,722 | 33% |

# EXHIBIT 4

If you want to calculate the comparable after-tax income, please select from the cities below and enter your after tax income and click on Calculate.

**From:**                    --Please Select--

**Income in From City:**

**To:**                      --Please Select--

Calculate

| Index | Milwaukee- Waukesha , WI | Buffalo , NY | Nassau County , NY | New York (Manhattan) , NY | New York (Queens) , NY | Plattsburgh , NY | National Average |
|---|---|---|---|---|---|---|---|
| Composite (100%) | 100.3 | 101.8 | 153.9 | 214.3 | 149.4 | 99.7 | 100.0 |
| Grocery (13%) | 95.3 | 105.4 | 125.8 | 158.2 | 131.0 | 104.1 | 100.0 |
| Housing (28%) | 106.4 | 90.6 | 241.5 | 400.7 | 219.5 | 95.6 | 100.0 |
| Utilities (10%) | 96.5 | 134.5 | 140.2 | 152.5 | 129.2 | 80.8 | 100.0 |
| Transportation (10%) | 100.2 | 107.5 | 110.2 | 122.6 | 110.4 | 103.9 | 100.0 |
| Health (4%) | 111.1 | 93.4 | 117.4 | 128.4 | 112.8 | 105.0 | 100.0 |
| Miscellaneous (35%) | 97.2 | 99.4 | 114.9 | 139.6 | 121.2 | 105.0 | 100.0 |

**Q42007**

| ITEM | Milwaukee- Waukesha , WI | Buffalo , NY | Nassau County , NY | New York (Manhattan) , NY | New York (Queens) , NY | Plattsburgh , NY | National Average |
|---|---|---|---|---|---|---|---|
| T-Bone Steak | $8.52 | $8.97 | $10.02 | $11.97 | $10.05 | $9.27 | $8.74 |
| Ground Beef | $1.93 | $2.24 | $3.04 | $4.29 | $2.60 | $2.76 | $2.55 |
| Sausage | $3.64 | $3.70 | $3.30 | $4.88 | $3.64 | $3.99 | $3.18 |
| Frying Chicken | $1.00 | $1.23 | $1.86 | $2.07 | $1.57 | $1.09 | $1.08 |
| Chunk Light Tuna | $0.77 | $0.81 | $0.91 | $1.57 | $1.57 | $0.88 | $0.75 |
| Whole Milk | $2.11 | $1.89 | $2.13 | $2.47 | $2.12 | $1.71 | $2.03 |
| Eggs | $1.19 | $1.42 | $1.83 | $2.62 | $2.16 | $1.41 | $1.31 |
| Margarine | $0.75 | $1.25 | $1.82 | $2.10 | $1.91 | $0.72 | $0.85 |
| Parmesan Cheese | $2.98 | $3.64 | $4.35 | $5.62 | $3.97 | $2.94 | $3.41 |
| Potatoes | $3.56 | $4.26 | $5.18 | $6.10 | $4.59 | $3.99 | $3.88 |
| Bananas | $0.50 | $0.49 | $0.66 | $0.77 | $0.75 | $0.57 | $0.51 |
| Lettuce | $1.52 | $1.49 | $1.83 | $2.36 | $1.65 | $1.44 | $1.25 |
| Whitebread | $1.05 | $1.46 | $1.95 | $2.64 | $1.86 | $2.06 | $1.20 |
| Fresh Orange Juice | $3.18 | $3.25 | $3.45 | $4.08 | $3.22 | $3.09 | $3.07 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Coffee | $3.23 | $3.22 | $3.58 | $5.46 | $4.35 | $2.90 | $3.23 |
| Sugar | $1.82 | $1.90 | $2.23 | $2.87 | $2.59 | $1.93 | $1.87 |
| Corn Flakes | $3.60 | $3.23 | $3.82 | $5.33 | $3.94 | $2.76 | $3.08 |
| Sweet Peas | $0.85 | $0.81 | $1.20 | $1.45 | $1.17 | $0.80 | $0.86 |
| Peaches | $1.95 | $1.76 | $2.30 | $2.49 | $2.14 | $1.62 | $1.87 |
| Facial Tissues | $1.89 | $1.69 | $2.48 | $2.67 | $2.44 | $1.66 | $1.85 |
| Detergent | $4.27 | $4.75 | $5.17 | $6.02 | $4.94 | $3.98 | $4.12 |
| Shortening | $3.91 | $3.62 | $3.70 | $4.43 | $4.23 | $3.33 | $3.70 |
| Frozen Meal | $2.57 | $2.84 | $3.65 | $3.71 | $4.02 | $2.36 | $2.53 |
| Frozen Corn | $1.25 | $1.45 | $1.62 | $2.46 | $1.92 | $0.98 | $1.25 |
| Potato Chips | $1.77 | $2.62 | $2.59 | $3.11 | $2.92 | $2.51 | $2.46 |
| Soft Drink | $1.33 | $1.50 | $1.33 | $1.91 | $1.47 | $1.36 | $1.34 |
| Apartment Rent | $773 | $818 | $1,777 | $3,481 | $1,725 | $0 | $779 |
| Home Price | $332,179 | $268,397 | $744,866 | $1,202,800 | $674,978 | $292,599 | $308,108 |
| Total Energy | $165.84 | $210.23 | $234.90 | $260.05 | $197.64 | $81.64 | $162.30 |
| Phone | $23.01 | $37.36 | $34.99 | $36.95 | $36.95 | $33.65 | $26.05 |
| Tire Balance | $9.08 | $10.27 | $10.60 | $14.39 | $11.48 | $8.62 | $9.22 |
| Gasoline | $2.68 | $2.81 | $2.87 | $2.85 | $2.76 | $2.88 | $2.58 |
| Optometrist Visit | $43.95 | $49.44 | $80.76 | $95.00 | $79.50 | $79.15 | $78.62 |
| Doctor Visit | $96.11 | $58.11 | $96.00 | $106.00 | $94.17 | $80.23 | $78.45 |
| Dentist Visit | $92.91 | $69.47 | $90.93 | $110.67 | $85.63 | $77.42 | $70.84 |
| Ibuprofen | $5.76 | $6.20 | $5.95 | $5.70 | $6.07 | $6.61 | $5.86 |
| Lipitor | $125.26 | $132.92 | $142.33 | $133.62 | $135.78 | $130.79 | $124.01 |
| Hamburger | $2.64 | $2.85 | $3.37 | $3.12 | $3.46 | $3.17 | $2.66 |
| Pizza | $9.94 | $10.72 | $10.36 | $9.99 | $9.99 | $9.85 | $10.36 |
| Fried Chicken | $3.57 | $3.85 | $3.35 | $3.31 | $3.75 | $3.51 | $2.98 |
| Haircut | $13.11 | $11.76 | $9.87 | $15.56 | $10.60 | $10.30 | $11.90 |
| Beauty Salon | $26.87 | $24.22 | $39.33 | $58.25 | $30.00 | $21.24 | $29.26 |
| Toothpaste | $2.09 | $2.18 | $2.39 | $4.46 | $3.96 | $3.11 | $2.41 |
| Shampoo | $0.99 | $1.07 | $1.12 | $1.94 | $1.67 | $1.11 | $1.05 |
| Dry Cleaning | $11.23 | $10.05 | $7.84 | $11.46 | $7.45 | $8.64 | $9.41 |
| Man Dress Shirt | $22.55 | $24.06 | $24.40 | $48.53 | $38.70 | $22.36 | $25.93 |
| Boy Jeans | $17.72 | $15.54 | $20.67 | $25.38 | $23.04 | $20.98 | $19.28 |
| Women Slacks | $23.33 | $24.66 | $32.63 | $48.67 | $38.93 | $30.26 | $27.27 |
| Washer Repair | $49.90 | $37.90 | $66.78 | $73.00 | $53.33 | $60.34 | $55.19 |
| Newspaper | $16.61 | $21.62 | $21.67 | $21.39 | $21.53 | $13.91 | $14.02 |
| Movie | $8.60 | $8.36 | $9.85 | $10.37 | $9.98 | $8.54 | $7.88 |
| Bowling | $3.57 | $2.77 | $5.07 | $8.26 | $5.63 | $3.43 | $3.58 |
| Tennis Balls | $2.33 | $2.17 | $2.80 | $2.47 | $2.74 | $2.79 | $2.29 |
| Veterinary | | | | | | | |

