UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

STATE OF NEW YORK, STATE OF ILLINOIS,
STATE OF MARYLAND, STATE OF WASHINGTON,   :

                      Plaintiffs,     :      07-CV-8621 (PAC)

          - against -            :      DECLARATION OF
                                        ROGER GANTZ

UNITED STATES DEPARTMENT OF HEALTH AND   :
HUMAN SERVICES,                           ECF CASE

                      Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     ROGER GANTZ hereby declares the following to be true and correct under penalty of

perjury, pursuant to 28 U.S.C. § 1746:

     1.     I am competent to testify in the matters set forth below, which are based on my

personal knowledge.

     2.     I am employed as the Director of the Division of Policy and Analysis of the

Health and Recovery Services Administration (HRSA) of Washington State's Department of

Social and Health Services (DSHS).  DSHS is the single state agency designated to administer

the Medicaid plan; HRSA is the component of DSHS that administers Washington State's public

medical assistance programs, including Medicaid and the State Children's Health Insurance

(SCHIP) programs.  I have been employed by DSHS since January 1977.

     3.     I began working with HRSA (then called the Division of Medical Assistance) in

1987. At that time I was employed as the Section Manager for HRSA's Reimbursement Section,

which dealt with both hospital and outpatient rates.

     4.     In 1990, I was employed as the Section Manager for the Cost Containment and

Accountability Section of HRSA, and in September of 2001, I became HRSA's Director of

Legislative and Policy Analysis.  In those capacities, I have been responsible for advising the

Assistant Secretary of HRSA on cost-containment initiatives, acting as the legislative

coordinator, tracking and analyzing federal legislation and the federal Medicaid agency's policy,

and assisting in the development of the Governor's budget and supplemental budgets.

5.      As part of my duties, I have worked with and have knowledge of detailed aspects

of Washington's State Children's Health Insurance Program, or SCHIP.  I have studied and

developed, coordinated and contributed to many reports on several aspects of the SCHIP

program, including compliance with federal requirements, Washington's SCHIP State Plan, and

Washington's eligibility requirements, cost-sharing obligations, mechanisms to deter substitution

of SCHIP coverage for private coverage (commonly referred to as "crowd-out"), and mandatory

waiting periods between the time private coverage is terminated and the time in which a child is

eligible to enroll in SCHIP.  I am familiar with the low-income populations enrolled in SCHIP

and the impact imposed on them by Washington's enrollment requirements.  I have knowledge

of the State's SCHIP allotment and federal and state budgeting aspects for SCHIP.

Washington's SCHIP Program

6.      Washington's SCHIP program was created following the enactment of Wash.

Laws of 1999, ch. 370, which authorized DSHS to create the program consistent with Title XXI

of the Social Security Act.  The program began on February 1, 2000, after receiving federal

approval through the Centers for Medicare and Medicaid Services ("CMS") of Washington's

State child health plan.  Federal law allows SCHIP coverage to be extended to children with

family income up to 200% of the federal poverty level, or 50 percentage points above the state's

upper threshold eligibility limit for Medicaid as of March 31, 1997.  Washington had been at the

forefront of extending public medical coverage to low-income children prior to enactment of the

SCHIP program and by March 31, 1997, had extended Medicaid coverage to children from families whose income was up to 200% of the federal poverty level. As a consequence, Washington's SCHIP program covers children with family income 50 percentage points above the 200% of federal poverty level, currently offering health coverage under SCHIP to children up to age 19 who live in households with income between 200% and 250% of the federal poverty level and having no other health coverage (children who are eligible for Medicaid or who have any creditable health coverage cannot be eligible for SCHIP). Between 2000 and 2006, Washington reduced the number of uninsured children in the State by 25% through implementation of its SCHIP program. Approximately 13,000 children are currently enrolled in Washington's SCHIP program. Families whose children are enrolled in Washington's SCHIP program pay a monthly premium of $15 per child with a family maximum of $45 per month.

7.      SCHIP is jointly funded by the federal and state governments. To be eligible for federal funding, the state must adopt an SCHIP State Plan, which contains certain elements and assurances as required by Title XXI and codified federal regulations. The State Plan must be approved by CMS. Under Title XXI, SCHIP is not an entitlement program, and the federal government's share of funding is capped. Each federal fiscal year, the State is afforded an allotment of federal funds which can be used for SCHIP. The State is required to report SCHIP expenditures on a quarterly accounting statement to the federal government. Once the accounting statement is approved, the federal government authorizes the State to draw upon the federal allotment for reimbursement to the State. The federal government reimburses Washington for 65 of SCHIP expenditures. Washington has never expended its full federal allotment for any federal fiscal year since the inception of its SCHIP program. For example, the

amount of allotment granted to and expended by the State of Washington for federal fiscal years 2001 through 2004 was as follows:

| SCHIP ALLOTMENT YEAR | Allotment Amount | Amount Unused & Returned |
| --- | --- | --- |
| FFY 2001 Allotment | $ 60,869,643 | $ 30,434,821 |
| FFY 2002 Allotment | $ 42,446,166 | $ 17,026,401 |
| FFY 2003 Allotment | $ 50,326,484 | $ 35,450,575 |
| FFY 2004 Allotment | $ 50,326,484 | $ 14,081,347 |
| FFY 2005 Allotment | $ 64,705,479 | $ 27,896,607 |

More recent figures are not available because the SCHIP statute allows states to carry the unused allotment forward for two years. Washington's allotment is $79,883,308 per year for federal fiscal years 2007 and 2008.

2007 Legislative Modification of Washington's SCHIP Program

8.      In 2007, the Washington Legislature enacted Wash. Laws of 2007, ch. 5, which authorized expansion of Washington's SCHIP program to include children from families whose income does not exceed 300% of the FPL, effective January 1, 2009 ( (I hereafter will refer to the bill as the "Cover All Kids" Act). Through the Cover All Kids Act, the Washington Legislature sought to ensure that all children in the state have health insurance coverage by 2010, by taking advantage of available private coverage as well as public programs. In doing so, Cover All Kids modified Washington's SCHIP program. First, it made coverage for children with family income up to 250% of the federal poverty level an entitlement, effective July 27, 2007.[1]

Second, it authorized expansion of Washington's SCHIP program to cover children with family income between 250% and 300% of federal poverty level, effective January 1, 2009.[2] Based upon projections, Washington would be able to maintain its existing coverage

---

[1] Of course, to the extent that federal funding is not available through SCHIP, Washington would be required to provide funding for entitlements solely through state funds.
[2] Children not eligible for such programs, such as undocumented aliens, will be covered using solely state funds.

commitments under SCHIP as well as cover the expansion population within its existing SCHIP allotment. Washington expects to enroll approximately 3,000 children in families with incomes above 250% of the FPL by July 2009 and approximately 8,000 children by June of 2010. Experience in other states demonstrates that similar expansions have also had the desirable effect of increasing enrollment among children already eligible for, but not currently enrolled in, either Medicaid or SCHIP, and this is also a substantial goal of the SCHIP program.

