UNITED STATES DISTRICT COURT
SOURTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
STATE OF NEW YORK, STATE OF ILLINOIS, STATE OF  :
MARYLAND, STATE OF WASHINGTON,                  :
                          Plaintiffs,     :  07-CV-8621 (PAC)
                                                                                       :
                           - against -            :  ECF Case
                                                                                      :
UNITED STATES DEPARTMENT OF HEALTH AND          :
HUMAN SERVICES,                                 :
                                                             :
                                Defendant.      :
---------------------------------------------------------------- x

## MEMORANDUM OF LAW OF *AMICUS CURIAE*
## THE COUNCIL OF THE CITY OF NEW YORK
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
## JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

ELIZABETH R. FINE
General Counsel
Council of the City of New York
250 Broadway, 15th Floor
New York, New York 10007
(212) 788-7017

Attorney for *Amicus Curiae*
Council of the City of New York

Of Counsel:
Lauren G. Axelrod
Alvin L. Bragg, Jr.

# TABLE OF CONTENTS

    Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTEREST OF *AMICUS CURIAE* THE
COUNCIL OF THE CITY OF NEW YORK ......................................................................... 1

PRELIMINARY STATEMENT ........................................................................................... 3

ARGUMENT ......................................................................................................................... 6

    I.    DEFENDANT'S NEW DIRECTIVE WILL FORECLOSE A
        POLICY ALTERNATIVE THAT WOULD ADDRESS THE
        LACK OF HEALTH CARE ACCESS IN THE UNITED STATES
        AND NEW YORK STATE ................................................................................... 6

        A.    The Health Care Crisis in New York City ................................................ 6

        B.    SCHIP Should Be Expanded in New York to Address
            the Health Care Crisis ............................................................................... 7

        C.    Increasing the Eligibility Cap is a Promising Strategy for
            Reducing the Number of Uninsured Children ........................................... 8

        D.    Defendant's Directive Will Exacerbate the Health Care
            Crisis in New York ................................................................................... 9

    II.   DEFENDANT IMPROPERLY ADOPTED A NEW RULE IN
        VIOLATION OF THE NOTICE AND COMMENT PROVISIONS
        OF THE ADMINISTRATIVE PROCEDURE ACT ........................................... 12

        A.    The August 17 Letter Imposes Obligations Beyond
            Those Contemplated in the SCHIP Statute ............................................. 13

        B.    The August 17 Letter Binds the States ................................................... 14

CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Air Transport Ass'n of America v. FAA,
   291 F.3d 49 (D.C. Cir. 2002) .................................................................. 13

Chamber of Commerce of the U.S. v. Dep't of Labor,
   174 F.3d 206 (D.C. Cir. 1999) ................................................................ 14

General Electric v. EPA,
   290 F.3d 377 (D.C. Cir. 2002) ................................................................ 12, 13, 14

New York City Employees' Retirement Sys. v. SEC,
   45 F.3d 7 (2d Cir. 1995) .......................................................................... 12

Shalala v. Guernsey Mem'l Hospital,
   514 U.S. 87 (1995) .................................................................................. 13

United States Gypsum Co. v. Muszynski,
   209 F. Supp. 2d 308 (S.D.N.Y. 2002) ..................................................... 14

**Federal Statutes**

5 U.S.C. § 551 et seq. ....................................................................................... 12

42 U.S.C. § 1397aa(a) ...................................................................................... 4 n.12

42 U.S.C. § 1379bb(b)(B) ................................................................................ 4 n.12

**Federal Register**

64 Fed. Reg. 60,922 (Nov. 8, 1999) ................................................................ 13

66 Fed. Reg. 2,602 (Jan. 11, 2001) .................................................................. 9 n.33

**Federal Rules and Regulations**

42 C.F.R. § 457.1 ............................................................................................. 4 n.12

42 C.F.R. § 457.805 ......................................................................................... 9 n.32; 13

**Other Authorities**

Allison Cook et al., Urban Inst. & United Hosp. Fund, Health Insurance Coverage in New York, 2004-2005 (2007) .................................. 9 n.29

Children's Def. Fund – N.Y., Losing Ground: The Unanticipated Increase in Uninsured Children (2006) ...................................................... 3 n.11

Children's Def. Fund & The N.Y. Acad. of Med., Barriers to Enrollment in Child Health Insurance Programs (2003) ...................................... 2 n.7

Cindy Mann & Michael Odeh, Center for Children & Families, Moving Backward: Status Report on the Impact of the August 17 SCHIP Directive To Impose New Limits on States' Ability to Cover Uninsured Children (2007) .................................................................................. 10 n.37; 15 n.44

