**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------- x

STATE OF NEW YORK,
STATE OF ILLINOIS,
STATE OF MARYLAND,
STATE OF WASHINGTON,

Plaintiffs,

- against –

UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES

Defendant.

---------------------------------------- x

No.: 07-CV-8621
(PAC) (RLE)

---

**AMICUS CURIAE BRIEF OF**
**THE HEALTHCARE ASSOCIATION OF NEW YORK STATE**

---

**WILSON, ELSER, MOSKOWITZ,**
**EDELMAN & DICKER LLP**
Michael G. Weisberg, Esq.
*Attorneys for Healthcare Association*
*of New York State, Amicus Curiae*
677 Broadway, 9th Floor
Albany, New York 12207
(518) 449-8893

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTEREST OF THE AMICUS ........ 1

SUPPLEMENTAL STATEMENT OF FACTS ........ 3

A. Uninsured Children Go Without Care ........ 3

B. The Burden of Caring for the Uninsured Falls Disproportionately Upon Hospitals ........ 7

C. Everyone Suffers ........ 9

ARGUMENT – THE AUGUST 17, 2007 LETTER IS CAUSING PRESENT HARDSHIPS IN NEW YORK ........ 10

CONCLUSION ........ 14

## TABLE OF AUTHORITIES

### CASES

*American Hosp. Ass'n v. Sullivan*, 1990 U.S. Dist. LEXIS 6306 (D.D.C. 1990)....................10

*American Med. Ass'n v. Weinberger*, 522 F.2d 921 (7th Cir. 1975)....................10, 11

*Better Government Ass'n v. Department of State,* 780 F.2d 86 (D.C. Cir. 1986)....................13

*Burlington Mem. Hosp. v. Bowen*, 644 F. Supp. 1020 (W.D. Wis. 1986)....................10

*DeBuono v. NYSA-ILA Med. & Clin. Servs. Fund*, 520 U.S. 806 (1997)....................10

*Hillsborough County v. Automated Med. Labs.*, 471 U.S. 707 (1985)....................10

*Johnson v. Wright*, 412 F.3d 398 (2d Cir. 2005)....................11

*Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974)....................12

*New York v. Heckler*, 719 F.2d 1191 (2d Cir. 1983)....................10, 11

*New York v. Schweiker*, 557 F. Supp. 354 (S.D.N.Y. 1983)....................10, 11

*Pharmaceutical Soc'y v. New York State Dep't of Soc. Servs.*, 50 F.3d 1168 (2d Cir. 1995)....................10

*Planned Parenthood Federation v. Heckler*, 712 F.2d 650 (D.C. Cir. 1983)....................10

### FEDERAL STATUTES AND REGULATIONS

34 C.F.R. § 300.8(c)....................7

20 U.S.C. § 1400....................7

20 U.S.C. § 1400(c)(1)....................7

20 U.S.C. § 1400(c)(2)(C)....................7

20 U.S.C. § 1401(3)....................7

42 U.S.C. § 300....................11

42 U.S.C. § 1395dd....................8

## NEW YORK STATE STATUTES

N.Y. CONST. art. XVII, §§ 1, 3 .......... 10

N.Y. PUB. HEALTH LAW § 2800 .......... 10

N.Y. UNCONSOL. LAWS § 7382 .......... 10

## PUBLICATIONS

"Delays in Treatment for Mental Disorders and Health Insurance Coverage," HEALTH SERVS. RESEARCH, Vol. 39, Issue 2, at 221-223 (Apr. 2004) .......... 5

"Going Without: America's Uninsured Children," Robert Wood Johnson Foundation (Aug. 2005), http://www.rwjf.org/files/newsroom/ckfresearchreportfinal.pdf .......... 5

"Income, Poverty, and Health Insurance Coverage in the United States: 2006," U.S. Census Bureau (Aug. 2007), http://www.census.gov/prod/2007/pubs/p60-233.pdf .......... 8

"No Shelter from the Storm: America's Uninsured Children," Campaign for Children's Health Care (Publication No. CCHC-0601, 2006) http://www.childrenshealthcampaign.org/tools/reports/Uninsured-Kids-report.PDF .......... 5