| **Services** | $28.64 | $39.46 | $52.97 | $82.90 | $49.47 | $36.68 | $37.20 |
| **Beer** | $7.62 | $7.73 | $8.52 | $9.37 | $8.80 | $7.89 | $7.80 |
| **Wine** | $5.07 | $6.58 | $7.70 | $8.55 | $7.15 | $6.95 | $6.55 |

*(Source: ACCRA Cost of Living Index Comparison data. The above data is provided as an example.)*

Data represent the index calculated for First Quarter 2007 through Third Quarter 2007

## Thanks for choosing the ACCRA Cost of Living Index!

*The national average cost for each index area is set at "100", and the indices
for each place are then calculated based upon their relation to that average. In
addition, the total cost of living index does not include taxes. For more
information please refer to the Methodology & Data Interpretation area.

COPYRIGHT 2007 | ALL RIGHTS RESERVED | P.O. BOX 100127, ARLINGTON, VA 22210
PHONE: 703-522-4980 FAX: 703-522-4985

# EXHIBIT 5

If you want to calculate the comparable after-tax income, please select from the cities below and enter your after tax income and click on Calculate.

**From:**                           --Please Select--

**Income in From City:**

**To:**                             --Please Select--

[ Calculate ]

| Index | Memphis , TN | Little Rock-N Little Rock , AR | Savannah , GA | Lexington , KY | Grand Rapids , MI | Columbia , SC | National Average |
|---|---|---|---|---|---|---|---|
| Composite (100%) | 89.7 | 96.1 | 95.1 | 98.6 | 102.9 | 89.5 | 100.0 |
| Grocery (13%) | 90.5 | 100.4 | 91.8 | 95.4 | 105.6 | 98.4 | 100.0 |
| Housing (28%) | 77.4 | 79.0 | 86.2 | 91.1 | 101.5 | 78.1 | 100.0 |
| Utilities (10%) | 84.1 | 109.2 | 112.8 | 109.3 | 121.3 | 95.5 | 100.0 |
| Transportation (10%) | 92.3 | 96.0 | 94.1 | 97.4 | 99.2 | 84.8 | 100.0 |
| Health (4%) | 97.1 | 95.1 | 95.4 | 99.4 | 90.9 | 102.1 | 100.0 |
| Miscellaneous (35%) | 99.1 | 104.7 | 98.7 | 102.8 | 100.1 | 93.6 | 100.0 |