9.      In Cover All Kids, the Legislature instructed DSHS to take all actions necessary to ensure federal funding to cover children eligible for Medicaid and SCHIP. I was personally involved in the legislative process and testified with the Governor's Health Policy Advisor in support of the legislation. In supporting this legislation, DSHS was aware and relied upon the fact that CMS has approved SCHIP expansion programs in many other states, including Connecticut, Illinois, Massachusetts, Maryland, Missouri, New Jersey, and Vermont, covering children up to or above 300% of the federal poverty level. Until issuance of CMS's letter of August 17, 2007, we were not aware of any controversy in covering children in expansion populations up to 300% of the federal poverty level and were not aware of CMS denial of any state plan amendment requesting such an expansion. We were aware of congressional concern and actions taken to terminate the practice of coverage of adults through SCHIP (other than pregnant women). Washington does not cover adults through SCHIP (other than pregnant women, which is explicitly approved by the Administration). Additionally, as noted above, DSHS had forecasted that it could provide coverage to the expansion population within Washington's existing SCHIP allotment. As a consequence, DSHS and the Legislature relied on the fact that the expansion could be funded through SCHIP, and this assumption was built into the state budget which was approved by the Legislature. Between January and June 2009, DSHS

projected that the expansion would provide coverage for an additional 2,680 uninsured, low-income children through SCHIP, with a cost of approximately $1.5 million. The State anticipated that it could draw upon the SCHIP allotment to reimburse the State for $1.0 million of those costs.

10.    The Legislature appropriated $4.4 million to DSHS to develop an outreach program in connection with the anticipated implementation of Cover All Kids. *See* Wash. Laws of 2007, ch. 522, § 209(19). Attached to this declaration as **Exhibit A** is a copy of the report submitted to the Legislature as required by this proviso.

11.    DSHS plans to include several provisions to prevent crowd-out in developing the SCHIP expansion. First, a four-month waiting period will be required between the time private insurance coverage is terminated and the date on which a child may enroll in SCHIP (with exceptions for involuntary loss of private coverage, such as a parent's death or involuntary job loss). This policy has already been approved by CMS for SCHIP coverage of children between 200% and 250% of FPL. Second, applicants will be required to disclose available private insurance coverage (including through a non-custodial parent). Third, families with children in the expansion population will be required to pay higher premiums.[3] The Cover All Kids Act required DSHS to develop the cost-sharing schedule in consultation with the majority and minority leaders of the State Legislature. Additionally, Washington monitors the availability of private insurance and any potential crowd-out on a monthly basis.

12.    Implementing the program expansion requires considerable planning, modification of regulations, preparation and submittal of a state plan amendment to CMS for

---

[3] DSHS has not finalized its premium amounts for children between 250% and 300% of FPL. Consideration is being given to setting premiums in $36 to $42 per-child range (1.5% to 1.75% of income range). There also would be a three-child family maximum payment amount. DSHS will also consider increasing the premium for children between 200% and 250% of FPL from the current $15 per month to $20 per month (1% of income).

approval, and public education and outreach. These processes consume considerable state resources. DSHS is well into the planning, outreach, and administrative efforts necessary to comply with the legislative directive of expanding coverage for children between 250% and 300% of FPL by January 1, 2009.

13.    To implement the expanded program by January 2009, staff from two divisions within DSHS were required to begin work in January 2008 and will work through the implementation date. Staff have been required to develop and program the automated, computerized eligibility system, draft the state plan amendment and develop supporting data and reports required for plan submittal to CMS, draft regulatory amendments and manual instructions for eligibility staff, and work with community partners to educate the public about upcoming changes to eligibility. Total staff hours for these requirements are estimated at the equivalent of two full-time positions between January 2007 and the implementation date of January 2009. If the planned expansion is delayed or does not go into effect by the implementation date of January 2009, considerable resources and time will need to be devoted to notify providers and the public and start over in working toward a different implementation date.

14.    It takes approximately eight months to process a change in regulations in the Washington Administrative Code, due to time needed to draft modifications, publish proposed changes in the Washington State Register to provide public notice, and conduct a public hearing.

15.    A state plan amendment also can take several months in order to draft the amendment, gather data, and prepare reports to support requested approval from CMS and respond to requests for additional information or questions from CMS. Our process of preparing of a State Plan Amendment for the SCHIP expansion contemplated by Cover All Kids is almost complete and ready to submit to CMS for approval. However, it appears likely that

Washington's State Plan Amendment will not be approved based on the new requirements imposed by CMS through its August 17, 2007 letter.

CMS's August 17 Letter:  Likely Impact on Washington, Due to Washington's Inability to Comply with Mandatory Requirements.

16.     Effect on Additional Low-Income Children Who Are Presently Uninsured.  If Washington is not able to implement its planned SCHIP expansion to cover children with family income between 250-300% FPL, in the short run this will mean that approximately 2,700 uninsured low-income children will remain without health coverage (through the end of 2009). It would also mean that the State cannot use $1.0 million of its SCHIP allotment for coverage between January and July 2009, although the State has consistently expended less than its annual SCHIP allotment.[4]  However, because we do not believe that Washington can meet the new requirements imposed by the CMS August 17, 2007 letter, it appears that Washington's SCHIP expansion will not be approved by CMS.

Prohibition on Expansion for Children With Family Incomes Above 250% of Federal Poverty Level Unless the State First Establishes that 95% of all Children in the State Below 200% of Federal Poverty Level Are Insured.

17.     In its August 17, 2007 letter, CMS does not specify the source of data to be used when measuring whether a State has met the 95% coverage requirement.  The SCHIP statute refers to the Current Population Survey (CPS) prepared by the United States Bureau of Labor Statistics and the Census Bureau.  Codified SCHIP regulations refer to use of the CPS data for measuring SCHIP requirements (see, for example, 42 C.F.R. § 457.608).  If the 95% requirement

---

[4] Depending on CMS's policy regarding claiming Title XXI match for children with incomes above 250% who were enrolled in SCHIP before August 2008, Washington could lose over $3.0 million in federal funds for that population.  In future years, the amount of lost federal revenue for both groups will be significantly more as enrollment grows and costs are for a full-year period.

is to be based on CPS data, it does not appear that Washington or any other state will be able to meet the requirement. Based on 2007 CPS data, Washington and nine other states have the highest rates of insurance coverage for children, ranging between 90 and 95 percent of 200 percent of FPL during 2006. However, according to a recent Urban Institute paper authored by Genevieve Kenney, no state has yet met the CMS 95 percent insurance requirement. Genevieve Kenney, *"The Failure of SCHIP Reauthorization: What Next?"*, The Urban Institute (March 2008).

18.    Even if CMS allows Washington to use other sources of data, we are uncertain whether Washington can establish the 95% requirement. Washington's Office of Financial Management compiles survey data in the Washington State Population Survey (WSPS). We believe this data more accurately reflects health insurance coverage in Washington when compared to the CPS data, because the sample size is much larger than the CPS sample and the Office of Financial Management uses Medicaid and SCHIP coverage information to account for under-reporting of Medicaid and SCHIP coverage (because the CPS does not have such access, it is commonly believed that the CPS figures under-report public coverage rates). While a two-month period in March and April of 2006 showed an average health insurance coverage rate of 95.3% for citizen children in households up to 200% of the federal poverty level, over the past six-year period the average coverage rate for such children in Washington has been 93.5%.