Eliot Spitzer, Let's Complete the Job: Expanding SCHIP, Apr. 23, 2007 ... 8 n.26

Fair Share Proposals for Health Care Costs: Hearing Before the Assembly Comm. on Ins. and Labor, 2006 Leg., 229th Sess. 5 (N.Y. 2006) (testimony of the Children's Defense Fund – New York) ............................... 9 n.34

Families USA, Administration Blocks Road to Coverage for Children (2007) .................................................................................. 10 n.36; 11 n.39, n.40

Families USA, The Great Divide: When Kids Get Sick, Insurance Matters (2007) .................................................................................. 6 n.15

Fiscal Policy Institute, The Health Care and Social Costs of the Uninsured in New York State (2007) ...................................................... 7 n.16, n.17

Genevieve M. Kenney, Medicaid and SCHIP Participation Rates: Implications for New CMS Directive, Health Policy Online No. 16 (Sept. 2007) .................................................................................. 10 n.38

Increasing Access to Health Insurance Coverage and Moving Toward Universal Coverage: Defining the Goals and Identifying the Steps: Hearing Before the N.Y. State Dep't of Health & Dep't of Ins. (2007) (statement of Marjorie Cadogan, Exec. Dir., Office of Citywide Health Insurance Access, N.Y. City Human Resources Administration) ............................ 1 n.3; 2 n.8

Jennifer Sullivan, Campaign for Children's Health Care, No Shelter From the Storm: America's Uninsured Children (2006) .......................... 3 n.11; 6 n.14

Letter from Christine C. Quinn, Speaker, New York City Council, to New York Congressional Delegation (Sept. 18, 2007) .......................... 2 n.6

| | |
|---|---|
| Letter from Dennis G. Smith, Dir., Ctr. for Medicaid & State Operations, Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Human Servs., to State Health Official (Aug. 17, 2007) | 3 n.10; 14 n.43 |
| Letter from Kerry Weems, Acting CMS Administrator, to Judith Arnold, Director, Division of Coverage and Enrollment, State of New York Department of Health (Sept. 7, 2007) | 5 n.13 |
| Lisa Dubay, Jennifer Haley, and Genevieve Kenney, The Urban Institute, Children's Eligibility for Medicaid and SCHIP: A View from 2000 (March 2002) | 2 n.8 |
| New York City Indep. Budget Office, Analysis of the Mayor's Preliminary Budget for 2002 (2001) | 7 n.18, n.19 |
| N.Y. State Dep't of Health, Child Health Plus Program Table of Enrollment by Insurer (December 2007) | 1 n.2; 8 n.24 |
| N.Y. State Dep't of Health, Child Health Plus: What benefits can you get for your kids? | 7 n.23 |
| N.Y. State Dep't of Health, Child Health Plus: Who is Eligible? (2008) | 7 n.21, n.22 |
| Press Release, N.Y. State Governor Eliot Spitzer, Governor Spitzer and Senator Clinton Call on President Bush to Reverse Federal Policy Denying Health Care Coverage to Thousands of Uninsured Children: Spitzer and Clinton Joined by Families Affected by Bush Action (Aug. 30, 2007) | 8 n.25; 10 n.35, n.38 |
| U.S. Census Bureau, Current Population Survey: Annual Social and Economic Supplement (2007) | 1 n.4, n.5; 3 n.9; 8 n.27; 9 n.30; 11 n.41 |
| U.S. Census Bureau, Current Population Survey: Annual Social and Economic Supplement (2006) | 11 n.41 |
| U.S. Ctr. for Medicare & Medicaid Servs., Dep't of Health & Human Servs. 2007 Poverty Level Guidelines (2007) | 7 n.21 |

MEMORANDUM OF LAW OF *AMICUS CURIAE*
THE COUNCIL OF THE CITY OF NEW YORK
IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The Council of the City of New York (the "Council") respectfully submits this *amicus curiae* memorandum of law in support of Plaintiffs' motion for partial summary judgment, and in opposition to Defendant's motion to dismiss the complaint in the above-captioned action.[1]

INTEREST OF *AMICUS CURIAE*
THE COUNCIL OF THE CITY OF NEW YORK

New York City (the "City") is the locality with the largest number of children enrolled in New York State's State Children's Health Insurance Program ("SCHIP"), Child Health Plus ("CHP"). The City is home to 144,580 children who were enrolled in CHP as of December 2007 – nearly 40 percent of all enrolled children in New York State.[2] Approximately 217,000 City children do not have insurance,[3] more than half of the uninsured children in the state.[4] In fact, only nine states (including New York) have more uninsured children than New York City.[5]