"Preventive Care for Children in Low-Income Families: How Well Do Medicaid and State Children's Health Insurance Programs Do?," Cynthia D. Perry and Genevieve M. Kenney, PEDIATRICS (2007), http://pediatrics.aappublications.org/cgi/content/full/120/6/e1393 .......... 6

"Racial, economic disparities seen in kids' vision care: Uncorrected vision may impair performance in school," University of Michigan Health System, http://www.eurekalert.org/_pub_releases/2003-05/uomh0red043003.php .......... 6

"Summary Health Statistics for U.S. Children: National Health Interview Survey, 2006," http://www.cdc.gov/nchs/data/series/sr_10/sr10_234.pdf .......... 3, 4

"Understanding the Effects of Maltreatment on Early Brain Development," U.S. Department of Health and Human Services, Administration for Children and Families (Oct. 2001), http://www.childwelfare.gov/pubs/focus/earlybrain/earlybrain.pdf .......... 5-6

"Use of Hospital Emergency Departments in New York City: What Does it Tell Us about Access to Care?," United Hospital Fund, HOSPITAL WATCH (Apr. 2008), www.uhfnyc.org/usr_doc/Hospital_Watch_April_2008.pdf ........ 8-9

"Waits to See an Emergency Department Physician: U.S. Trends and Predictors, 1997-2004," Andrew P. Wilper, et al, 27 HEALTH AFFAIRS – WEB EXCLUSIVE w84 (no.2, Jan. 15, 2008) ........ 8, 9

"Why Health Insurance is Important," Randall R. Bovbjery and Jack Hadley, The Urban Institute, (DC-SPG no.1, Nov. 2007), http://www.urban.org/UploadedPDF/411569_importance_of_insurance.pdf ........ 5

## INTEREST OF THE AMICUS

The Healthcare Association of New York State ("HANYS") is New York's statewide trade association representing the interests of over 220 not-for-profit voluntary or public hospitals as well as over 200 other not-for-profit health care providers in New York State. With a mission of advancing "the health of individuals and communities by providing leadership, representation, and service to health providers and systems across the entire continuum of care," HANYS provides technical, educational, administrative, and advocacy services for its members, and frequently advocates on behalf of its members and their patients in State and Federal courts. HANYS has filed numerous *amicus* briefs with respect to issues important to its membership.

With respect to the present litigation, HANYS submits this *amicus* brief in order to emphasize that the present case is ripe for judicial action. While the Defendant claims that the Plaintiffs' claims are not ripe because the Defendant's August 17, 2007 "Dear State Health Official" letter is not being implemented and is not binding, (*see* Defendant's Brief, at 14-18), the Plaintiffs have shown that the Defendant *is* implementing the August 17th letter. In fact, the Defendant relied upon the criteria set forth in the August 17th letter—which are not set forth in any other administrative pronouncement—as the Defendant's basis for rejecting New York's proposed State Plan Amendment, (*see* Plaintiffs' Brief, at 14-15), and the Defendant also has advised the State of Maryland that Maryland faces a one-year deadline for coming into compliance with the August 17th letter's requirements. (*See* Plaintiffs' Brief, at 20-21).

The Plaintiffs have already provided the Court with their first-hand knowledge of the August 17th letter's implementation, and the Plaintiffs also have presented comprehensive arguments in support of their legal contentions. This *amicus* brief will not repeat these arguments. Rather, in this *amicus* brief, HANYS focuses on the issue with respect to which

HANYS has unique insight: the hardship that New York's hospitals and their patients are enduring on a daily basis as a consequence of the Defendant's actions.

This case would be serious enough if it were only about New York's 72,000 uninsured children whose family incomes are between 250% and 400% of the federal poverty level. *See* Arnold Decl., ¶ 25. In fact, however, the adverse impact of these children's lack of insurance is felt even more widely. The burden of caring for the uninsured, including uninsured children, falls especially heavily on New York's hospitals. Ultimately, these burdens work to the detriment of the hospitals' other patients, including patients who have health insurance and who therefore would at first blush appear to be unaffected by the Defendant's SCHIP decisions. Because of the concrete harms that recur on a daily basis in New York as a result of the lack of health insurance for all New Yorkers, including New York's children, the present action is ripe, and the Defendant's motion to dismiss must be denied.