**Q42007**

| ITEM | Memphis ,TN | Little Rock-N Little Rock ,AR | Savannah ,GA | Lexington ,KY | Grand Rapids ,MI | Columbia ,SC | National Average |
|---|---|---|---|---|---|---|---|
| T-Bone Steak | $9.96 | $9.58 | $8.54 | $9.15 | $10.94 | $10.47 | $8.74 |
| Ground Beef | $2.32 | $2.42 | $1.98 | $2.68 | $2.70 | $2.40 | $2.55 |
| Sausage | $2.77 | $3.16 | $2.71 | $3.31 | $3.87 | $3.14 | $3.18 |
| Frying Chicken | $0.85 | $0.91 | $1.01 | $1.39 | $1.60 | $1.02 | $1.08 |
| Chunk Light Tuna | $0.66 | $0.81 | $0.63 | $0.73 | $0.75 | $0.69 | $0.75 |
| Whole Milk | $2.07 | $2.13 | $2.05 | $2.23 | $2.06 | $2.19 | $2.03 |
| Eggs | $1.33 | $1.38 | $1.52 | $1.41 | $1.31 | $1.42 | $1.31 |
| Margarine | $0.61 | $0.73 | $0.60 | $0.71 | $0.85 | $0.80 | $0.85 |
| Parmesan Cheese | $3.39 | $3.61 | $3.07 | $3.06 | $3.52 | $3.16 | $3.41 |
| Potatoes | $3.50 | $3.97 | $4.77 | $3.79 | $3.05 | $5.09 | $3.88 |
| Bananas | $0.49 | $0.52 | $0.49 | $0.44 | $0.48 | $0.50 | $0.51 |
| Lettuce | $1.00 | $1.07 | $1.25 | $1.07 | $0.99 | $1.36 | $1.25 |
| Whitebread | $1.14 | $1.16 | $1.32 | $1.29 | $1.55 | $1.26 | $1.20 |
| Fresh Orange Juice | $2.93 | $3.30 | $3.18 | $3.13 | $3.20 | $3.23 | $3.07 |
| Coffee | $3.13 | $3.73 | $3.19 | $3.05 | $3.62 | $2.84 | $3.23 |
| Sugar | $1.85 | $2.11 | $1.85 | $1.80 | $1.83 | $1.90 | $1.87 |
| Corn Flakes | $2.63 | $3.19 | $2.99 | $2.63 | $3.38 | $3.28 | $3.08 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sweet Peas | $0.74 | $0.97 | $0.82 | $0.80 | $0.98 | $0.85 | $0.86 |
| Peaches | $1.84 | $2.29 | $1.79 | $2.01 | $2.07 | $1.95 | $1.87 |
| Facial Tissues | $1.84 | $2.24 | $1.66 | $1.55 | $1.74 | $1.83 | $1.85 |
| Detergent | $3.79 | $3.90 | $4.08 | $3.40 | $3.94 | $4.27 | $4.12 |
| Shortening | $3.39 | $3.84 | $3.99 | $3.61 | $3.82 | $4.00 | $3.70 |
| Frozen Meal | $1.95 | $2.43 | $2.09 | $2.17 | $2.94 | $2.56 | $2.53 |
| Frozen Corn | $0.98 | $1.08 | $0.93 | $1.04 | $1.26 | $1.49 | $1.25 |
| Potato Chips | $2.21 | $2.29 | $1.71 | $2.52 | $2.25 | $2.13 | $2.46 |
| Soft Drink | $1.32 | $1.54 | $1.33 | $1.36 | $1.45 | $1.15 | $1.34 |
| Apartment Rent | $750 | $698 | $720 | $753 | $742 | $771 | $779 |
| Home Price | $226,932 | $243,324 | $267,473 | $282,480 | $319,080 | $231,513 | $308,108 |
| Total Energy | $130.55 | $184.58 | $184.95 | $166.79 | $205.32 | $161.30 | $162.30 |
| Phone | $23.57 | $26.83 | $29.17 | $31.39 | $29.77 | $23.50 | $26.05 |
| Tire Balance | $7.84 | $8.63 | $8.21 | $8.99 | $8.30 | $6.62 | $9.22 |
| Gasoline | $2.54 | $2.58 | $2.56 | $2.59 | $2.74 | $2.41 | $2.58 |
| Optometrist Visit | $79.93 | $72.30 | $68.98 | $55.62 | $70.47 | $71.27 | $78.62 |
| Doctor Visit | $68.14 | $77.40 | $79.90 | $80.73 | $69.80 | $77.00 | $78.45 |
| Dentist Visit | $68.95 | $62.62 | $62.37 | $76.28 | $62.07 | $82.40 | $70.84 |
| Ibuprofen | $5.97 | $6.56 | $5.20 | $5.34 | $5.80 | $5.63 | $5.86 |
| Lipitor | $131.06 | $126.06 | $134.93 | $125.12 | $122.15 | $120.09 | $124.01 |
| Hamburger | $2.68 | $2.81 | $2.38 | $2.45 | $2.69 | $2.39 | $2.66 |
| Pizza | $10.88 | $11.65 | $10.28 | $10.31 | $9.99 | $10.99 | $10.36 |
| Fried Chicken | $2.77 | $2.83 | $2.48 | $2.54 | $2.92 | $2.06 | $2.98 |
| Haircut | $11.73 | $12.33 | $12.87 | $11.40 | $11.47 | $11.07 | $11.90 |
| Beauty Salon | $31.67 | $34.27 | $37.66 | $35.05 | $19.80 | $20.07 | $29.26 |
| Toothpaste | $2.09 | $2.90 | $2.38 | $2.73 | $2.46 | $2.34 | $2.41 |
| Shampoo | $1.00 | $1.15 | $0.98 | $1.03 | $1.03 | $1.00 | $1.05 |
| Dry Cleaning | $10.44 | $7.92 | $10.76 | $9.00 | $11.07 | $8.39 | $9.41 |
| Man Dress Shirt | $24.94 | $30.70 | $24.34 | $28.51 | $28.71 | $28.52 | $25.93 |
| Boy Jeans | $20.92 | $23.09 | $20.56 | $20.55 | $19.29 | $19.99 | $19.28 |
| Women Slacks | $22.76 | $29.66 | $30.58 | $36.88 | $32.46 | $28.59 | $27.27 |
| Washer Repair | $50.40 | $55.00 | $54.93 | $68.13 | $48.90 | $49.83 | $55.19 |
| Newspaper | $18.66 | $11.58 | $14.00 | $20.03 | $13.14 | $15.82 | $14.02 |
| Movie | $7.80 | $7.96 | $7.88 | $6.85 | $6.92 | $7.50 | $7.88 |
| Bowling | $3.66 | $3.04 | $4.83 | $4.64 | $3.26 | $3.50 | $3.58 |
| Tennis Balls | $2.39 | $2.87 | $2.02 | $2.18 | $2.75 | $2.35 | $2.29 |
| Veterinary Services | $45.75 | $38.54 | $36.48 | $38.27 | $37.85 | $32.42 | $37.20 |
| Beer | $8.02 | $7.80 | $8.57 | $7.96 | $7.71 | $8.14 | $7.80 |
| Wine | $6.83 | $8.79 | $7.03 | $5.52 | $6.14 | $7.02 | $6.55 |

*(Source: ACCRA Cost of Living Index Comparison data. The above data is provided as an example.)*

Data represent the index calculated for First Quarter 2007 through Third Quarter 2007

## Thanks for choosing the ACCRA Cost of Living Index!

*The national average cost for each index area is set at "100", and the indices
for each place are then calculated based upon their relation to that average. In
addition, the total cost of living index does not include taxes. For more
information please refer to the Methodology & Data Interpretation area.

COPYRIGHT 2007 | ALL RIGHTS RESERVED | P.O. BOX 100127, ARLINGTON, VA 22210
PHONE: 703-522-4980 FAX: 703-522-4985

# EXHIBIT 6





September 27, 2007

### "CROWD-OUT" IS NOT THE SAME AS VOLUNTARILY DROPPING PRIVATE HEALTH INSURANCE FOR PUBLIC PROGRAM COVERAGE
By Leighton Ku

As leading health policy experts have explained, under the fragmented U.S. health insurance system, virtually *any* effort to cover more of the uninsured — including efforts that rely on tax deductions or credits for the purchase of health insurance in the private market, as well as public program expansions — will result in some "crowd-out" (in the substitution of one type of health insurance for another) or in more heavily subsidizing people who are already insured, rather than in extending coverage to those who are uninsured. For example, an analysis of the Administration's health tax proposals from last year by the noted health economist Jonathan Gruber estimated that *77 percent* of the benefits would go to people who already are insured.

In comparison, the Congressional Budget Office estimates that under the bipartisan SCHIP agreement passed yesterday by the House on a 265-159 vote, about one-third — or 2 million — of the 5.8 million children who would gain SCHIP or Medicaid coverage by 2012 under the legislation would have otherwise had private coverage, a percentage less than half the 77 percent for the Administration proposals.[1] The CBO estimates also show that 3.8 million children who otherwise would be uninsured would gain coverage by 2012.

In any case, the phenomenon of crowd-out related to SCHIP and Medicaid is widely misunderstood. Many people assume that CBO's estimate of the bipartisan agreement means that the families of 2 million children who currently have private coverage would voluntarily drop that coverage for their children and enroll the children in SCHIP or Medicaid instead. As CBO director Peter Orszag has explained, this is not correct.

CBO defines "crowd-out" to include all children who are *uninsured* when they enroll in SCHIP or Medicaid but whose families would — in the absence of SCHIP or Medicaid — have purchased private coverage for these children at some point in the future, possibly many months later. Orszag has explained that these children account for a substantial share of those whom CBO estimates would otherwise have private coverage.

In other words, a large share of the SCHIP "crowd-out," as estimated by CBO, involves children who are uninsured now but who would obtain private coverage at some later point if SCHIP (or Medicaid) coverage were not available to them. These are *not* children who had private insurance that their families voluntarily dropped for public program coverage.