19.    Children's Crowd-Out Rate. In order to expand SCHIP coverage above 250% of federal poverty level, the CMS August 17, 2007 letter also requires that states make assurances that the number of targeted low-income children's insurance rate in private employers coverage has not decreased by more than two percentage points over the prior five-year period. Based on WSPS data for 2000 and 2006, it appears that Washington State may not meet this test. The

WSPS data reported a 35.5 percent employer coverage rate for children in families up to 200% of federal poverty level in 2000 and a 32.2% rate in 2006, for a reduction of 3.3 percentage point.

20.     It is not at all certain that these reductions in coverage described in the preceding paragraph are attributable to the expansion in children's publicly financed coverage. For example, there was also a 1.2 percent point reduction for children in households above 200 percent of FPL during the 2000-06 period, which suggests that employer-sponsored dependent coverage for dependent children was falling for all children. During the 2002-06 period, there was -1.84 percent reduction for adults. This again would suggest the state's SCHIP coverage for children had little or no impact on the percent of persons with employer-sponsored coverage.

21.     Regulation of Private Employer Conduct. The CMS August 17, 2007 letter also requires states to impose measures to ensure that employers do not drop private insurance coverage in an effort to shift employees and their families onto public coverage. The CMS letter provides no specificity in the type of regulation required in this regard. The State has limited ability to regulate employer decisions respecting whether to offer health care benefits, especially as state regulation over most employment-based plans is preempted by the Employee Retirement Income Security Act. In any case, our experience with employers through the State's Premium Assistance Program for Medicaid-eligible children (by which the State pays for cost-sharing for Medicaid children eligible for private coverage through a parent) does not support a finding that employers purposefully shift coverage of employees to public programs, although we have not studied this in significant detail.

22.     Monitoring Requirements. The CMS letter of August 17, 2007, requires that states' SCHIP reports be current and that the state monitor "crowd-out" on a monthly basis. We have been informally advised by CMS that our state is current with CMS reporting requirements.

CMS reportedly has not yet developed the crowd-out monitoring reports which the August 17 letter requires.

Impact on Washington

23.     The requirements in CMS's letter of August 17, 2007, will adversely affect Washington's ability to provide affordable, publicly financed coverage for low-income, uninsured children.  They will also have an adverse effect on our ability to meet the state's goal of having affordable coverage for all children by 2010 by limiting the availability of Title XXI funds to help finance this coverage and otherwise imposing cost-sharing and imposing waiting requirements that will create barriers for families to access this coverage.

24.     CMS's August 17, 2007 letter states that the new requirements apply to children with "effective" incomes above 250% of federal poverty level.  As explained in the following paragraphs, this could result in children already enrolled in Washington's SCHIP program losing eligibility, regardless of whether Washington can satisfy the other conditions discussed above.

25.     It is common in determining eligibility for federally funded benefit programs that certain categories of expenses be deducted from the applicant/recipient's available income.  These items are typically referred to as "income disregards" because that portion of the applicant/recipient's income is "disregarded" when determining eligibility.  For example, there are numerous disregards and exclusions for Supplemental Security Income benefits (*see* 20 C.F.R. §§ 416.1103, .1124, .1210-.1239), and the federal food stamp program (*see* 7 C.F.R. § 273.9).

26.     The Medicaid program State Plan language specifies that States "shall exclude" certain income in the eligibility process.  The family's income, net of disregards and exemptions, is referred to as "countable" income for purposes of determining eligibility.  Washington and

many other states apply income disregards and exemptions in computing a family's countable income for children's medical coverage. For example, families are able to disregard $90 per-month of earned income for each working member of the household and can deduct work-related child care expenses and court-ordered child support payments. The same income disregards and exclusions apply to all of Washington's public healthcare programs for children, as required by Cover All Kids.

27.    Due to these income disregards and exclusions, Washington already covers children with gross family income above 250% of federal poverty level through SCHIP (such children are considered by us to have "countable" income of less than 250% federal poverty level). Based on review of SCHIP December 2007 enrollment data, approximately 1,800 (15 percent) of the 12,100 existing SCHIP children were in families with gross income above 250% federal poverty level.

28.    CMS's August 17, 2007 letter imposes the new requirements upon children with "effective" incomes above 250% of federal poverty level. CMS has confirmed, albeit informally, that the reference to "effective" means "gross" income, allowing for no income disregards or exclusions. As a consequence, approximately 1,800 children currently enrolled in Washington's SCHIP program may be affected by the new requirements.

29.    CMS's August 17, 2007 letter states that CMS does not expect the new requirements to have any effect on "current enrollees," but also instructs states to bring their State Plans into compliance with the new requirements by August 2008. It therefore appears that while CMS may allow for "grandfathering" of existing SCHIP children with gross family income above 250% of federal poverty level, any such grandfathering may not provide much protection for those children. For example, if any such grandfathered children disenroll from

SCHIP because private employment-based coverage becomes available, and attempt to re-enroll at a later time if such coverage is no longer available, it appears likely that Washington would have to treat them as new enrollees, subject to the requirements in CMS's August 17, 2007 letter.

30.     Children also disenroll at renewal time. When these children re-enroll two months later, it appears that they would be considered a new applicant. If there is no grandfathering and the new requirements will apply to currently enrolled children with gross family incomes above 250%, this could mean the loss of health insurance coverage for approximately 1,800 low-income children in Washington. It would also mean that the State cannot use the (approximate) $3.2 million of its SCHIP allotment used to fund the federal share for their coverage on an annual basis, although the State has consistently expended less than its full annual SCHIP allotment.

CMS Communicates Its Expectation to Washington that the August 17 Letter Requirements are Mandatory.

31.     In all formal and informal communication we have received from CMS representatives following the August 17 letter, CMS has informed Washington of its expectation that the August 17 requirements are mandatory and must be met before Washington can expand its SCHIP program to children above 250% FPL.

32.     On or about August 27, 2007, CMS Director Dennis Smith conducted a conference call with states for the purpose of discussing the new requirements for SCHIP expansion for children with family income above 250% FPL imposed by CMS in the August 17 letter. I participated in the conference call on behalf of Washington State. Mr. Smith went over all of the mandatory requirements discussed in the August 17 letter. He said some states were

already affected by the August 17 letter and that those states had until August 2008 to bring their State Plans into compliance with the August 17 letter.

33.     On February 26, 2008, I participated in another conference call, along with other staff members of HRSA, with representatives of CMS.  The conference call was set up at CMS's request.  The participating CMS representatives were Kathleen Farrell, CMS Director for the SCHIP Program; Jeffery Silverman, CMS Center for Medicaid State Operations; and Janice Adams from CMS's Regional Office.  The purpose of the meeting was to discuss how Washington would meet the requirements in the August 17 letter.  The CMS representatives went over each of the requirements imposed in the letter and asked questions about how Washington would meet them.  It was clear from this conversation that CMS will require every aspect of the August 17 letter requirements to be met before CMS will approve any expansion of Washington's SCHIP program to children above 250% FPL.  However, CMS did express some willingness to work with Washington on the various sources of data Washington can use to establish the requirements.  The CMS representatives also said they would consider granting exceptions to the one-year period of uninsurance in limited cases, due to involuntary loss of private coverage.

34.     Attached as **Exhibit B** is a true and correct copy of a letter from Susan Cuerdon, Acting Director of the CMS's Family & Children's Health Program, which Washington State received on January 28, 2008.  Attached to this declaration as **Exhibit C** is a copy of a letter sent by Defendant Leavitt to Senator Charles Grassley, former chair and now Ranking Member of the United States Senate Committee on Finance.