---

[1] By order dated February 4, 2008, this Court, with the consent of all parties, granted the Council's motion to submit this memorandum of law as an *amicus curiae*.
[2] N.Y. State Dep't of Health, Child Health Plus Program Table of Enrollment by Insurer (December 2007), www.health.state.ny.us/statistics/child_health_plus/enrollment/docs/2007-12.pdf [hereinafter CHP Enrollment Table].
[3] See Increasing Access to Health Insurance Coverage and Moving Toward Universal Coverage: Defining the Goals and Identifying the Steps: Hearing Before the N.Y. State Dep't of Health & Dep't of Ins., 3 (2007) (statement of Marjorie Cadogan, Exec. Dir., Office of Citywide Health Insurance Access, N.Y. City Human Resources Administration), available at http://home.nyc.gov/html/hra/downloads/pdf/HRA_OCHIA_testimony_110207.pdf [hereinafter Increasing Access].
[4] See U.S. Census Bureau, Current Population Survey: Annual Social and Economic Supplement (2007), available at www.census.gov/hhes/www/cpstc/cps_table_creator.html (custom created tables on file with the Council) [hereinafter 2007 Current Population Survey].
[5] Id.

1

As the legislative body of the City, the Council has oversight and budgetary authority for all city agencies, including those whose missions include providing health services to the City's children. The Council, therefore, is keenly aware of the effects of federal SCHIP funding and the need for such funding at the City level.

Because of the Council's significant interest, it has taken an active role in supporting the CHP program. In September 2007, the Council issued a letter to New York's congressional representatives, calling on Congress to reauthorize the SCHIP law and to override Defendant's new review strategy that is the subject of this litigation.[6] In January 2008, the Council passed a local law that requires CHP applications to be made available in day care centers. Easier access to applications is strongly correlated with actual enrollment: nearly half of all CHP enrollees in 2007 utilized facilitated enrollment services, through which local service providers assist applicants in completing applications for CHP.[7]

Despite these outreach efforts, there remain an estimated 24,000 to 94,000 children in the City who are uninsured but not eligible for any type of public insurance, mainly due to income eligibility requirements.[8] In an attempt to close this gap, New York State recently applied for a waiver to expand eligibility for CHP to children in families above 250 percent of the federal poverty limit ("FPL"). New York's proposed

---

[6] Letter from Christine C. Quinn, Speaker, New York City Council, to New York Congressional Delegation (Sept. 18, 2007), available at www.nyccouncil.info/pdf_files/reports/fedagenda.pdf.
[7] Children's Def. Fund & The N.Y. Acad. of Med., Barriers to Enrollment in Child Health Insurance Programs 8 (2003), available at www.cdfny.org/RR/reports/BarrierReportDRAFT.pdf.
[8] See Increasing Access, supra note 3, at 3. Most of these children live in families with income above 300 percent of the federal poverty limit ("FPL"), rendering them ineligible for Medicaid or CHP. Others are ineligible due to their citizenship status. See generally Lisa Dubay, Jennifer Haley, and Genevieve Kenney, The Urban Institute, Children's Eligibility for Medicaid and SCHIP: A View from 2000 (March 2002), available at www.urban.org/UploadedPDF/310435.pdf.

2

waiver would have made up to 80,000 children eligible for insurance coverage.[9] However, on August 17, 2007, Defendant issued a letter to state health officials that effectively prohibits any states from raising the family income maximum above 250 percent of the FPL (the "August 17 Letter")[10]. One month later, Defendant disapproved New York State's waiver application.

The Council submits this *amicus curiae* memorandum of law because New York City shares the state's concern for the well being of its youngest residents. Indeed, because the Council has legislative responsibility for the state's largest municipal population of uninsured children, it can bring to this Court a sense of the potential impact of a decision upholding Defendant's improper rulemaking.

## PRELIMINARY STATEMENT

Health care costs exact a toll on states and municipalities, which frequently are required to fill the gaps to provide for the health and well-being of their residents who might not gain access to health care services through their employers.[11] These costs are amplified in New York City, where the cost of living is one of the highest in the country. The City spends billions of dollars each year subsidizing hospitals, community health centers and public health programs.