To prove this point, HANYS includes in this *amicus* brief a Supplemental Statement of facts that provides additional factual information in support of the Plaintiffs. The Supplemental Statement of Facts begins with a discussion of the ways in which uninsured children do and do not obtain health care services. HANYS then discusses the burdens that New York's hospitals experience in caring for the uninsured, including uninsured children. HANYS concludes its Supplemental Statement of Facts by discussing the hardships that the hospitals' other patients experience as a result of the uninsured. Finally, HANYS argues in this *amicus curiae* brief that New York and its children, hospitals, and hospital patients have incurred and continue on a daily basis to incur a hardship as a result of the Defendant's implementation of the August 17, 2007 letter, and that the "hardship" element of ripeness therefore is satisfied in the present case.

## SUPPLEMENTAL STATEMENT OF FACTS

A. Uninsured Children Go Without Care.

The denial of health insurance coverage to a child is not just a matter of withholding payment for health care services. Rather, the denial of health insurance coverage is effectively a denial of care. Children who lack health insurance receive fewer health care services than insured children, and, ironically, the health care services that the uninsured children receive are both more expensive than and less medically appropriate than the health care services received by children who have private or public health insurance.

The Defendant's own data confirm this point. In its publication "Summary Health Statistics for U.S. Children: National Health Interview Survey, 2006," available at http://www.cdc.gov/nchs/data/series/sr_10/sr10_234.pdf, the U.S. Department of Health and Human Services reports that in 2006: "About 1.8 million children (2%) were unable to get needed medical care because the family could not afford it, and medical care for 2.9 million children (4%) was delayed because of worry about the cost." *Id.*, at 6. Among uninsured children, more than 12% had an unmet medical need, and nearly 17% of uninsured children experienced a delay in care because of worry about the cost. *Id.*, at 39.

The same publication by the Defendant also shows that:

- Only 74% of uninsured children had a usual place of health care compared with 98% of children with private health insurance and 97% of children with Medicaid or other public coverage. *Id.*, at 6, 32.
- Uninsured children were four times more likely to use an emergency room as their usual place of health care than insured children were. *Id.*, at 6, 32.

- Children with public health insurance coverage (16%) or private health insurance coverage (13%) were significantly more likely than children with no health insurance coverage (5%) to have been on regular medication. *Id.*, at 5, 15.
- Twenty-three percent of uninsured children had unmet dental needs, compared with 4% of children with private health insurance and 7% of children with Medicaid or other public coverage. *Id.*, at 6, 45
- Uninsured children are significantly less likely than insured children to be diagnosed with respiratory conditions such as asthma (*id.*, at 8), or hay fever and respiratory allergies. *Id.*, at 10.
- Uninsured children also are significantly less likely to be diagnosed with conditions that affect their educational needs, such as learning disabilities and attention deficit hyperactivity disorder. *Id.*, at 13.

Predictive of all of these results are the Defendant's data with respect to the amount of time that has elapsed since a child's last contact with a health care professional. In this regard, the Defendant found that 27% of uninsured children had not seen a health care professional in over a year, compared with 7% of privately insured and 8% of publicly insured children. Twelve percent of uninsured children had not seen a health care professional in more than two years, compared with 2% of privately insured and 4% of publicly insured children, and 6% of uninsured children had not seen a health care profession in more than five years, compared with 1% of privately insured and 3% of publicly insured children. *Id.*, at 37.

The facts behind these statistics are clear: children who rarely see a doctor or other health care professional have few opportunities to have their health conditions diagnosed. And with no diagnosis, there is no treatment. The Defendant's own data show that uninsured children are

systematically lack essential health care services to identify and treat medical conditions that affect the children's daily living. Too often, delays in obtaining treatment result in a worsening of the patient's medical condition and harmful medical consequences that could have been avoided. *E.g.*, Randall R. Bovbjerg and Jack Hadley, "Why Health Insurance is Important," The Urban Institute, (DC-SPG no.1, Nov. 2007), available at http://www.urban.org/UploadedPDF/411569_importance_of_insurance.pdf.