Surveys show, in fact, that only a small share of children had private health insurance before enrolling in SCHIP or Medicaid. The Congressionally-mandated 10-state evaluation of SCHIP found that while 28 percent of newly enrolled children had private coverage before joining SCHIP, half of them — or 14 percent —*lost* their private insurance for *involuntary* reasons before enrolling in SCHIP, such as when parents lost their jobs or became divorced or employers stopped offering health insurance for dependents.[2]

CBO estimates an overall crowd-out rate of about one-third under the bipartisan SCHIP legislation in part because of what CBO estimates would happen *after* some children who are uninsured enroll in SCHIP or Medicaid. For example, an unemployed parent of an uninsured child who enrolled in SCHIP may eventually get a low-paying job in which private insurance is available but employees have to pay hefty premiums and deductibles (or the insurance has large gaps). In such cases, the low-income parent may choose not to pick up private insurance for her children because the children already have satisfactory insurance through SCHIP. CBO counts these

**Document Resources:**
- PDF of report (2pp.)
- E-mail to a friend
- Print

**Report Categories:**
- All Reports by Date
- Health Policy

**CBPP Services:**
- E-mail Notifications
- RSS Alerts

children as individuals who would otherwise have had private insurance and thus as part of its crowd-out estimate. Referring to the families whose children show up as "crowd-out" children in CBO's estimates, Orszag has said that "For many such families, after they are on the program [SCHIP], they could have had an opportunity to pick up private coverage but don't."[3]

Some who cite the CBO crowd-out estimates misuse them, contending that all of the children included in CBO's crowd-out estimate are children who would voluntarily drop existing private health insurance to join SCHIP or Medicaid. At the point that they would enroll in SCHIP or Medicaid, however, many of the children cited in the CBO crowd-out estimate would be uninsured, and they often would remain uninsured for some period of time unless they enrolled in public coverage.

---

**End Notes:**

[1] In describing the crowd-out levels under the House-passed bill, which also had a crowd-out effect of about one-third, CBO director Peter Orszag has stated that he "has not seen another plan that adds 5 million kids to [SCHIP and Medicaid] with a 33 percent crowd-out rate. This is pretty much as good as it is going to get" (except for approaches that would impose mandates on employers, individuals, or states.) "SCHIP: Governors, Health Officials, Seek Withdrawal of CMS Rules Targeting 'Crowd-Out' by SCHIP," BNA Health Care Daily, August 31, 2007.

[2] J. Wooldridge, et al. "Congressionally Mandated Evaluation of the State Children's Health Insurance Program," Report to HHS, Oct. 26, 2005.

[3] From the transcript of "Who Is Counting? What Is Crowd-out, How Big Is It and Does It Matter for SCHIP," Alliance for Health Reform, Aug. 29, 2007.

Click here to join the Center's e-mail notification list.
To ask questions, or send comments, write to bazie@cbpp.org
Center on Budget and Policy Priorities
820 First Street, NE, Suite 510
Washington, DC 20002
Ph: (202) 408-1080
Fax: (202) 408-1056



# EXHIBIT 7

# CMS Has a 10-Year History of Approving Eligibility Levels Above 250% FPL

*(States Ordered By Approval Date Of Eligibility Expansion)*

| State & Current Eligibility Level | Approval Date: >250% | Current Waiting Period | Crowd-Out Exceptions |
|---|---|---|---|
| **Minnesota** (1,2)<br><br>**275% FPL**<br>after disregards | 1995 | 4 months<br>>150% FPL | None |
| **Hawaii** (2)<br>**300% FPL** | 4/1996 | 3 months<br>> 100%FPL | • Parent loses job within 45 days of application. |
| **Connecticut**<br><br>**300% FPL** | 4/27/1998 | 2 months<br>> 185% FPL<br><br><br>*Decreased from 6 to 2 months<br>on 10/25/2005.* | • Loss of a job for a reason other than voluntary termination.<br>• Death of a parent.<br>• Change in a new employer who does not cover dependents.<br>• Moving to an address where employer-sponsored coverage is not available.<br>• Discontinuation of health benefits to all employees of the applicant's employer.<br>• Expiration of the coverage periods established by the COBRA of 1985.<br>• Self-Employment.<br>• Termination of health benefits due to a long-term disability.<br>• Termination of dependent coverage due to economic hardship of the employer or employee.<br>• Substantial reduction in either lifetime medical benefits for benefit category available to an employee and dependents under an employer's health care plan. |
| **Rhode Island** (1)<br>**250% FPL** | 5/8/1998 | None | None |

(1) Each of these States has effective eligibility higher than 250% FPL after income disregards (offsets).
(2) Pre-SCHIP. However, the State must comply with the August 17 Directive.

# CMS Has a 10-Year History of Approving Eligibility Levels Above 250% FPL

*(States Ordered By Approval Date Of Eligibility Expansion)*

| State & Current Eligibility Level | Approval Date: >250% | Current Waiting Period | Crowd-Out Exceptions |
|---|---|---|---|
| **New Hampshire**<br><br>**300% FPL** | 9/15/1998 | 6 months | • Loss of employment.<br>• Change of employment to an employer who does not provide dependent coverage.<br>• Death of employed parent.<br>• Discontinuation of coverage to all employees.<br>• Voluntary loss of employment and the loss occurred for any of the good cause reasons specified in New Hampshire Code of Administrative Rules He-W 910.09 ( c ) (2) a-g.<br>• Temporary insurance policy ended.<br>• Loss of coverage beyond the control of custodial parent when non-custodial parent drops insurance.<br>• Insurer closes operation in New Hampshire.<br>• Involuntary reduction in work hours that no longer allows the employee to enroll the employees dependent children.<br>• Domestic Violence.<br>• Loss of Coverage when parent leaves work to be primary caretaker for his/her children under age 5.<br>• COBRA coverage was lost. |
| **Vermont**<br><br>**300% FPL** | 12/15/1998 | 1 month | • Loss of employment.<br><br>• Loss of eligibility for coverage as a dependent under a policy held by a parent.<br>• Death or Divorce |
| **New Mexico** (1)<br><br>**235% FPL**<br>**after disregards** | 1/11/1999 | 6 months | • Divorce or legal separation.<br>• Death.<br>• Expiration of COBRA benefits.<br>• Termination of employment.<br>• Reduction in the number of hours of employment.<br>• Employer contributions toward the coverage were terminated. |
| **New Jersey**<br><br>**350% FPL** | 8/3/1999 | 3 months if >133%FPL<br><br>*Decreased from 6 to 3 months on 11/22/2005.* | • Plan ends coverage in NJ.<br>• Employer ceases operation in NJ.<br>• Loss of job.<br>• Death.<br>• New employer increases employee contribution. |

(1) Each of these States has effective eligibility higher than 250% FPL after income disregards (offsets).
(2) Pre-SCHIP. However, the State must comply with the August 17 Directive.