35.     I understand that CMS's argument in the lawsuit is that Washington and the other Plaintiff States have the option of submitting their proposed State Plan Amendments and

appealing CMS's decision declining to approve those amendments, and/or imposing sanctions because its current State Plan does not comply with the requirements of the August 17 letter. This approach does not satisfy Washington's need for a prompt resolution of this issue. We have spent, and expect to continue to expend, considerable energy in developing our proposed amendment, including the out-reach activities required under the statute. If we follow the course that CMS is suggesting, we would either have to put the plan on hold pending resolution of the appeal, or proceed with the plan using state funds with the hope that the federal share would ultimately be returned to the state.

Dated:  Olympia, Washington
        April 14, 2008

_____
ROGER GANTZ

# EXHIBIT A



*Washington State*
Department of Social
& Health Services

# REPORT TO THE LEGISLATURE

# CONCERNING ACCESS TO HEALTH CARE SERVICES FOR CHILDREN

## Chapter 5, Law 2007
## SHB 1128 Sec 209(19)

**Department of Social & Health Services**
**Health and Recovery Services Administration**
**Division of Healthcare Services**
**PO Box 45530**
**Olympia, WA  98504-5550**
**(360) 725-1629**
**Fax:  (360) 753-7315**

# Table of Contents

Page

Introduction ...................................................................................................................1

Creating One Program/Marketing and Re-Branding ..................................................2

Enrolling Clearly Eligible Children ...........................................................................3

Maximizing Federal Funding.......................................................................................4

Linking with Free and Reduced-Price School Meals .................................................5

Ensuring Outreach Does Not Target Privately-Insured Children ...............................6

Implementing an Application Agent Program.............................................................6

Enrolling Children Automatically...............................................................................7

Helping Families Who Have Lost Employment .........................................................8

Increasing Renewals ...................................................................................................8

Creating an Effective Online Application....................................................................9

Leveraging Seasonal Opportunities for Outreach.....................................................10

Increasing Health Literacy........................................................................................11

Securing Federal Match for Outreach .......................................................................12

Sustaining the Program .............................................................................................12

Conclusion .................................................................................................................13

**INTRODUCTION**

In 2007, the Washington State Legislature enacted Chapter 5, Law 2007 SHB 1128 Sec 209(19) Second Substitute Senate Bill (2SSB) Concerning Access to Health Care Services for Children. To help meet the goal, the Legislature also appropriated $63 million to cover an additional 38,500 children by June 2009 and $4.4 million for outreach for children's health.

The following report describes the plan put in place by the Department of Social and Health Services (DSHS) and the Children's Health Outreach Workgroup. The Children's Health Outreach Workgroup was convened by DSHS and has met monthly since the legislative session adjourned. The workgroup includes representatives from non-profit organizations, local health jurisdictions, health providers, insurance companies, state agencies, and legislative staff. [1]

The outreach plan consists of implementing several promising strategies, all with the goal of maximizing enrollment of eligible but uninsured children into state health insurance or premium support programs for private insurance. These strategies include:

- Creating one program/marketing and re-branding;
- Enrolling clearly eligible children;
- Maximizing federal funding;
- Exploring possibilities of linking with free and reduced-price school meals;
- Ensuring outreach does not target privately-insured children;
- Implementing an application agent program;
- Investigating possibilities for automatic enrollment of certain children;
- Helping families who have lost employment;
- Increasing renewals;
- Creating an effective online application;
- Leveraging seasonal opportunities for outreach;
- Increasing health literacy; and
- Sustaining the program.

Taken together, our hope is these strategies will go a long way to identify and enroll eligible children in health insurance programs. Each strategy will be rigorously evaluated to determine its success, and will be enhanced or discontinued accordingly.

The state implemented TANF and children's outreach campaign from October 1998 through June 2001 using federal matching funds intended to help families and children to obtain and retain Medicaid coverage. During that period, the Children's Medicaid program increased 24% from 244,800 to 302,500, the Children's Health Program (CHP) increased 51% from 12,700 to 19,300, and the SCHIP increased to 4,300 from its February 2000 start date. While funding was reduced to due to one-time only Medicaid funds, outreach efforts have continued to be support through the department's administration match program and other community-based efforts. The Children's Medicaid Program is currently covering 360,300 children, CHP enrollment is 23,600 and SCHIP is 12,400. The plan presented in this report builds on these results but also recognizes differences in the children being targeted and in the environment.

---

[1] NOTE: LIST OF PARTICIPATING ORGANIZATIONS.

First, because of past successes, there are significantly fewer uninsured children to reach. Based on the most recent 2006 Washington State Population Survey, there are about 45,000 uninsured children in families below 250% of the federal poverty level (FPL) – a 6.2% uninsured rate. Second, the children in the target group are somewhat different than in earlier years and include more moderate-income children who may have limited/no other interaction with public benefits programs and more children for whom English is not their families' primary language. Third, advancements in technology give the state more opportunities to use strategies such as online applications and using third party sources to verify income. Fourth, federal law and regulation has shifted, in many cases putting constraints on our ability to conduct outreach.

## CREATING ONE PROGRAM/MARKETING AND RE-BRANDING

*Strategy:* Current children's health programs can be confusing to families because of the many names the programs use. Because the Legislature clearly set out the goal to create one program to cover all children, the department is melding its outreach and application efforts into one system and creating one name for the program.

The "Cover All Kids" law requires the development of a public marketing campaign and re-branding of the program. The department has retained the services of PRR to work in partnership with the Children's Health Outreach Workgroup to execute these two pieces. The marketing campaign will be applicable to all audiences department-wide, and, when appropriate, catered to address unique regional or community circumstances. Local outreach contractors can draw on the universal materials developed by PRR and do not need to spend time and money developing their own materials. The goal is to create a single identity for children's programs, to replace the current perception that children's health consists of numerous distinct programs.

*Process:* The department is in the midst of a process to choose a single name and a single identity for all the state's children's health programs. It also is developing materials to be used in the marketing campaign. PRR is leading these efforts. PRR is researching effective names and what has worked and not worked in other states.

*Implementation:* The new name will be chosen by the end of January 2008. A graphic identity for the program will also be developed. Once these are finalized, application and outreach materials will be the same for all programs and will reflect the new name. Funding streams for the various programs will continue to be calculated separately because of differences in federal match rates, but these differences will be invisible to families. DSHS workers are trained to ensure if a child is not eligible for one program, to evaluate the possibility the child is eligible for another state program. Launch of the marketing campaign is expected for March or April 2008.

*Barriers and Limitations:* The only difference among the various programs that should be apparent to families is the premium requirement for children above 200% of poverty. While this creates some challenges for describing the cost of the program to families, our hope is this will not be a significant barrier. Marketing a state-wide program can pose challenges since the state is made up of many unique communities with dissimilar needs and values. The department, work group, and consultant will need to address these differences.

2

**ENROLLING CLEARLY ELIGIBLE CHILDREN**

*Strategy:* A promising and efficient outreach strategy is reaching out to and enrolling children clearly eligible for children's health programs. Targeted outreach efforts to find children who are income eligible uses less time and resources than outreach to children of all income levels.

*Process*: DSHS has examined numerous state databases and discovered thousands of children already known to the department but were not enrolled in state-sponsored programs and whose insurance status was unknown. These children fall into four categories:
- Children receiving child care assistance 9,132
- Children receiving basic food assistance: 5,289
- Children receiving child support assistance: potentially up to 20,000
- Children whose families have not provided all information needed for citizenship verification: 9,134.