---

[9] See 2007 Current Population Survey, supra note 4.
[10] Letter from Dennis G. Smith, Dir., Ctr. for Medicaid & State Operations, Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Human Servs., to State Health Official (Aug. 17, 2007), available at www.cms.hhs.gov/smdl/downloads/SHO081707.pdf [hereinafter August 17 Letter].
[11] Contrary to popular belief, the overwhelming majority of uninsured children live in working families. See Children's Def. Fund – N.Y., Losing Ground: The Unanticipated Increase in Uninsured Children 2 (2006), available at www.childrensdefense.org/site/DocServer/CDFNY_-_FinalLosingGround.pdf?docID=2961. Seventy percent of uninsured children who live with a parent live in families where at least one parent works full-time and year-round. See Jennifer Sullivan, Campaign for Children's Health Care, No Shelter From the Storm: America's Uninsured Children 2 (2006), available at www.childrenshealthcampaign.org/tools/reports/Uninsured-Kids-report.PDF [hereinafter Sullivan].

3

The SCHIP program was created to alleviate this heavy burden on states and municipalities. To that end, the statute gives states substantial flexibility in determining the standard of coverage for their residents.[12] Increasing the income eligibility cap is one method that has proven effective in expanding coverage and would be especially useful in New York City, where higher incomes often do not offset the higher cost of living. The SCHIP law also gives states flexibility in devising methods to prevent higher-income populations from substituting SCHIP coverage for private health insurance – a phenomenon referred to as "crowding out."

The August 17 Letter states that any state wishing to expand its income eligibility standard must use a fixed set of crowd out prevention methods. States must now ensure that (1) the cost sharing requirements of state plans are not more favorable than those of competing private plans by more than 1 percent of the family income; (2) new enrollees wait a minimum of one year without insurance before they are eligible for public coverage; (3) at least 95 percent of children living below 200 percent of the FPL are enrolled; and (4) the number of children living below 200 percent of the FPL who are insured through private plans has not decreased by more than two percentage points over the previous five years.

In April 2007, New York State submitted a Title XXI state plan amendment ("SPA") to Defendant. The SPA requested that the state be allowed to raise CHP income

---

[12] See 42 C.F.R. § 457.1; see also 42 U.S.C. § 1397aa(a) (SCHIP is intended "to provide funds to States to enable them *to initiate and expand* the provision of child health assistance to uninsured, low-income children in an effective and efficient manner that is coordinated with other sources of health benefits coverage for children") (emphasis added). Indeed, the SCHIP statute sets forth only two restrictions on setting eligibility standards: the state may not target children with higher family income without covering children with a lower family income, and the state may not deny eligibility based on a child having a pre-existing medical condition. See 42 U.S.C. § 1397bb(b)(B).

4

limits to 400 percent of the FPL, and to require children in families with incomes above 250 percent of the FPL to have been uninsured for six months prior to enrollment in CHP, with some exceptions. In September 2007, Defendant denied New York's request, citing the August 17 Letter. Specifically, Defendant determined that the state had not enrolled at least 95 percent of children who are currently eligible; did not include a waiting period for children in families with incomes over 250 percent of the FPL; and failed to limit the cost sharing advantage to one percent of the family income.[13]

As demonstrated by Defendant's rejection of the SPA, the August 17 Letter effects a substantial policy change: it imposes mandatory, nationwide crowd out prevention standards on all states that wish to expand SCHIP coverage. As this memorandum discusses in Part I, these mandatory standards are unattainable for most states and will prevent thousands of children from receiving insurance coverage. For higher cost areas such as New York City, raising income eligibility thresholds is an effective means of expanding coverage for children in great need of insurance. Defendant's directive threatens New York's ability to use this method. Not only is Defendant's directive flawed as a matter of policy, but also, as Part II demonstrates, it is invalid as a matter of law. The August 17 Letter imposes new, legally binding obligations that depart dramatically from the plain language of the SCHIP statute, its implementing rules and regulations, and the historical operation of the program, and is therefore a legislative rule. Accordingly, Defendant's failure to seek notice and comment before promulgating the August 17 Letter constitutes a violation of the Administrative Procedure Act. For these reasons, the August 17 Letter should be declared unlawful.

---

[13] Letter from Kerry Weems, Acting CMS Administrator, to Judith Arnold, Director, Division of Coverage and Enrollment, State of New York Department of Health (Sept. 7, 2007), available at www.familiesusa.org/assets/pdfs/ny-spa.pdf.