Further, even when uninsured children receive care, the care that they receive is often episodic, unlike the continuous care that insured children typically enjoy with their pediatricians or other providers of ongoing primary medical care.[1] Campaign for Children's Health Care, "No Shelter from the Storm: America's Uninsured Children," (Publication No. CCHC-0601, 2006), at 13 (available at http://www.childrenshealthcampaign.org/tools/reports/Uninsured-Kids-report.PDF). The lack of an ongoing doctor-patient relationship results in a fragmentation of the patient's care, with numerous providers and no coordination between them, and with inadequate attention to fundamental primary care services such as immunizations. *Id.* In the absence of any single provider, and often in the absence of any single, comprehensive medical record, it becomes impossible for any health care professional to evaluate a child on a longitudinal basis to monitor the child's development and identify changes that suggest a need for further assessment. Physicians lose the opportunity to recognize neurodevelopment issues that are critical to identify and address early in childhood, before the child turns five and preferably before the child turns three, (U.S. Department of Health and Human Services, Administration for Children and Families, "Understanding the Effects of Maltreatment on Early Brain Development" (Oct.

---

[1] Eighty-six percent of insured children have a relationship with someone they consider to be their personal doctor or nurse, compared with only 57% of uninsured children. Robert Wood Johnson Foundation, "Going Without: America's Uninsured Children," (Aug. 2005), at 12, available at http://www.rwjf.org/files/newsroom/ckfresearchreportfinal.pdf.

2001), at 1-5, available at http://www.childwelfare.gov/pubs/focus/earlybrain/earlybrain.pdf). Likewise, in the child's teenage years, there is no physician looking out for signs of mental illness, which, if left untreated, can lead to the development of various psychiatric and physical comorbidities, improper self-medication and substance abuse, and an increased risk of suicide, among other harms. "Delays in Treatment for Mental Disorders and Health Insurance Coverage," HEALTH SERVS. RESEARCH, Vol. 39, Issue 2, at 221-23 (Apr. 2004).

Additionally, children's parents miss out on the opportunity to build a relationship with the physician or other provider and develop a rapport that allows the parents to ask questions and allows the physician to educate the parents about their children's health needs. *Id.* The absence of an ongoing relationship also means that the children and their parents miss out on the health counseling that many pediatricians provide with respect to issues such as diet and exercise, and accident prevention. Cynthia D. Perry and Genevieve M. Kenney, "Preventive Care for Children in Low-Income Families: How Well Do Medicaid and State Children's Health Insurance Programs Do?," PEDIATRICS (2007), available at http://pediatrics.aappublications.org/cgi/content/full/120/6/e1393.

The failure to identify children's health care needs also has an adverse effect on children's education. For example, research shows that children who lack adequate vision care may not realize that they need eyeglasses, but nevertheless may fall behind in school because they cannot see the blackboard. University of Michigan Health System, "Racial, economic disparities seen in kids' vision care: Uncorrected vision may impair performance in school," http://www.eurekalert.org/pub_releases/2003-05/uomh-red043003.php. Likewise, untreated mental illness can impact a student's educational attainment and subsequent earning capacity. "Delays in Treatment for Mental Disorders and Health Insurance Coverage," *supra*, at 222. The

failure to identify children's needs also means that many uninsured children who are eligible for educational services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, will not be able to establish that they qualify for those services.[2] This unfortunate result contravenes our national public policy as expressed by Congress, which expressly recognized in the IDEA statute that "undiagnosed disabilities prevent[ ] children from having a successful educational experience," 20 U.S.C. § 1400(c)(2)(C), and that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1).

Health care too long delayed is health care denied. The Defendant's refusal to approve the expansion of New York's SCHIP program in accordance with the terms of the SCHIP statute and the Defendant's own past practice is inflicting harms on New York's uninsured children on a daily basis right now. The Defendant's own publications show that uninsured children are going without needed medical care. The lack of care has the harmful results of exacerbating the uninsured children's medical conditions, and adversely impacting the children's physical, social and educational development as well as their economic prospects as adults.