# CMS Has a 10-Year History of Approving Eligibility Levels Above 250% FPL

*(States Ordered By Approval Date Of Eligibility Expansion)*

| State & Current Eligibility Level | Approval Date: >250% | Current Waiting Period | Crowd-Out Exceptions |
|---|---|---|---|
| **Washington** (1)<br><br>**250% FPL**<br>**after disregards** | 9/8/1999 | 4 months | • Loss of job.<br>• Death.<br>• Serious medical condition.<br>• Reached max lifetime coverage.<br>• Child could not get medical services locally.<br>• Domestic violence.<br>• Employer ended coverage for children.<br>• Out-of-pocket cost is $50/month or more for family.<br>• COBRA expired. |
| **California** (1)<br>**250% FPL**<br>**after disregards**<br><br>*300% for four counties that use county only funds to match federal funds.*<br>*(6/10/2004)* | 11/23/1999 | 3 Months | • Loss of employment due to factors other than voluntary termination.<br>• Change to a new employer that does not provide an option for dependent coverage.<br>• Change of address so that no employer sponsored coverage is available.<br>• Discontinuation of health benefits to all employees of the applicant's employer.<br>• Expiration of COBRA coverage period. |
| **Maryland**<br>**300% FPL** | 11/7/2000 | 6 months<br>> Medicaid Level | • Involuntary loss of coverage. |
| **Georgia** (1)<br><br>**235% FPL**<br>**after disregards** | 6/1/2001 | 6 months | • Employer cancellation of the entire group plan.<br>• Loss of eligibility due to parent's layoff.<br>• Resignation of parent from employment.<br>• Employment termination.<br>• Leave of absence without pay.<br>• Reduction of work hours.<br>• Cancellation of private health plan in which cost-sharing is expected to exceed 5% of families annual income.<br>• Cancellation of an individual within a family policy due to meeting max life benefit.<br>• Cancellation of COBRA. |

(1) Each of these States has effective eligibility higher than 250% FPL after income disregards (offsets).
(2) Pre-SCHIP. However, the State must comply with the August 17 Directive.

# CMS Has a 10-Year History of Approving Eligibility Levels Above 250% FPL

*(States Ordered By Approval Date Of Eligibility Expansion)*

| State & Current Eligibility Level | Approval Date: >250% | Current Waiting Period | Crowd-Out Exceptions |
|---|---|---|---|
| **Massachusetts**<br><br>300% FPL | 1/20/2006 | 6 months<br>200 -300% FPL | • A child or children has special or serious health care needs.<br>• The prior coverage was involuntarily terminated, including withdrawal of benefits by an employer, involuntary job loss, or COBRA expiration.<br>• A parent in the family group died in the previous six months.<br>• The prior coverage was lost due to domestic violence.<br>• The prior coverage was lost due to becoming self-employed.<br>• The existing coverage's lifetime benefits were reduced substantially within the previous six months, or prior employer-sponsored health insurance was cancelled for this reason. |
| **Tennessee** (1)<br>**250% FPL**<br>after disregards | 1/18/2007 | 3 months | • Layoff.<br>• Business closing.<br>• Other involuntary employee changes. |
| **Pennsylvania**<br><br>300% FPL | 2/20/2007 | 6 months<br>> 200% FPL over age 2<br>(If crowd-out increases by 10%, an additional 6 months can be added.) | • Parent is in receipt of unemployment compensation, or is no longer employed and is ineligible for unemployment compensation.<br>• Switching public programs. |
| **District of Columbia**<br>300% FPL | 3/15/2007 | None | None |
| **Missouri**<br><br>300% FPL | 9/28/2007 | 6 months<br>> 150% FPL<br>(If above 225%, additional 30 day waiting period.) | "Good Cause" |

**Prepared by New York State Department of Health, Office of Health Insurance Programs - 2/27/2008**

**Source:**
- U.S. Department of Health and Human Services - Centers for Medicare and Medicaid Services.
   Each state's current State Plan Amendment was accessed for the information at the CMS link below.
   http://www.cms.hhs.gov/LowCostHealthInsFamChild/SCHIPASPI/list.asp?intNumPerPage=all&submit.x=9&submit.y=11
**Additional sources for the exceptions:**
- Connecticut - http://search.cga.state.ct.us/dtsearch_lpa.asp?DocId=21361&HitCount=0&Index=I%3A%5Czindex%5C1999&Item=5&cmd=getdoc&hc=0&hits=&req=
- New Mexico - http://www.hsd.state.nm.us/mad/pdf_files/eligmanl/KID.8.232.400.pdf

(1) Each of these States has effective eligibility higher than 250% FPL after income disregards (offsets).

(2) Pre-SCHIP. However, the State must comply with the August 17 Directive.

# EXHIBIT 8

DEPARTMENT OF HEALTH & HUMAN SERVICES
7500 Security Boulevard, Mail Stop S2-01-16C
Centers for Medicare & Medicaid Services
Baltimore, Maryland 21244-1850



CENTERS for MEDICARE & MEDICAID SERVICES

Family and Children's Health Programs Group, Center for Medicaid and State Operations

Ms. Judith Arnold                                          JUL 1 9 2007
Director
Division of Coverage and Enrollment
Office of Health Insurance Programs
State of New York Department of Health
Corning Tower
Empire State Plaza
Albany, New York, 12237-0004

Dear Ms. Arnold:

This letter is in follow up to correspondence that the Centers for Medicare and Medicaid
Services (CMS) sent to New York on June 28, 2007 regarding the submission of its State
Children's Health Insurance Program (SCHIP) title XXI state plan amendment (SPA) submitted
on April 12, 2007, with additional information provided on May 9, 2007 and June 26, 2007.

I am enclosing questions related to the data that CMS is seeking from the State in order to clarify
whether its proposed strategy will prevent substitution of coverage for children in families with
income above 250 percent of the Federal Poverty Level (FPL) consistent with the requirements
of Section 2102(b)(3)(C) and the applicable regulations at 42 C.F.R. 457.805.

Please send your response, either on disk or electronically, as well as in hard copy, to Kathy
Cuneo and Stacey Green, the CMS Central Office contact for the New York title XXI proposal,
with a copy to the CMS Region II Office.

Ms. Cuneo's Internet address is kathleen.cuneo@cms.hhs.gov. Her mailing address is:

        Centers for Medicare & Medicaid Services
        Center for Medicaid and State Operations
        Division of State Children's Health Insurance
        Mail Stop S2-01-16
        7500 Security Boulevard
        Baltimore, MD 21244-1850

Page 2 – Ms. Judith Arnold

We appreciate the efforts of your staff and share your goal of providing health care to low-income, uninsured children through title XXI. If you have questions or concerns regarding the matters raised in this letter, your staff may contact either Stacey Green at (410) 786-6102 or Nicole McKnight, CMS Region II, at (212) 616-2429. They will provide or arrange for any technical assistance you may require in preparing your response. Your cooperation is greatly appreciated.

Sincerely,

Kathleen Farrell

Kathleen Farrell
Director
Division of State Children's Health Insurance

Enclosure

cc: CMS Region II DMSO

## CMS Questions

1. According to your latest response to our questions, you indicate that 296,000 children in families with incomes below 250% of FPL are uninsured and that encompasses 75% of all uninsured children in the State. What specific steps are you taking to enroll these children in Medicaid and SCHIP other than requesting to expand your program and when can we see results from these efforts?

2. Your State plan amendment is structured to increase your covered population to 400% of the FPL. Please send us data describing the number of children in this target population who are currently insured through private employers. Also, please send data describing the same target population who were insured through private employers over the prior five year period.

3. Please provide us with information regarding the percentage of current employers (who employ 60% or more of its employees with salaries at or below the highest FPL comparable to the FPL that the State wants to expand its eligibility) who provide health insurance to its employees. Also, please provide us with comparable information for a period five years prior and provide an explanation for any significant difference between the two percentages.

4. Please verify that the cost sharing requirement under the proposed State plan is equal to or comparable to the cost sharing required by competing private plans.