Children in families receiving child care assistance and basic food assistance are clearly eligible for children's health programs because the children's health income eligibility limit is higher than eligibility for those programs. Some children receiving child support assistance may not be eligible for children's health programs because they are over income; there is no income limit for child support assistance. The department is working to narrow the child support assistance list so efforts will target low- and moderate-income children.

These children have not enrolled in children's health programs for the following possible reasons:
- They did not know about the programs.
- They were unable to complete the paperwork.
- They already have health insurance. (These children will be encouraged to remain on the insurance they have, or to convert to a program where the department pays their employee premiums if that is more cost efficient.)
- They did not want state health insurance.

*Implementation:* The department has compiled lists of children on child care assistance and basic food assistance. These lists include family contact information. The lists have been shared with local health jurisdictions so they can reach out to families; at this early date it is not clear how many children will be enrolled through this effort. Some local health jurisdictions have passed the names of children on to community-based organizations with whom they have contracts and confidentiality agreements. Those community-based organizations are conducting outreach. The department is still developing the list of children receiving child support assistance.

Local health jurisdictions or community-based organizations will receive a one-time grant of infrastructure money to support the development of additional outreach strategies. They also will receive $75 for each child from the list who successfully enrolls in a children's health program.

*Future Efforts:*
- The department will carefully evaluate this strategy for effectiveness and will continue it if it is successful.

3

- The department will examine reasons these families don't enroll at the same time they are applying for other services and develop processes that ensure enrollment and ensure enrollment at the outset, including automatic enrollment with opt-out.
- The department will identify areas where local health jurisdictions are not doing outreach and encourage them to accept the lists and subcontract with community-based organizations.
- In counties where there is no local health jurisdiction to do outreach, the department will find community-based organizations who can do the work.

*Barriers and Limitations:*
- The strategy raises concerns over confidentiality and data sharing. Sharing client data creates some difficulties, particularly when sharing information with groups except local health jurisdictions or other local government agencies.
- In counties where local health jurisdictions have not chosen to do outreach, there is a currently a gap in reaching children. The department is beginning to investigate how to find outreach contractors in these areas.
- The list creation by the department requires minimal staff time; however, there are data quality issues including households on the list with incorrect addresses, disconnected phone numbers or no phone number. This creates significant challenges in easily locating families.
- These lists also include the names of children with private coverage. It is unclear how many families did not enroll because they already have insurance or did not want state insurance.

## MAXIMIZING FEDERAL FUNDING

*Strategy*: DSHS was directed to maximize federal funding to support new children's health program. This includes obtaining Title XIX Medicaid federal financial participation (FFP) for children in families up to 200% of the federal poverty level (FPL) and Title XXI SCHIP funding for children between 200% and 250% of FPL. Title XXI will also be sought for children up to 300% of FPL when the program is expanded in January 2009.

*Process:* Federal law requires states to verify and document that all Medicaid children are United States citizens. The department has adopted a citizenship declaration process that requires families to provide information so that the department can obtain birth certificates to verify citizenship status; DSHS also has implemented a centralized citizenship verification unit to obtain the federally-required documentation. This has allowed the department to verify citizenship for 166,243 new applicants.

*Barriers and Limitations:* To fully comport with federal requirements, Washington may not be able to claim Title XIX FFP until the date that the citizenship verification has been made. Also, not all families provide the needed information so that department can obtain birth certificates. To date, the department has disenrolled 9,134 children whose families have not provided all information needed for citizenship verification.

*Future Efforts:* To maximize FFP, the department will be analyzing with it can employ Section 1920A provisions to adopt presumptive eligibility during the eligibility determination process.

This would allow the department to claim FFP from the date that an application was received by the department until the date that eligibility was determined.

The department also will be reviewing its application and citizenship determination policies to balance the duel goals of providing health coverage to all uninsured children up to 200% of FPL and maximizing Title XIX FFP to finance this coverage.

## LINKING WITH FREE AND REDUCED-PRICE SCHOOL MEALS

***Strategy:*** Thousands of children in Washington State receive free or reduced-price meals through their schools. These children are well below the income limits for children's medical and are a promising pool to reach for outreach. The Legislature specifically directed the department to develop a plan to reach these children. DSHS and the Office of Superintendent of Public Instruction (OSPI) are currently working on a process to ensure these children are identified and contacted.

***Barriers and Limitations:*** Federal restrictions on sharing student education records without parental consent limit data sharing options between DSHS and OSPI. There are additional infrastructure limits within local school districts with varying capacity to collect, store and easily share information relevant to this effort. The department and OSPI are working towards a process that will allow the sharing of data of this pool of potential eligibles.

***Future Efforts:*** OSPI is taking the following steps:
- Providing DSHS with aggregated numbers (not student-level, identifiable data) by school and school district of students who currently qualify for free or reduced-price meals but are not currently enrolled in Medicaid or TANF. This will give DSHS a rough geographic indicator of enrollment possibilities that may inform outreach efforts.
- Examining the feasibility of establishing data sharing procedures between OSPI and DSHS to identify students who qualify for (by nature of their qualification for free or reduced-price meals) but are not yet enrolled in free or low-cost health coverage. This would require at least the following steps:
  - Notice to parents by school districts that student education records and contact information may be shared with DSHS for the purposes of examining eligibility for free or low-cost health coverage.
  - Modifications to local school district free and reduced-price meal application forms to include 'opt out' parental consent to share such student information.
  - Establishment of data sharing agreements between school districts, OSPI, and DSHS to facilitate this process.
  - Retooling of local school district data systems and state education data systems to allow for efficient aggregation and sharing of relevant student information.
- Encouraging key school personnel to develop methods for identifying uninsured children and connecting these children and their families with DSHS something or others that can enroll them in free or low-cost health coverage. Possible opportunities exist with school nurses, school counselors, school social workers, coaches and athletic directors, and others. School personnel will need clear, simple outreach tools (brochures, flyers, eligibility forms, etc.) to successfully implement such methods.
- Encouraging school districts that are participating in Medicaid Administrative match to conduct outreach to these children.

5

- Encouraging school districts not participating in Medicaid Administrative match to utilize community-based outreach contractors to conduct outreach activities to these children.

Long term, the Legislature will likely need to enact legislation and appropriate funding to create cross-agency data systems that can facilitate the data sharing necessary to efficiently identify school children who qualify for but are not yet enrolling in free or low-cost health coverage.

## ENSURING OUTREACH DOES NOT TARGET PRIVATELY-INSURED CHILDREN

*Strategy:* States are required by the Deficit Reduction Act of 2005 (DRA) to implement new laws requiring all private insurers to share information with the state about their enrollees. This requirement provides an opportunity to better target outreach efforts by identifying these privately-insured children when conducting data matches with other state program databases and determining which children to contact about enrolling in public insurance. This strategy is a way to be more efficient and maximize limited resources dedicated to the outreach program, and to minimize so-called "crowd-out" or moving privately-insured children to public programs.

*Process:* Once insurance plans are complying with the new state law, the department would use the enrollee information to match with lists of children enrolled in other state programs including free and reduced-price meals, child support, and unemployment insurance. Any children found to have private insurance would be removed from lists targeted for outreach.