## ARGUMENT

I. **DEFENDANT'S NEW DIRECTIVE WILL FORECLOSE A POLICY ALTERNATIVE THAT WOULD ADDRESS THE LACK OF HEALTH CARE ACCESS IN THE UNITED STATES AND NEW YORK STATE**

New York City is currently undergoing a health care crisis. The City is home to thousands of uninsured children, many of whom are not qualified for Medicaid. The SCHIP program was created to alleviate the social and financial costs incurred by states with large populations of uninsured children. To that end, the statute affords states substantial flexibility in determining appropriate income eligibility standards and crowd out prevention methods. Defendant's August 17 Letter departs from the intent and historical operation of SCHIP. Its one-size-fits-all mandates will hamstring New York's efforts to expand coverage for the state's youngest residents.

A.   The Health Care Crisis in New York City

New York City's 217,000 uninsured children are at particular risk for illness and injury because of their uninsured status. They are three times more likely than those with coverage to have not seen a physician within the past year and thirteen times more likely to lack a regular source of primary care.[14] In New York State, uninsured children admitted to the hospital because of injuries are 20 percent more likely to die while in the hospital and 43 percent less likely to be discharged to rehabilitative care than children with insurance.[15]

Uninsured individuals also require substantial resources from the City and its health care infrastructure. The Fiscal Policy Institute ("FPI") estimates that uncompensated care provided to uninsured residents of New York City cost $1.4 billion

---

[14] Sullivan, supra note 11, at 7.
[15] Families USA, The Great Divide: When Kids Get Sick, Insurance Matters 5 tbls.2 & 3 (2007), available at www.familiesusa.org/assets/pdfs/the-great-divide.pdf.

6

in 2006.[16] FPI also estimates that the social costs of the uninsured in New York were between $2.5 and $4.9 billion.[17] The City's public hospitals bear a large part of this burden. In 2000, the New York City Health and Hospitals Corporation treated 560,476 uninsured individuals at a cost of $780 million.[18] Of this, the state reimbursed only $480 million, or roughly 62 percent, of the cost of care.[19]

B.   SCHIP Should Be Expanded in New York to Address the Health Care Crisis

Despite the success of CHP, the state and the City continue to seek ways of expanding coverage to reach the thousands of lower income children who remain uninsured. To be eligible for CHP, a child must be a New York State resident under the age of 19 who has no other source of health insurance, with some exceptions.[20] Families with lower incomes pay no monthly premium,[21] while families with higher incomes pay a small premium per child.[22] CHP covers comprehensive medical care including primary and preventive care, laboratory tests, emergency care, inpatient hospital and surgical care, prescriptions and dental care.[23]

---

[16] Fiscal Policy Institute, The Health Care and Social Costs of the Uninsured in New York State 4 (2007), available at www.fiscalpolicy.org/publications2007/FPI_CostsofUninsured_Dec07.pdf.
[17] Id.
[18] New York City Indep. Budget Office, Analysis of the Mayor's Preliminary Budget for 2002 41 (2001), available at www.ibo.nyc.ny.us/iboreports/march2001report.pdf.
[19] Id.
[20] See N.Y. State Dep't of Health, Child Health Plus: Who is Eligible? (2008), www.health.state.ny.us/nysdoh/chplus/who_is_eligible.htm (last visited April 21, 2008) [hereinafter Who Is Eligible]; U.S. Ctr. for Medicare & Medicaid Servs., Dep't of Health & Human Servs. 2007 Poverty Level Guidelines 1 (2007).
[21] See id.; U.S. Ctr. for Medicare & Medicaid Servs., Dep't of Health & Human Servs. 2007 Poverty Level Guidelines 1 (2007), www.cms.hhs.gov/medicaideligibility/downloads/POV07ALL.pdf (last visited April 21, 2008).
[22] In 2007, families with incomes of 222 percent of the FPL paid nine dollars per month for each child and families with incomes of 250 percent of the FPL paid 15 dollars per month for each child. See Who Is Eligible, supra note 21.
[23] N.Y. State Dep't of Health, Child Health Plus: What benefits can you get for your kids?, www.health.state.ny.us/nysdoh/chplus/what_benefits_can_you_get.htm (last visited April 21, 2008).

As of December 2007, 368,804 children were enrolled in CHP, including 144,580 New York City children.[24] This enrollment number represents 88 percent of all children eligible (*i.e.*, living below 250 percent of the FPL) for SCHIP in 2007.[25] Since CHP became a federally approved SCHIP plan in 1998, the number of uninsured children has decreased by 40 percent.[26] Although New York State and City will continue to try to enroll every eligible child through successful strategies such as facilitated enrollment (through which local service providers assist applicants in completing applications for CHP), other avenues must be made available to decrease the population of uninsured children. Of the state's population of uninsured children, 140,000 are not eligible for CHP under the current income cap of 250 percent of the FPL.[27] This number includes an estimated 24,000 to 94,000 children in the City who are uninsured but not eligible for any type of public insurance.[28] The state must retain the flexibility to pursue new strategies in order to make insurance available to these children.