B. The Burden of Caring for the Uninsured Falls Disproportionately upon Hospitals.

Hospitals are the health care system's safety net. When no other care setting is available, patients show up at hospitals. Patients come to hospitals because they are too sick and require

---

[2] Many disabling conditions covered by IDEA are difficult to recognize. (*See* 20 U.S.C. § 1401(3) and 34 C.F.R. § 300.8(c) for definitions of children's disabling conditions under IDEA). Disabilities such as language impairments, autism, attention deficit hyperactivity disorder, and various developmental delays and learning disabilities, are identified only when parents, teachers and physicians work together to identify the child's needs. Often, diagnosis is made by a specialist such as a developmental pediatrician or child psychiatrist. For many uninsured children, however, the children's conditions are not diagnosed, and the educational services that the children need—and that the law assures them—remain inaccessible.

too much care to receive treatment in any other setting, or because a medical need arose late at night or on the weekend, when doctors' offices and clinics were closed.

Patients also come to hospitals because they have no health insurance. Under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, hospitals are required to screen and stabilize every patient who comes to the emergency department irrespective of whether the patient has health insurance.

For hospitals, the burden of EMTALA's mandate is ever-increasing. Census Bureau data show that from 1987, the year after EMTALA was enacted, through 2006, the number of uninsured Americans increased by more than 50%. U.S. Census Bureau, "Income, Poverty, and Health Insurance Coverage in the United States: 2006," (Aug. 2007), at 19 (available at http://www.census.gov/prod/2007pubs/p60-233.pdf). As a result, the number of patients seeking care in hospital emergency departments has risen because growing numbers of patients find themselves with no place else to go. Indeed, emergency departments find that the amount of emergency care they provide is being dwarfed by the amount of care being provided to patients complaining of less urgent symptoms.[3]

Disproportionately, the patients who make unnecessary trips to the emergency department are young children. In fact, a recent study of unnecessary emergency department visits in New York City shows that children under the age of five account for 14% of unnecessary emergency department visits even though these children represent only 7% of the City's population. United Hospital Fund, "Use of Hospital Emergency Departments in New

---

[3] From 1997 through 2004, the share of emergent visits at hospital emergency departments, as measured by their initial triage assessment, fell from 26.9 percent to 15.2 percent. Meanwhile, by 2004, nonurgent and semi-urgent care constituted more than forty percent of emergency departments' caseloads. Andrew P. Wilper, *et al.*, "Waits to See an Emergency Department Physician: U.S. Trends and Predictors, 1997-2004," 27 HEALTH AFFAIRS – *WEB EXCLUSIVE* w84 (no. 2, Jan. 15, 2008), at w92.

York City: What Does it Tell Us about Access to Care?," HOSPITAL WATCH (Apr. 2008) (available at http://www.uhfnyc.org/usr_doc/Hospital_Watch_April_2008.pdf).

These unnecessary visits interfere with the hospitals' ability to provide emergency care to the patients who need it. As the number of uninsured grows, and emergency departments become more crowded, emergency department patients are waiting longer amounts of time to be seen. Between 1997 and 2004, the median emergency department wait time increased by 36%. Patients needing emergency attention waited 40% longer, while median waits for patients diagnosed with acute myocardial infarction, a life-threatening condition, waited 150% longer.[4]

C. Everyone Suffers.

As the uninsured population grows, the availability of life-saving medical treatment is diminishing even for people who have health insurance. Hospital emergency departments are being overwhelmed with patients who do not require emergency care, but who have no other care resource. Uninsured children are disproportionately represented among the population of patients whose emergency department usage is inappropriate.