5. Please verify that you will establish a one year period of uninsurance for individuals prior to receiving coverage and that there will be no exceptions to the policy to assure that there is no incentive for substitution.

6. If available, please provide us with information on proposed legislation or regulations that will address and protect against the potential crowd out of private insurance by new employers. If not available, is there anything that the State would propose in the future?

7. Please verify that the State is current with all its SCHIP and Medicaid reporting requirements and that the State will report on a monthly basis data relating to enrollment and retention of children receiving health insurance through the private market up to 400% of the FPL.

# EXHIBIT 9

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-26-12
Baltimore, Maryland 21244-1850



**Center for Medicaid and State Operations**

AUG 1 7 2007                    SHO #07-001

Dear State Health Official:

This letter clarifies how the Centers for Medicare & Medicaid Services (CMS) applies existing statutory and regulatory requirements in reviewing State requests to extend eligibility under the State Children's Health Insurance Program (SCHIP) to children in families with effective family income levels above 250 percent of the Federal poverty level (FPL). These requirements ensure that extension of eligibility to children at these higher effective income levels do not interfere with the effective and efficient provision of child health assistance coordinated with other sources of health benefits coverage to the core SCHIP population of uninsured targeted low income children.

Section 2101(a) of the Social Security Act describes the purpose of the SCHIP statute "to initiate and expand the provision of child health assistance to uninsured, low-income children in an effective and efficient manner that is coordinated with other sources of health benefits coverage." Section 2102(b)(3)(C) of the Act, and implementing regulations at 42 CFR Part 457, Subpart H, require that State child health plans include procedures to ensure that SCHIP coverage does not substitute for coverage under group health plans (known as "crowd-out" procedures). In addition, section 2102(c) of the Act requires that State child health plans include procedures for outreach and coordination with other public and private health insurance programs.

Existing regulations at 42 C.F.R. 457.805 provide that States must have "reasonable procedures" to prevent substitution of public SCHIP coverage for private coverage. In issuing these regulations, CMS indicated that, for States that expand eligibility above an effective level of 250 percent of the FPL, these reasonable crowd-out procedures would include identifying specific strategies to prevent substitution. Over time, States have adopted one or more of the following five crowd-out strategies:

- Imposing waiting periods between dropping private coverage and enrollment;
- Imposing cost sharing in approximation to the cost of private coverage;
- Monitoring health insurance status at time of application;
- Verifying family insurance status through insurance databases; and/or
- Preventing employers from changing dependent coverage policies that would favor a shift to public coverage.

As CMS has developed more experience and information from the operation of SCHIP programs, it has become clear that the potential for crowd-out is greater for higher income beneficiaries. Therefore, we are clarifying that the reasonable procedures adopted by States to prevent crowd-out pursuant to 42 C.F.R. 457.805 should include the above five general crowd-out strategies with certain important components. As a result, we will expect that, for States that expand eligibility above an effective level of 250 percent of the FPL, the specific crowd-out

Page 2 - State Health Official

strategies identified in the State child health plan to include all five of the above crowd-out strategies, which incorporate the following components as part of those strategies:

- The cost sharing requirement under the State plan compared to the cost sharing required by competing private plans must not be more favorable to the public plan by more than one percent of the family income, unless the public plan's cost sharing is set at the five percent family cap;
- The State must establish a minimum of a one year period of uninsurance for individuals prior to receiving coverage; and
- Monitoring and verification must include information regarding coverage provided by a noncustodial parent.

In addition, to ensure that expansion to higher income populations does not interfere with the effective and efficient provision of child health assistance coordinated with other sources of health benefits coverage, and to prevent substitution of SCHIP coverage for coverage under group health plans, we will ask for such a State to make the following assurances:

- Assurance that the State has enrolled at least 95 percent of the children in the State below 200 percent of the FPL who are eligible for either SCHIP or Medicaid (including a description of the steps the State takes to enroll these eligible children);
- Assurance that the number of children in the target population insured through private employers has not decreased by more than two percentage points over the prior five year period; and
- Assurance that the State is current with all reporting requirements in SCHIP and Medicaid and reports on a monthly basis data relating to the crowd-out requirements.

We will continue to review all State monitoring plans, including those States whose upper eligibility levels are below an effective level of 250 percent of the FPL, to determine whether the monitoring plans are being followed and whether the crowd-out procedures specified in the SCHIP state plans are reasonable and effective in preventing crowd-out.

CMS will apply this review strategy to SCHIP state plans and section 1115 demonstration waivers that include SCHIP populations, and will work with States that currently provide services to children with effective family incomes over 250 percent of the FPL. We expect affected States to amend their SCHIP state plan (or 1115 demonstration) in accordance with this review strategy within 12 months, or CMS may pursue corrective action. We would not expect any effect on current enrollees from this review strategy, and anticipate that the entire program will be strengthened by the focus on effective and efficient operation of the program for the core uninsured targeted low-income population. We appreciate your efforts and share your goal of providing health care to low-income, uninsured children through title XXI.

Page 3 - State Health Official

If you have questions regarding this guidance, please contact Ms. Jean Sheil, Director, Family and Children's Health Programs, who may be reached at (410) 786-5647.

Sincerely,

Dennis G. Smith

Dennis G. Smith
Director

cc:

CMS Regional Administrators

CMS Associate Regional Administrators,
    Division of Medicaid and Children's Health

Martha Roherty
Director, Health Policy Unit
American Public Human Services Association

Joy Wilson
Director, Health Committee
National Conference of State Legislatures

Matt Salo
Director of Health Legislation
National Governors Association

Debra Miller
Director for Health Policy
Council of State Governments

Christie Raniszewski Herrera
Director, Health and Human Services Task Force
American Legislative Exchange Council

Jacalyn Bryan Carden
Director of Policy and Programs
Association of State and Territorial Health Officials

# EXHIBIT 10

5164743295          NYS DEPARTMENT OF                                    19 23 15   10-02-2007          7 /14

SEP-07-2007   07:33                                                                      P.02



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Centers for Medicare & Medicaid Services

_____

*Administrator*
Washington, DC 20201

**SEP - 7** 2007

Ms. Judith Arnold, Director
Division of Coverage and Enrollment
Office of Health Insurance Programs
State of New York Department of Health
Corning Tower
Empire State Plaza
Albany, NY 12237-0004

Dear Ms. Arnold:

I am responding to your request for approval of a title XXI State plan amendment (SPA) dated
April 12, 2007, with additional information submitted on May 9, 2007, and August 27, 2007.
This SPA seeks to increase the financial eligibility standard for its separate State Children's
Health Insurance Program (SCHIP) from the current effective family income eligibility level at
or below 250 percent of the Federal poverty level (FPL) to an effective family income eligibility
level at or below 400 percent of the FPL. The SPA also proposes to implement a 6-month
waiting period of prior uninsurance for children with family incomes above 250 percent of the
FPL, with certain listed exceptions. After extensive review of this SPA by the Department of
Health and Human Services, I regret to inform you that we are not approving this SPA.