*Implementation:* The state complied with the DRA by passing and implementing House Bill 1826 (effective July 2007) requiring plans to share enrollee information with the Department. However, HB 1826 does not specifically address allowing the data to be used to better target outreach efforts. The Children's Health Outreach Workgroup has asked the Urban Institute, a Washington D.C. based organization that provides states with advice on a variety of topics including outreach , to review HB 1826 and determine if it needs to be amended for this purpose or if the existing statute is sufficient.

*Barriers and Limitations:* First, CMS has not issued federal guidance on how to implement the requirements of the DRA around enrollee information-sharing. State implementation of HB 1826 ahead of guidance might necessitate plans to collect the data differently than CMS requires, creating a burdensome system and potentially delaying or disrupting receipt of enrollee information by the state. Second, removing insured children from outreach target lists could deny some children who are "underinsured" from the wraparound coverage Medicaid provides.

## IMPLEMENTING AN APPLICATION AGENT PROGRAM

*Strategy:* As a part of the overall outreach strategy for the "Cover all Kids" law, the department will create a system to broaden the net of participating organizations. "Application agents" are groups for whom outreach is not the center of their work, but who interact regularly with children – groups like day care centers, YMCA and YWCA, Boys and Girls clubs, and religious places of worship. The value of the application agent approach is that by leveraging community-based and other organizations not traditionally involved in direct outreach activities but that see or serve likely eligible populations, the likelihood of finding eligible children increases. The state of Illinois employed an application agent approach as part of its two year old *All Kids* program, and has seen a significant increase in child enrollment in public programs and

6

corresponding decline in improperly completed application forms.  In addition, the current availability in Washington of an online application tool will give additional options for families and application agent organizations under this strategy.

**Features:**
- Any organization interested and willing to attend  training on outreach and application assistance may participate; and
- Participating organizations receive a $75 fee per child enrolled in a publicly-funded health care program;

**Process:**  Department staff learned about the positive results Illinois had in its application agent program.  In July 2007, the department staff and stakeholder members of the Children's Health Outreach Workgroup met with representatives from Illinois to learn about their experience.  The department staff and stakeholder representatives agreed that the application agent approach should be used in Washington State as a part of the second wave of activities.

**Implementation:**  The application agent program is scheduled to be implemented July, 2008.

**Future Efforts:**  During the first two quarters of 2008, the Children's Health Outreach Workgroup will develop a strategy to roll out the application agent program.  RFPs for interested parties will be developed, and a training program will be created.  Lessons learned from the application agent program in Illinois will be considered.

**Barriers and Limitations:**  Since the application agent program is yet to be implemented, we do not have concrete examples of barriers and limitations yet faced.  However, this program may present potential challenges, including:
- **Training logistics:**  Some interested parties may find it difficult to attend the training necessary to become an application agent.
- **Quality/value of outreach work:**  Because the application agent program is designed specifically to involve organizations not experienced with outreach and application assistance activities, the quality of work and the value of the program will need to be monitored.
- **Burdensome contracting/payment process:**  Department staff could be overwhelmed if a large volume of organizations apply, however a process can be put in place to limit the number of direct contractors.  Organizations under contract could offer subcontracts to assure broad community involvement.

## ENROLLING CHILDREN AUTOMATICALLY

**Strategy:**  Automatically enrolling clearly eligible children makes the process easy for families and saves the state considerable paperwork.

**Process and Implementation:**  One group of children has already been automatically enrolled: non-citizen siblings of citizen children currently enrolled in children's health programs.  The department had all the information it needed for these children, and rather than requiring them to go through the application process, simply enrolled them in health insurance.  Their renewal dates were synced with their siblings' renewal date, meaning most of them will receive coverage for less than a year, but the families and the state will benefit from having the renewal process

initiated at the same time. The department is currently examining other promising automatic enrollment strategies, learning from other states and national experts, and determining which children might be eligible for automatic enrollment.

*Future Efforts*: The department also has all the information it needs to determine eligibility for children receiving food assistance and child care support. In the future, these children could be automatically enrolled, or at least offered a simple "Yes, my children are uninsured and would like insurance through the state's program" enrollment form. Their eligibility review could be timed to the next time the department would seek review information for the current program. DSHS will explore if it has enough information for children receiving free and reduced-price meals and child support collection assistance.

*Barriers and Limitations:* Enrolling siblings of non-citizen children made sense in part because their care is paid for on a fee-for-service basis – if they do not use services, the state will not expend any funds. Children who would be enrolled in a managed care plan and for whom the state would make a capitated payment present a greater challenge. It is unclear if the families did not enroll in children's health programs because they already had insurance. If that is the case, it would not make sense for the state to pay an insurer for their coverage. Perhaps presumptive eligibility with a fee-for-service bridge could be created for these children, or, again, at least a very simplified application process.

## HELPING FAMILIES WHO HAVE LOST EMPLOYMENT

*Strategy:* Most people who lose their jobs do not enroll in COBRA and therefore become uninsured. Even those who do enroll in COBRA generally cannot afford the health premiums for their families. Connecting with these newly uninsured children through the Unemployment Insurance program could be a very promising strategy.

*Process:* This idea is a new one for the Children's Health Outreach Workgroup and needs exploration. However, our initial thoughts are that Unemployment Insurance enrollees should be asked during their weekly renewals if they have health insurance, if their children have health insurance, and if they would like assistance getting insurance. We believe a weekly renewal is a better place than initial enrollment into Unemployment Insurance because the client will not be as overwhelmed.

Clients typically do their weekly renewals by the phone or on the internet. Data is downloaded and processed quickly to send checks. We are particularly interested in piloting this idea on the internet renewal system – it is quite good and user-friendly, and would be an easy place for families to indicate they would like help.

*Implementation:* The department will begin exploring this idea with the Employment Security Department. As this idea is further developed, the department will seek assistance and advice from the Urban Institute, national experts in health care outreach.

## INCREASING RENEWALS

*Strategy:* Many of the state's uninsured children have been enrolled in children's health programs in the past, but did not successfully re-enroll. Many other children experience gaps of a few months in their insurance because they do not re-enroll. The department is working to

8

reduce this "churn" rate which is difficult for families and administratively burdensome and expensive for the state.

*Process:* Effective January 2008, the department is implementing renewal pilot projects throughout the state at local Community Services Offices and at the state agency. These pilots will test promising renewal policies that are designed to minimize administrative barriers for parents and eliminate gaps in eligibility for children who are eligible for coverage. The outcome will determine the permanent policy change to be implemented in the summer of 2008.

*Implementation:* The pilot projects will:
- Initiate phone renewals three months prior to the scheduled renewal date – phone calls are easier for parents understand and respond to.
- Initiate "anytime" phone renewals – if a parent calls for any reason within three months of the renewal date, the department will initiate the renewal process at that point instead of waiting.
- Mail renewal notices in envelopes with colorful lettering to draw attention to the urgent notice.
- Send a simplified renewal form with a business reply self-mailer three months prior to the recertification date.
- One pilot project will incorporate all these strategies.
- One region will serve as the control group and will make no changes.

*Future Efforts*: DSHS will be evaluating the outcomes of each of the pilot projects, and will determine which were most effective. These will be the basis of changing renewal processes in mid-2008. The department will continue to monitor the ongoing projects, and make adjustments as necessary.