C. <u>Increasing the Eligibility Cap is a Promising Strategy for Reducing the Number of Uninsured Children</u>

Raising the income limit for CHP eligibility would serve to reduce further the number of New York children who live without critical health coverage because their parents are unable to afford personal coverage or lack employer-based coverage. Increasing eligibility is particularly important in New York City, as the City's higher cost

---

[24] CHP Enrollment Table, <u>supra</u> note 2.
[25] <u>See</u> Press Release, N.Y. State Governor Eliot Spitzer, <u>Governor Spitzer and Senator Clinton Call on President Bush to Reverse Federal Policy Denying Health Care Coverage to Thousands of Uninsured Children: Spitzer and Clinton Joined by Families Affected by Bush Action</u> (Aug. 30, 2007), <u>available at</u> www.ny.gov/governor/press/0830071.html [hereinafter Spitzer Press Release].
[26] Eliot Spitzer, <u>Let's Complete the Job: Expanding SCHIP</u> (Apr. 23, 2007), <u>available at</u> www.commonwealthfund.org/publications/publications_show.htm?doc_id=478902#areaCitation.
[27] <u>See</u> 2007 Current Population Survey, <u>supra</u> note 4.
[28] <u>See</u> discussion <u>supra</u> note 8.

8

of living makes health care even less affordable for many families and the City has a higher percentage of uninsured individuals than the rest of the State.[29] In 2006, 34 percent of uninsured children in New York State lived in families that were at or above 250 percent of the FPL, including 14 percent at or above 400 percent of the FPL.[30] Expanding eligibility for CHP to children in families with incomes at or below 400 percent of the FPL, as New York State has proposed, could extend coverage for up to 80,000 additional uninsured children.[31]

D.   Defendant's Directive Will Exacerbate the Health Care Crisis in New York

Prior to August 2007, SCHIP rules only required that states have "reasonable procedures" in place to prevent insureds and their employers from substituting SCHIP insurance for private coverage.[32] States were encouraged to develop their own crowd out prevention methods, based on their own unique experiences with the SCHIP program.[33] For example, New York has always enjoyed a particularly low crowd out rate, and therefore has never imposed a waiting period to enroll in CHP.[34] Pursuant to the August 17 Letter, however, an eligible child who was previously covered by private insurance will have to remain uninsured for twelve months following the loss of private coverage. This mandatory waiting period would create an unacceptable health care gap for New York children, and would be a dramatic departure from the state's policy.

---

[29] Allison Cook et al., Urban Inst. & United Hosp. Fund, Health Insurance Coverage in New York, 2004-2005 3 (2007), available at www.uhfnyc.org/usr_doc/Chartbook_2004-05_Final.pdf.
[30] See 2007 Current Population Survey, supra note 4.
[31] See id.
[32] 42 C.F.R. § 457.805.
[33] 66 Fed. Reg. 2,602 (Jan. 11, 2001) (on the phrase "reasonable procedures" to prevent substitution: "This approach permits State flexibility and implementation of policies based on the emerging research regarding substitution and on State experiences with substitution").
[34] Fair Share Proposals for Health Care Costs: Hearing Before the Assembly Comm. on Ins. and Labor, 2006 Leg., 229th Sess. 5 (N.Y. 2006) (testimony of the Children's Defense Fund – New York), available at www.cdfny.org/FairShare%20Testimony%205.23.06.pdf.

The August 17 Letter also establishes standards that are not squarely within the states' control, and therefore unfairly penalizes children living above 250 percent of the FPL, whose coverage is contingent upon states' compliance with the new mandates. First, the August 17 Letter requires that states enroll 95 percent of children living below 200 percent of the FPL. The 95 percent enrollment mandate is extraordinarily difficult to achieve, and will result in a denial of coverage to thousands of uninsured children if a state fails to attain a few additional percentage points. As discussed above, through aggressive outreach and enrollment strategies, New York State enrolled approximately 88 percent of all eligible children (those living below 250 percent of the FPL) for SCHIP in 2007.[35] Currently *no state* meets the 95 percent enrollment standard.[36] The average participation rate for SCHIP is approximately 63 percent,[37] which New York State exceeds.[38] Defendant's directive will stymie New York's efforts to provide insurance to those children whom it has determined should be eligibile – those living under 400 percent of the FPL. Children living between 250 and 400 percent of the FPL in one of the country's most expensive cities should not be denied access to public insurance merely because New York falls a few percentage points shy of this new nationwide enrollment standard.