As a result, everyone who comes to an emergency department is waiting longer to receive care. For those patients experiencing genuine emergencies, these additional delays can cause unnecessary medical complications, permanent disabilities, and death. Nor does health insurance insulate wealthy patients from the effects of these delays. Rather, research shows that emergency department wait times for insured and uninsured patients are the same.[5]

---

[4] *Id.*
[5] *Id.*

## ARGUMENT

## THE AUGUST 17, 2007 LETTER IS

## CAUSING PRESENT HARDSHIPS IN NEW YORK

As the Plaintiffs have argued, the present action is ripe for judicial consideration. The Defendant's implementation of its August 17, 2007 "Dear State Health Official" letter has resulted in daily hardships for New York, its uninsured children, its hospitals, and its citizens and guests who require hospital care. All of these hardships are hardships for New York.[6] Under similar circumstances, federal courts have enjoined the implementation of other health care regulations and policies,[7] and the August 17th letter should be enjoined as well.

HANYS agrees with New York and the other Plaintiff States that the Defendant's implementation of the August 17th letter is causing New York and the other Plaintiff States immediate, substantial and concrete hardships. Plaintiffs' Brief, at 17-21. *Cf. New York v. Heckler*, 719 F.2d 1191, 1195 (2d Cir. 1983) (stating that "[w]hile New York State and [the New York State Department of Health] may not have a right to receive grants under Title X [of the Public Health Service Act], to the extent that funds are dispensed with allegedly unlawful conditions attached, these plaintiffs are injured . . . ."). These facts alone are enough to establish the ripeness of the present action. *See American Hosp. Ass'n v. Sullivan*, 1990 U.S. Dist. LEXIS 6306 (D.D.C 1990), at *16 (stating that "when compliance with a regulation causes a plaintiff

[6] Both pursuant to the State's historic police powers as well as pursuant to the State's Constitution, New York has authority over and responsibility for ensuring the health and welfare of its inhabitants. *E.g., DeBuono v. NYSA-ILA Med. & Clin. Servs. Fund*, 520 U.S. 806, 814 (1997), citing *Hillsborough County v. Automated Med. Labs.*, 471 U.S. 707, 715 (1985); N.Y. Const. art. XVII, §§ 1, 3. In fulfilling these fundamental government responsibilities, New York relies upon and acts in concert with the hospitals within its borders to "provide for the protection and promotion of the health of the inhabitants of the state." N.Y. PUB. HEALTH LAW § 2800; *see also* N.Y. UNCONSOL. LAWS § 7382 (declaration of policy and statement of purposes underlying the creation of the New York City Health and Hospitals Corporation).

[7] *E.g., Pharmaceutical Soc'y v. New York State Dep't of Soc. Servs.*, 50 F.3d 1168 (2d Cir. 1995); *Planned Parenthood Federation v. Heckler*, 712 F.2d 650 (D.C. Cir. 1983); *American Med. Ass'n v. Weinberger*, 522 F.2d 921 (7th Cir. 1975); *American Hosp. Ass'n v. Sullivan*, 1990 U.S. Dist LEXIS 6306 (D.D.C. 1990); *Burlington Mem. Hosp. v. Bowen*, 644 F. Supp. 1020 (W.D. Wis. 1986); *New York v. Schweiker*, 557 F. Supp. 354 (S.D.N.Y. 1983).

direct and immediate harm, and the alternative to compliance is costly, a regulation is ready for judicial review").

Nevertheless, HANYS is compelled to emphasize that also suffering immediate and severe harm are New York's uninsured children. The Defendant's denial of health insurance to these children based on the requirements of the August 17th letter is causing these children to go without health care that would otherwise be available to them right now. The deprivation of health care is harmful. *E.g.*, *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (holding that deliberate indifference to an inmate's medical needs violates the inmate's constitutional rights); *American Med. Ass'n v. Weinberger*, 522 F.2d 921, 926 (7th Cir. 1975) (agreeing with District Court's observation that the denial of timely health care services can result in irreparable harm to the patient's health). Thus, in *New York v. Schweiker*, 557 F. Supp. 354 (S.D.N.Y. 1983), the District Court granted a preliminary injunction to enjoin the Secretary of Health and Human Services from implementing regulations promulgated under Title X of the Public Health Service Act, 42 U.S.C. § 300 *et seq*. The Court found that the regulations would have the effect of withholding family planning services from adolescents (who also are part of the target population of the SCHIP program in the present action). Finding that the HHS regulations would result in adolescents not receiving diagnostic and preventive health care services, and would lead to an increase in teen pregnancies as well as sexually transmitted diseases that would not be prevented, detected or treated, the Court concluded that the HHS regulations placed these adolescents at serious risk of irreparable harm, and that a preliminary injunction therefore was warranted.[8] *Id.*, at 359.