Section 2101(a) of the Social Security Act (the Act) specifies that the purpose of title XXI is to
"expand the provision of child health assistance to uninsured, low-income children in an
effective and efficient manner that is coordinated with other sources of health benefits coverage
for children." New York has not demonstrated that its program operates in an effective and
efficient manner with respect to the core population of targeted low-income children.
Specifically, it has failed to provide assurances that the State has enrolled at least 95 percent of
the children in the core targeted low-income child population, those with family incomes below
200 percent of the FPL. As outlined in an August 17, 2007, letter to State Health Officials, such
assurances are necessary to ensure that expansion to higher income populations does not
interfere with the effective and efficient provision of child health assistance. In the absence of
such an assurance, I cannot conclude that New York is effectively and efficiently using available
resources to serve that core population, such that expansion to higher income levels would not
divert resources from serving the core population.

Section 2102(b)(3)(C) of the Act requires that State plans include procedures to ensure that
SCHIP insurance does not substitute for coverage under group health plans. Applicable
regulations at 42 CFR section 457.805 implement this requirement by mandating that the State
plan include a description of "reasonable procedures to ensure that health benefits coverage
provided under the State plan does not substitute for coverage provided under group health

Page 2 – Ms. Judith Arnold

plans." In issuing this regulation, the Centers for Medicare & Medicaid Services (CMS) acknowledged that, at higher family income eligibility levels, there is a greater likelihood of substitution of coverage. At the high proposed family income eligibility levels, reasonable procedures should include a full range of procedures to discourage substitution. New York's proposal does not include procedures to prevent such substitution that include a 1-year period of uninsurance for populations over 250 percent of the FPL. Additionally, New York's proposed cost sharing has not met the requirement that cost sharing under the State plan compared to cost sharing required by competing private plans not be more favorable to the public plan by more than 1 percent of the family income, nor has the State proposed to set its cost sharing at the 5 percent family cap. Absent such procedures, I cannot find that New York meets the requirement for reasonable procedures to prevent substitution of coverage.

For these reasons, and after consulting with the Secretary as required under 42 CFR section 457.150(c), I am unable to approve this SPA for expanding coverage. This disapproval is consistent with the August 17, 2007, letter to State Health Officials discussing how these existing statutory and regulatory requirements should be applied to all States expanding SCHIP effective eligibility levels above 250 percent of the FPL.

If you are dissatisfied with this determination, you may petition for reconsideration within 60 days of the receipt of this letter, in accordance with the procedure set forth at Federal regulations at 42 CFR section 457.203. Your request for reconsideration may be sent to Ms. Cynthia Potter, CMS, Center for Medicaid and State Operations, 7500 Security Boulevard, Mail Stop S2-25-22, Baltimore, Maryland 21244-1850.

If you have any questions or wish to discuss this determination further, please contact Ms. Sue Kelly, Associate Regional Administrator, Centers for Medicare & Medicaid Services, Division of Medicaid and Children's Health, 26 Federal Plaza, Room 3811, New York, NY 10278-0063.

Sincerely,

Kerry Weems
Acting Administrator

5184743295          NYS DEPARTMENT OF                                          19 24 17    10.02 2007        9:14

SEP-07-2027  07:34                                                                                P.04

Page 3 – Ms. Judith Arnold

cc: CMS Region II, New York

# EXHIBIT 11



**STATE OF NEW YORK
DEPARTMENT OF HEALTH**

Corning Tower    The Governor Nelson A. Rockefeller Empire State Plaza    Albany, New York 12237

Richard F. Daines, M.D.                                                      Wendy E. Saunders
*Commissioner*                                                               *Chief of Staff*

October 31, 2007

Ms. Cynthia Potter
Center for Medicaid and State Operations
Centers for Medicare and Medicaid Services
Department of Health and Human Services
7500 Security Boulevard
Mail Stop S2-25-22
Baltimore, Maryland 21244-1850

Re:    REQUEST FOR RECONSIDERATION
       Centers for Medicare & Medicaid Services Disapproval of
       New York State Title XXI State Plan Amendment #10

Dear Ms. Potter:

Pursuant to procedures set forth in section 457.203 of Title 42 of the Code of Federal
Regulations ("C.F.R."), the New York State Department of Health ("NYSDOH") hereby
requests expedited reconsideration of the disapproval by the Centers for Medicare and Medicaid
Services ("CMS") of the above mentioned proposed amendment to New York State's Title
XXI, State Children's Health Insurance Program ("SCHIP"), State Plan. By letter dated
September 7, 2007 (copy enclosed), CMS informed NYSDOH that its proposal to increase the
financial eligibility standard from 250 percent of the federal poverty level to 400 percent of the
federal poverty level for its separate SCHIP program was disapproved.

New York submitted its State Plan Amendment #10 ("SPA") in accordance with section
2106(b) of the Social Security Act and procedures set forth in 42 C.F.R. Part 457, in order to
implement by September 1, 2007 various provisions of N.Y. Public Health Law §§ 2510 and
2511 governing an increase in financial eligibility for its child health insurance program from
250 percent of the federal poverty level to 400 percent of the federal poverty level, with a
mandatory six month period of no insurance, subject to certain exceptions related to involuntary
loss of coverage, applicable to children within the new population.

The sole basis for the disapproval by CMS is that New York fails to meet newly imposed
federal standards and required assurances regarding "crowd out" and target rate of coverage set
forth in a CMS letter to State Health Officials dated August 17, 2007.

2

The NYSDOH respectfully requests another review and reconsideration of its SPA in accordance with the existing, legally promulgated, federal standards, setting aside application of the illegal standards set forth in the August 17 letter. These standards conflict with Title XXI and existing federal regulations, and they exceed the authority vested in the Secretary by Congress. They also constitute illegally promulgated regulations in violation of the notice and comment provisions of the federal Administrative Procedure Act.

Given the proposed September 1, 2007 implementation date of New York's SPA, and the harm being done to New York's children each day that the SPA stands as not approved, NYSDOH respectfully requests that CMS reconsider its SPA on an expedited basis with any hearing date set as soon as possible.

A copy of this petition for reconsideration has been sent to Sue Kelly, Associate Regional Administrator, Centers for Medicare & Medicaid Services, Division of Medicaid and Children's Health, 26 Federal Plaza, Room 3811, New York, NY 10278-0063. If you have any questions pertaining to this petition, please contact Judith A. Arnold, Director, Division of Coverage and Enrollment, Office of Health Insurance Programs, 518-474-0180 and jaa01@health.state.ny.us.

Sincerely,

Deborah Bachrach
Deputy Commissioner
Office of Health Insurance Programs

Enclosure
cc:    Sue Kelly
       Judith A. Arnold

# EXHIBIT 12



DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC 20201

NOV 3 0 2007

Ms. Deborah Bachrach
Deputy Commissioner
Office of Health Insurance Programs
State of New York
Department of Health
Corning Tower
Empire State Plaza
Albany, NY 12237

Dear Ms. Bachrach:

I am responding to your request for reconsideration of the decision to disapprove the
New York State Children's Health Insurance Program (SCHIP) State Child Health Plan
Amendment (SPA) #10, which was submitted on April 12, 2007, with additional
information submitted on May 9, 2007, and August 27, 2007, and disapproved on
September 7, 2007.