The department is also investigating how to involve outreach contractors in the renewal process. The majority of families do complete renewals on their own fairly quickly; the Children's Health Outreach Workgroup does not want to use limited resources to pay outreach contractors to help families who can easily make it through the renewal process on their own. However, the department may be able to identify a midway point and generate a list of families who have not completed or initiated a renewal within two or three weeks of receiving a renewal notice and share these names with outreach contractors for quick follow-up. Another opportunity in the future is auto-email reminders to families who have applied on-line. This feature is under development by community organizations and will be discussed as improvements to the CSO Online Application are made over the next year.

## CREATING AN EFFECTIVE ONLINE APPLICATION

*Strategy:* Families are seeking to apply for state programs through easy online avenues. The creation of a web-based (online) application for children's health that is easy for families to use would assist in a number of the other outreach strategies. For example, application agents could use the online application system as they work with potential enrollees. Community outreach workers could carry laptop computers and enroll families immediately. In addition, if the system feeds information directly into ACES, it could save considerable state worker time. The system could also be configured to send automatic renewal notices via email which could help with the churn rate. A current online application tool that streamlines the application process is available

9

at ParentHelp123.org. This tool was developed by a Washington based community organization. The opportunity now is to improve the state online CSO application process and link the system with tools already available for families so that applications flow easily through the system using technology.

*Process:* The Cover All Kids law mandated a feasibility study and implementation plan to develop online application capability integrated with the department's automated client eligibility system. DSHS already had made considerable progress on an online application so the study was deemed unnecessary.

The Online Services Application Project has been launched to develop an electronic means for families and community partners, on behalf of families, to apply for DSHS Public Assistance benefits and services. The new online application will integrate with the department's current systems while allowing linkage with the online application developed by the private sector.

*Implementation:* Phase one of the project will develop an online application to replace the current version used by the department and implement a document management system by July 2008. This phase will also incorporate an eligibility calculator and electronic signature. The department is exploring electronic signatures, however CMS has not currently approved a click/submit model for signatures. Phase two of the project will run through July 2009 and build the data integration into the department ACES system, as well as the integration of data from community partners that have online application capability. This phase will also determine how and when the program will be changed and updated.

*Future Efforts*: There are a number of opportunities in the coming years to improve online outreach tools and test their use with state-wide and local outreach organizations.
- The department will need to train local CSO workers as changes to the system are made as well as consider addressing additional issues such as automated renewal notification.
- The department is working with stakeholders to determine how private sector organizations can submit electronic applications directly to the ACES system.
- The department is looking into how to build online efforts into the outreach plans.

*Barriers and Limitations:* Several major issues remain to be addressed. First, the online application should be connected to the ACES system so the information is automatically entered and the worker does not need to re-enter all the information. Second, the new federal signature requirement is challenging, and what constitutes an acceptable electronic signature remains unclear.

Complexity of the project and need for the system to be continually improved as technology changes is another great challenge. There will be ongoing needs for evaluation, technology upgrades, and new features for system efficiency.

## LEVERAGING SEASONAL OPPORTUNITIES FOR OUTREACH

*Strategy*: The outreach effort is following a strategic timeline. The plan includes discrete, seasonally-appropriate efforts designed to leverage certain holidays, celebrations or annual activities (such as the start of the school year) to secure the attention of potentially eligible families. The goal will be to maximize likelihood of new enrollment by delivering mailings,

distributing materials, creating earned media stories, or other strategically-timed information sharing with families about available public insurance options for children.  One idea is to incorporate health promotion messages during each seasonal outreach effort that focus on rotating health themes, such as oral health, physical activity, and others.

*Process*:  The approach toward outreach timing and seasonal targeting will incorporate a number of partners including schools, community-based organizations, and religious organizations.  It also will require partnering with key agencies like OSPI and school districts.  Appropriate materials will need to be developed in conjunction with the Children's Health Outreach Workgroup and the outreach consultant PRR.

*Implementation*:  The outreach effort has implemented Wave I: Reaching out to uninsured children likely eligible for public insurance and on other DSHS programs for low-income children.

*Future Efforts*:  The waves of outreach are as follows:
- Wave I.  Reaching out to likely eligible children is ongoing through next year.
- Wave II.  Marketing/Re-branding.  The program will be re-branded in January, 2008 with a state-wide marketing campaign expected to launch in March or April, 2008.
- Wave III.  Application Agent (see Application Agent section) will launch in July, 2008.
- Wave IV. Contracts with community-based outreach for direct outreach.  Late next year contracts will be awarded for CBOs to conduct direct outreach to find and enroll in state medical programs hard-to-reach children not currently known to the department.

In addition, the department will devise seasonal outreach activities that center on specific health promotion messages.  Following are some possible examples:
- January-March, 2009: Healthy food and exercise focus
- April-July, 2009: Immunization focus
- June-August, 2009: Summer Meals Program
- August, 2009: Back-to-school
- October, 2009: Oral health focus

## INCREASING HEALTH LITERACY

*Strategy:*  The "Cover All Kids" law requires a health education component be included in the state's outreach strategy.  Studies show that people with health literacy – those that understand the value of preventive health, health insurance, and healthy lifestyles – are more likely to utilize the health care system appropriately.  They also are more likely to be aware of available public insurance programs and enroll themselves and their children in programs for which they are eligible.

*Process:*  The Department will utilize a number of approaches to ensure that likely eligible families become better educated.  Existing materials will be incorporated.  For example, the current statewide Maternal Health Hotline is linked with the statewide Children's Health Hotline which affords an opportunity to include health literacy messaging to families who are already seeking assistance.

*Implementation:* Wave III of outreach will include well-developed messages promoting the value of preventive health and health insurance, and explaining how to use the health care system most effectively. These messages will be included in materials promoting available public insurance options.

*Barriers and Limitations:* Incorporating a health literacy component into the state's outreach strategy and making it sustainable will require additional efforts outside of the current outreach strategies. Strategies should be incorporated into existing efforts but new approaches need to be developed. This will require a cross agency approach to develop the necessary tools.

Additionally, delivering multiple messages ("enroll your children," "use health insurance wisely," "take care of preventive care") can create a challenge in our single sound-bite world.

## SECURING FEDERAL MATCH FOR OUTREACH

*Strategy:* The Legislature directed the department to maximize federal matching funds for its outreach programs. Federal match will make state dollars go quite a bit further.

*Process and Implementation:* DSHS has contacted the Centers for Medicare and Medicaid Services (CMS) to determine the potential for matching the allocated state funds with federal funds for outreach and education activities. In that initial contact, CMS instructed the department to submit an informal proposal outlining the target populations for this outreach effort and what type of information would be provided to the general public though this outreach effort. Since the outreach efforts are likely to include potential SCHIP, Medicaid and state only recipients, CMS indicated that the state likely would be required to allocate across all of those funding pools. The department is currently in the process of developing the informal proposal for review by CMS.

*Barriers and Limitations:* Securing federal match for children's health programs has become considerably more difficult since the state's earlier outreach efforts. Children's health funding, whether through outreach or through the State Children's Health Insurance Program, is much more challenging, and decisions from the federal government can be a very long time in coming. Additionally, CMS has clearly stated that in seeking any federal match for outreach the department would need to assure CMS that there is no duplication between the state-funded outreach efforts and federally-funded outreach efforts. It remains unclear about how much federal match the department will be able to secure, but will actively pursue funding.