---

[35] See Spitzer Press Release, supra note 25.
[36] Families USA, Administration Blocks Road to Coverage for Children 1 (2007), www.familiesusa.org/assets/pdfs/administration-road-blocks.pdf [hereinafter Administration Blocks Road].
[37] Cindy Mann & Michael Odeh, Center for Children & Families, Moving Backward: Status Report on the Impact of the August 17 SCHIP Directive To Impose New Limits on States' Ability to Cover Uninsured Children 2 (2007), available at http://ccf.georgetown.edu/index/cms-filesystem-action?file=ccf%20publications/federal%20schip%20policy/movingbackward1212.pdf [hereinafter Mann & Odeh].
[38] See Spitzer Press Release, supra note 25; see also Genevieve M. Kenney, Medicaid and SCHIP Participation Rates: Implications for New CMS Directive, Health Policy Online No. 16 (Sept. 2007), available at www.urban.org/UploadedPDF/411543_medicaid_schip.pdf (discussing CMS estimates of participation rates).

Second, the August 17 Letter requires states to ensure that the number of children living below 200 percent of the FPL who are insured by private plans has not decreased by more than two percentage points in the past five years. States cannot control the percent of the population who have private insurance coverage, yet they will be prevented from extending coverage to children living above 250 percent of the FPL based on this unmanageable requirement. Employers may choose to roll back coverage for a variety of reasons unrelated to the availability of public insurance, including economic recessions or industry slowdowns. Nationally, employer-provided health insurance has declined approximately five percent since 2001,[39] which exceeds the allowable decline under Defendant's directive. Yet, the number of uninsured children has also increased over the past two years.[40] In New York State, the percentage of children living below 200 percent of the FPL who are not insured by employer-based plans increased 1.9 percentage points from 2006 to 2007.[41] New York children living between 250 and 400 percent of the FPL should not be denied CHP coverage on the basis of factors beyond the state's control.

Defendant has eradicated the states' longstanding discretion to determine SCHIP income eligibility standards based upon their unique populations and experiences with the program. The effects of the new standards are binding and already evident: Defendant's rejection of the New York SPA has delayed immediate access to public health insurance for thousands of children across the state and City.

---

[39] Administration Blocks Road, supra note 36.
[40] Id.
[41] See 2007 Current Population Survey, supra note 4; U.S. Census Bureau, Current Population Survey: Annual Social and Economic Supplement (2006).

## II. DEFENDANT IMPROPERLY ADOPTED A NEW RULE IN VIOLATION OF THE NOTICE AND COMMENT PROVISIONS OF THE ADMINISTRATIVE PROCEDURE ACT

In issuing the August 17 Letter, Defendant illegally promulgated a new rule in violation of the Administrative Procedure Act ("APA"). See 5 U.S.C. § 551 et seq. The APA requires that all agencies follow notice-and-comment rulemaking procedures when promulgating new rules. See 5 U.S.C. § 553(b). The statute sets forth limited exceptions to this requirement. An agency may bypass notice-and-comment rulemaking (i) when it issues interpretive rules, statements of policy, and internal rules, or (ii) where the agency finds that notice and comment would be impractical, or not in the public interest.[42] Id. § 553(b)(A), (B). The August 17 Letter does not qualify for any of the APA exemptions, and therefore Defendant violated the APA when it promulgated a legislative rule without giving the public notice and an opportunity to comment.

In distinguishing a legislative rule, which requires notice and comment, from an interpretive rule, which does not require notice and comment, courts consider (i) whether the agency action imposes additional rights and obligations on the agency and/or the regulated entity, and (ii) whether the rule will have a binding effect on the regulated entity. See General Electric v. EPA, 290 F.3d 377, 382 (D.C. Cir. 2002) (noting overlap between the two factors and recognizing that the second factor – whether a rule has the force of law – is more important); see also New York City Employees' Retirement Sys. v. SEC, 45 F.3d 7, 12 (2d Cir. 1995) ("Legislative rules are those that 'create new law, rights, or duties, in what amounts to a legislative act.' . . . . Legislative rules have the force of law. . . . Interpretive rules, on the other hand, do not create rights, but merely

---

[42] Defendant does not claim in its papers, nor did it state in the August 17 Letter, that the August 17 Letter was an internal rule or that notice and comment was impractical or not in the public interest.