[8] After trial, the Court granted a permanent injunction, which the Second Circuit substantially upheld on appeal. *New York v. Heckler*, 719 F.2d 1191 (2d Cir. 1983).

Indeed, in order for harm to be avoided, health care not only must be provided, but it must be provided in a timely manner. That health care might become available at a later time, either because the August 17th letter authorizes the enrollment of children in SCHIP after the children have been uninsured for a year, or because states might someday undertake the burden of insuring their uninsured children, is no remedy for the deprivations that these children are being subjected to right now.

In a different context, the Supreme Court specifically rejected a one-year waiting period for health care coverage in *Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974). *Memorial Hospital* involved a challenge to an Arizona statute requiring one year's residence in a county as a pre-condition to receiving non-emergency hospitalization or medical care at the county's expense. Citing medical care as a "basic necessity of life," *id.*, at 259, the Supreme Court considered the harm that the denial of non-emergency health care for a year could effect, and recognized that "[t]o allow a serious illness to go untreated until it requires emergency hospitalization is to subject the sufferer to the danger of a substantial and irrevocable deterioration in his health." *Id.*, at 261. The Court added that any fiscal savings from the denial of non-emergency care to indigents could be substantially offset when the patients' conditions deteriorated to the point of requiring more expensive emergency care and additional welfare benefits. *Id.*, at 265 & n.26. Finding that Arizona's law was not supported by any compelling State interest, the Supreme Court concluded that Arizona's statute was unconstitutional under the Equal Protection Clause because of the burden it imposed on the fundamental right to interstate travel.

Like the one-year residency requirement in *Memorial Hospital*, the August 17th letter's requirement that SCHIP coverage not be extended to any child unless that child has been

uninsured for a full year creates dangerous risks for children's health. The lack of health care coverage for an entire year can cause health conditions to worsen, and result in the loss of preventive care. These current, concrete harms compel the conclusion that the present action is ripe.

Further supporting a finding of ripeness is the hardship that the August 17th letter causes for New York's hospitals. As noted above, New York's uninsured, and especially New York's uninsured children, are overcrowding New York's emergency departments to the point of interfering with the delivery of emergency care. Emergency care must be delivered at the time when it is needed, and once that moment has passed, it can never be regained. The increase in waiting room times is undermining emergency departments' abilities to serve their most fragile patients with the urgency that the patients' conditions require. New York's proposed State Plan Amendment would have helped to address this problem, but the Defendant denied New York's application based on the criteria set forth improperly in the August 17th letter. The ongoing harm to New York's hospitals that flows from this denial further supports the Plaintiffs' assertion that this litigation is ripe. *Cf. Better Government Ass'n v. Department of State*, 780 F.2d 86, 93 (D.C. Cir. 1986) (stating that an organization suffers hardship when its ability to pursue its mission is impaired).

Finally, the harm to New York's emergency patients, who increasingly are denied timely care because of emergency department overcrowding, is a concrete hardship that has the potential to affect anyone within New York's borders. Particularly in an emergency situation, the timeliness of care can determine whether a patient lives or dies, and also can determine the severity of any physical damage that a patient who survives may incur. That patients are currently being placed at risk, even if they have health insurance, because emergency

departments are crowded with uninsured patients, and particularly uninsured children, is a hardship that faces all of New York's citizens and guests.

The present action is ripe.

## CONCLUSION

For all of the foregoing reasons, the Defendant's motion to dismiss should be denied, and the Plaintiffs' motion for partial summary judgment should be granted.

Dated: Albany, New York
April 23, 2008

Yours, etc.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

By: [signature]
Michael G. Weisberg
*Attorneys for Healthcare Association of New York State, Amicus Curiae*
677 Broadway
Albany, New York 12207
(518) 449-8893