This SPA would have increased the financial eligibility standard for the State's separate
SCHIP from the current effective family income eligibility level at or below 250 percent of
the Federal poverty level (FPL) to an effective family income eligibility level at or below 400
percent of the FPL. The SPA also would have imposed a 6-month waiting period from the
date of last insurance coverage for children with family incomes above 250 percent of the
FPL, with certain listed exceptions.

The Centers for Medicare & Medicaid Services (CMS) disapproved the SPA because it
would result in a child health plan that did not comport with the requirements of sections
2101(a), 2102(a), and 2102(b)(3)(C) of the Social Security Act (the Act). These
requirements provide that funding must be used to provide coverage to uninsured, low-
income children in an effective and efficient manner that is coordinated with other sources of
health benefits coverage, that the State plan includes effective outreach procedures to enroll
all eligible uninsured children, and that the coverage made available does not merely
substitute for private coverage. This disapproval is also consistent with the August 17, 2007,
letter to State Health Officials clarifying how CMS believes these existing statutory
requirements should be applied by all States expanding SCHIP effective eligibility levels
above 250 percent of the FPL.

The following will be at issue at the hearing:

- Whether the State has demonstrated that SPA #10 is consistent with the requirement
  in section 2101(a) of the Act for effective and efficient program operation. SPA #10

Page 2 – Ms. Deborah Bachrach

would require that the State devote limited SCHIP funding to children with higher effective family incomes when the program has not enrolled substantially all of the core population of targeted low-income children with family incomes below 200 percent of the FPL;

- Whether New York has demonstrated that SPA #10 is consistent with the requirements in section 2102(a) to identify and enroll all uncovered children who are eligible to participate in public health insurance programs, to ensure that the SCHIP program is coordinated with those efforts, and to have effective outreach procedures;

- Whether the State has met the requirements to have reasonable procedures in place to ensure that health benefits coverage provided under the State plan do not substitute for coverage provided under group health plans, consistent with section 2102(b)(3)(C) of the Act as implemented by Federal regulations at 42 CFR 457.805. For family income eligibility levels higher than 250 percent of the FPL, the preamble to that regulatory provision indicated that States would need to have specific procedures in place, and later the August 17, 2007, State Health Officials' Letter further articulated the procedures that CMS would consider reasonable. SPA #10 did not include those specific procedures (including a period of uninsurance of at least 1 year, and cost sharing comparable to competing private plans subject to the overall 5-percent family cap).

I am scheduling a hearing on your request for reconsideration to be held on January 16, 2008, at the CMS New York Regional Office, 38-110A, 26 Federal Plaza, New York, New York 10278, to reconsider the decision to disapprove SCHIP SPA #10. If this date is not acceptable, we would be glad to set another date that is mutually agreeable to the parties. The hearing will be governed by the procedures prescribed by Federal regulations at 42 CFR Part 430, Subpart D.

I am designating Ms. Kathleen Scully-Hayes as the presiding officer. If these arrangements present any problems, please contact the presiding officer at (410) 786-2055. In order to facilitate any communication which may be necessary between the parties to the hearing, please notify the presiding officer to indicate acceptability of the hearing date that has been scheduled and provide names of the individuals who will represent the State at the hearing.

Sincerely,

Kerry Weems
Acting Administrator

# EXHIBIT 13

## Green; Stacey D. (CMS/CMSO)

| From: | Farrell, Kathleen M. (CMS/CMSO) |
|---|---|
| Sent: | Thursday, September 06, 2007 1:31 PM |
| To: | Green, Stacey D. (CMS/CMSO) |
| Subject: | FW: TPs on NY disapproval |

**Attachments:** Talking Points on Disapproval of New York State Plan Amendment.doc

Stacey
Please review this right away and let me know if you have any comments


Kathleen Farrell

Director
State Children's Health Insurance Program
Centers for Medicare and Medicaid Operations
(410) 786-1236
(410) 786-8534--fax


---

**From:** Smith, Dennis G. (CMS/CMSO)
**Sent:** Thursday, September 06, 2007 1:27 PM
**To:** Sheil, Jean K. (CMS/CMSO); Fenton, Richard L. (CMS/CMSO); Farrell, Kathleen M. (CMS/CMSO)
**Cc:** Lasowski, William S. (CMS/CMSO); MacCarroll, Amber L. (CMS/CMSO)
**Subject:** TPs on NY disapproval

Please review ASAP. Thanks, Dennis

Talking Points on Disapproval of New York State Plan Amendment

- CMS has disapproved a state plan amendment submitted by New York to raise eligibility under its SCHIP program from the current level of 250% to 400% of the federal poverty level.
- The state responded to additional questions submitted by CMS in light of the August 17 policy guidance to states on prevention of "crowd out."
- New York provided assurance that private insurance coverage has not declined by more than 2 percentage points.
- It also provided the required assurance regarding data collection and monitoring.
- However, the state did not demonstrate compliance with the 95 percent threshold for coverage below 200% of the federal poverty level. The state reported that 88 percent of children are insured.
- The state indicated that it would not meet the 12 month uninsurance requirement to prevent substitution.
- In regards to cost sharing, the state indicated that its premiums would approximate dependent coverage in the private sector. The state indicates that dependent coverage in group coverage costs only $70 per month. However, it did not include the cost of other cost sharing typical in private sector coverage which includes deductibles, copayments, and coinsurance.
- This will be the fourth SCHIP state plan amendment that has been disapproved since 2001.
- As with any disapproval, the state has appeal rights should it chose to exercise them.

# EXHIBIT 14

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C2-21-15
Baltimore, Maryland 21244-1850



## Center for Medicaid & State Operations, Family & Children's Health Program Group

JAN 2 8 2008

Dear SCHIP Director:

This letter is a follow-up to the State Health Official Letter (SHO) of August 17, 2007, that
clarifies how the Centers for Medicare & Medicaid Services (CMS) applies existing statutory
and regulatory requirements in reviewing eligibility expansions under the State Children's
Health Insurance Program (SCHIP) to families with effective family income levels above 250
percent of the Federal poverty level (FPL).

I want to reaffirm that this guidance was specifically designed to apply to new applicants, rather
than to individuals currently served by the program. States, such as yours, that currently provide
coverage to children with effective family incomes over 250 percent of the FPL have 12 months
or until August 16, 2008, to come into compliance with the required crowd-out strategies and
assurances laid out in the August 17th SHO for new enrollees.

It is our intention to work cooperatively with you so that your state will be able to permit the
enrollment of additional children in higher income families if the reasonable standards of the
August 17th guidance are met. And as such, we would like to begin discussions on how your
State will implement appropriate procedures, if they are not already in place. Specifically, we
look forward to upcoming discussions on your State's crowd-out strategy implementation plan
and assurance that the State has enrolled at least 95 percent of the children in the State below 200
percent of the FPL who are eligible for either SCHIP or Medicaid. I would ask that you work
with Ms. Kathleen Farrell, Director of the Division of State Children's Health Insurance, and her
staff, to set up a conference call in the next few weeks. Ms. Farrell may be reached at 410-786-
1236.

Sincerely,

Susan Cuerdon
Acting Director