It is the department's goal to be able to claim Title XXI SCHIP or Title XIX Medicaid FFP for outreach activities by July 2009. The department will keep the Legislature and Congressional delegation apprised of these efforts.

## SUSTAINING THE PROGRAM

*Strategy:* In order to achieve the goal of ensuring that all children have access to health coverage by 2010, we anticipate that the current outreach program's activities must continue into the 2009-2011 biennium.

*Process:* At the end of the biennium, the department will evaluate which outreach strategies were most successful and determine the cost of continuing them. We expect costs will be lower

in the second biennium for two reasons: 1) much of the infrastructure will have been established; and 2) less costly processes like automatic enrollments will have been implemented.

***Future Efforts***: We hope to receive ongoing state funding to continue outreach, focusing on those strategies proven effective here or in other states. We also anticipate that we will be successful in obtaining federal matching funds to support this effort.

## CONCLUSION

The report is presented by the department on behalf of the entire Children's Health Outreach Workgroup, and reflects our best thinking about initial plans for reaching and enrolling uninsured children into children's health programs.

An important part of success will be an evaluation of the strategies we have chosen, and making course corrections or enhancements as the program proceeds. We will also continue to look for promising strategies from other states engaged in similar outreach efforts, and learn from their successes and failures.

We appreciate the Legislature and the Governor's wisdom that outreach is critical in order for the Cover All Kids law to be successful. We are excited about the prospect of putting this plan into action. We hope that if the program reaches its goals, it will be continued into the future.

13

# EXHIBIT B

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C2-21-15
Baltimore, Maryland 21244-1850



**Center for Medicaid & State Operations, Family & Children's Health Program Group**

JAN 2 8 2008

Dear SCHIP Director:

This letter is a follow-up to the State Health Official Letter (SHO) of August 17, 2007, that clarifies how the Centers for Medicare & Medicaid Services (CMS) applies existing statutory and regulatory requirements in reviewing eligibility expansions under the State Children's Health Insurance Program (SCHIP) to families with effective family income levels above 250 percent of the Federal poverty level (FPL).

I want to reaffirm that this guidance was specifically designed to apply to new applicants, rather than to individuals currently served by the program. States, such as yours, that currently provide coverage to children with effective family incomes over 250 percent of the FPL have 12 months or until August 16, 2008, to come into compliance with the required crowd-out strategies and assurances laid out in the August 17th SHO for new enrollees.

It is our intention to work cooperatively with you so that your state will be able to permit the enrollment of additional children in higher income families if the reasonable standards of the August 17th guidance are met. And as such, we would like to begin discussions on how your State will implement appropriate procedures, if they are not already in place. Specifically, we look forward to upcoming discussions on your State's crowd-out strategy implementation plan and assurance that the State has enrolled at least 95 percent of the children in the State below 200 percent of the FPL who are eligible for either SCHIP or Medicaid. I would ask that you work with Ms. Kathleen Farrell, Director of the Division of State Children's Health Insurance, and her staff, to set up a conference call in the next few weeks. Ms. Farrell may be reached at 410-786-1236.

Sincerely,

Susan Cuerdon
Acting Director

# EXHIBIT C



THE SECRETARY OF HEALTH AND HUMAN SERVICES
WASHINGTON, D.C. 20201

JUL 3 1 2007

The Honorable Charles Grassley
Committee on Finance
U.S. Senate
Washington, DC 20510

Dear Senator Grassley:

Thank you for your letters to the President and myself
urging that no further waivers for adult coverage under the
State Children's Health Insurance Program (SCHIP) be
granted or renewed. I appreciate knowing of your concerns;
the Administration completely agrees with how important it
is to clearly "return SCHIP to the original focus of
covering low income children." I want to assure you that
we are taking appropriate steps to meet this objective.

With regard to states that have waivers coming up for
renewal, we are currently working with them to move their
adult populations into Medicaid. In FY 2006, approximately
700,000 adults were served in SCHIP waivers, of which
500,000 were parents of Medicaid or SCHIP children and
200,000 were childless adults. As waivers have come up for
renewal this year, we have moved adult populations out of
SCHIP and into Medicaid. We anticipate that, by October 1
of this year, 296,000 of these parents and 86,500 childless
adults - or 55 percent of all adults ever enrolled in SCHIP
in 2006 - will be moved out of SCHIP. Moving adults out of
SCHIP and into regular Medicaid will significantly lower
the funds projected for SCHIP in FY 2008.

I am concerned that the reauthorization legislation
reported by the Senate Finance Committee will reverse the
progress we have made with states. The bill would allow
states to keep their adults in SCHIP for a longer period of
time than would be allowable under the Administration's
approach. Under the Senate bill, there may still be
approximately 600,000 adults in SCHIP in 2012 according to
the Congressional Budget Office (CBO).

Page 2 - The Honorable Charles Grassley

This is not, of course, a new issue to Congress as the model waiver was introduced in August 2001, a time when states had substantial reserves in their allotments. Under the terms and conditions of these waivers, serving an adult could never result in a child being denied coverage. States also agreed to take appropriate actions if they were to exhaust their SCHIP allotments, a situation states have now faced in recent years as SCHIP has matured and enrollment of children increased.

States such as Illinois, New Jersey, and Wisconsin have provided data to support the original rationale for these waivers -- that family coverage would increase enrollment of children and that more flexibility in public programs would allow for more effective coverage of low-income individuals. States led by Democratic and Republican governors alike wanted alternatives to traditional Medicaid. These waivers proved to provide valuable lessons to support Medicaid reforms such as benefit flexibility and appropriate cost sharing that Congress adopted under your leadership, Senator Grassley, in the Deficit Reduction Act of 2005 (DRA).

Because of the important reforms in the DRA, Medicaid is now a more viable option for states to use to serve parents who are low-income but in the workforce and we are directing states to that option rather than to SCHIP. We do not intend to approve any new waivers that cover adults under SCHIP or renew any waivers for adults.

Under your leadership, Congress has previously taken action on the issue of adults in SCHIP in the DRA and in the National Institutes of Health Reform Act of 2006. The Senate bill is a step back from that progress. As you acknowledge, Congress also continued to fund shortfalls in states that were attributed in part to adult coverage.

Another issue that has developed in the current debate is that states have been allowed to increase eligibility beyond the definition of a targeted low-income child. These expansions have been made through State Plan Amendments, not waivers. These expansions have been accomplished because the law gives states great flexibility to define income. Through income disregards, states effectively raise the income eligibility threshold. Under current regulations, we have no authority to disapprove amendments solely based on income disregards. We support closing this loophole.

Page 3 - The Honorable Charles Grassley

I look forward to working with you on the important task of
reauthorizing SCHIP as it was originally intended.  This
should receive broad bipartisan support as it did when
SCHIP was created 10 years ago.  It is urgent that Congress
complete its work and send the President a bill he can sign
before the program expires September 30, 2007.  In fact,
the President would sign reasonable legislation to
reauthorize SCHIP today.  The President's Budget included a
proposed $5 billion expansion of the program over five
years, which translates into a 20 percent increase in
funding above the baseline.

The Office of Management and Budget advises that there is
no objection to the transmission of this letter as regards
the program of the President.

Thank you for your leadership on this important issue.

Sincerely,

Michael O. Leavitt