12

'clarify an existing statute or regulation'") (citations omitted). The August 17 Letter is a legislative rule because it imposes obligations on the states beyond those set forth in the SCHIP statute, and because it carries the binding force of law. The parties do not disagree as to the legal standard; Defendant's argument rests exclusively on its strained interpretation of the substance and effect of the August 17 Letter.

A.  The August 17 Letter Imposes Obligations Beyond Those Contemplated in the SCHIP Statute

Contrary to Defendant's assertion, the August 17 Letter is not "merely a general statement of policy or interpretive rule." (Def. Mem. at 33.) An interpretive rule "spells out a duty fairly encompassed within the regulation." Air Transport Ass'n of America v. FAA, 291 F.3d 49, 55-56 (D.C. Cir. 2002) (quoting Paralyzed Veterans of America v. D.C. Arena L.P., 117 F.3d 579, 588 (D.C. Cir. 1997)); see also Shalala v. Guernsey Mem'l Hospital, 514 U.S. 87, 100 (1995) (notice and comment is required if an interpretation "adopts a new position inconsistent with . . . existing regulations") (citation omitted). By contrast, the August 17 Letter requires states to follow specific crowd out procedures, none of which could be anticipated from the language of the SCHIP statute or Defendant's regulations promulgated thereunder. Previously, states were only required to "include a description of reasonable procedures" to prevent crowd out. See 42 C.F.R. § 457.805. Indeed, Defendant has expressly acknowledged that it lacks the authority to mandate that states adopt any specific crowd-out prevention procedures. See 64 Fed. Reg. 60,922 (Nov. 8, 1999). These new and significant additions to the states' original obligations under SCHIP demonstrate that the August 17 Letter is, in fact, a legislative rule.

13

B.  The August 17 Letter Binds the States

Even if the August 17 Letter could be considered a statement of policy or an interpretive rule, it would still be subject to notice-and-comment rulemaking because it binds the regulated entities. See General Electric at 382. Defendant incorrectly argues that the August 17 Letter cannot be considered to have "legal consequences" simply because a state may be induced to make a certain choice. (Def. Mem. at 36). However, Defendant's position directly conflicts with the caselaw, which holds that a regulated entity's response may be evidence of a legally binding rule. See General Electric v. EPA, 290 F.3d 377 (D.C. Cir. 2002) (finding EPA statement of policy on waste disposal worked in practice as binding); Chamber of Commerce of the U.S. v. Dep't of Labor, 174 F.3d 206 (D.C. Cir. 1999) (finding an elective program chosen by 99% of regulated entities, because of the adverse consequences if they did not, to be a substantive rule); United States Gypsum Co. v. Muszynski, 209 F. Supp. 2d 308, 309-10 (S.D.N.Y. 2002) (refusing to "entertain the pretense that the [documents at issue] were merely 'advisory'" where defendants' reversal of position occurred solely on the basis of the new criteria).

Defendant has rejected New York State's proposed plan amendment, and is positioned to reject other states' proposed plan expansions, on the basis of the August 17 Letter. As the August 17 Letter states, Defendant "expect[s] affected States to amend their SCHIP state plan ... in accordance with this review strategy within 12 months, or CMS may pursue corrective action."[43] Defendant even concedes that the letter sets forth "the approach the agency intends to follow in future adjudications of state plans – which is where ***binding decisions*** will be made." (See Def. Mem. at 35) (emphasis added). At least four other states have modified their SCHIP plans as a direct result of the August 17

---

[43] August 17 Letter, supra note 10.

Letter.[44]  Where, as here, agency action imposes new obligations that carry the force of law, that action constitutes final rulemaking by the agency.

### CONCLUSION

From a policy perspective, Defendant's August 17 Letter will exacerbate the health crisis in New York City because it will foreclose an effective means of expanding coverage for the state's youngest residents.  States must retain the discretion to determine their own income eligibility standards, especially to ensure coverage of children in high cost areas such as New York City.  As a matter of law, Defendant illegally promulgated a rule in violation of the APA.  Accordingly, Defendant's arguments should be rejected and its motion to dismiss denied, and Plaintiffs' motion for partial summary judgment should be granted.

Dated: New York, New York
       April 23, 2008

> Respectfully submitted,
>
> FOR *AMICUS CURIAE* THE COUNCIL
> OF THE CITY OF NEW YORK
> Elizabeth R. Fine
> General Counsel
>
> By:    Lauren G. Axelrod (LA-1978)
>        Alvin L. Bragg, Jr. (AB-7889)
> Office of the General Counsel
> 250 Broadway, 15th Floor
> New York, New York 10007
> (212) 788-7017

---

[44] See Mann & Odeh, supra note 37, at 1.