UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STATE OF NEW YORK,<br>STATE OF ILLINOIS,<br>STATE OF MARYLAND,<br>STATE OF WASHINGTON, | :<br>:<br>:<br>:<br>: | No. 07-CV-8621 (PAC) (RLE) |
| Plaintiffs, | :<br>: | ECF Case |
| v. | :<br>: | |
| UNITED STATES DEPARTMENT<br>OF HEALTH AND HUMAN SERVICES, | :<br>: | |
| Defendant. | :<br>: | |

---

**AMICI CURIAE BRIEF OF THE STATES OF
CALIFORNIA, CONNECTICUT, MASSACHUSETTS AND NEW MEXICO
IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS AND IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

EDMUND G. BROWN JR.
ATTORNEY GENERAL
STATE OF CALIFORNIA

Douglas Press
Senior Assistant Attorney General
Jennifer M. Kim
Supervising Deputy Attorney General
California Department of Justice
300 South Spring Street
9th Floor, North Tower
Los Angeles, CA 90013

RICHARD BLUMENTHAL
ATTORNEY GENERAL
STATE OF CONNECTICUT

Hugh Barber
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

MARTHA COAKLEY
ATTORNEY GENERAL
COMMONWEALTH OF MASSACHUSETTS

Emily R. Paradise
Quentin A. Palfrey
Assistant Attorneys General
One Ashburton Place
Boston, MA 02108-1598

BILL RICHARDSON
GOVERNOR
STATE OF NEW MEXICO

Justin Miller
Deputy Chief Counsel
Office of the Governor
State Capitol Building, Suite 400
Santa Fe, NM 87501

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF THE AMICI...................................................2

OVERVIEW OF THE SCHIP PROGRAM AND CMS' AUGUST 17 LETTER...................3

ARGUMENT.........................................................................................7

I.    THE EFFECT OF CMS' LETTER IS TO DENY FUNDING FOR HEALTH SERVICES
      FOR THOUSANDS OF NEEDY CHILDREN ACROSS THE STATES...................7

      A.    California's Federally-Approved SCHIP State Plan.........................8

      B.    Connecticut's Federally-Approved SCHIP State Plan.......................9

      C.    Massachusetts' Federally-Approved SCHIP State Plan....................10

      D.    New Mexico's Federally Approved SCHIP State Plan......................11

II.   THE REQUIREMENTS OF THE CMS LETTER ARE INCONSISTENT WITH THE
      SCHIP STATUTE AND REGULATIONS AND THUS CONSTITUTE UNLAWFUL
      RULEMAKING..................................................................................12

      A.    CMS' Letter Is Inconsistent with Congress' Intent to Grant States Discretion in
            Making Income Determinations for Their SCHIP Programs........................13

      B.    CMS' Letter Is Inconsistent with Congress' Intent to Grant States Discretion in
            Devising Their Own "Crowd-Out" Provisions, and Its Own Regulations.........16

III.  CMS' NEW CROWD-OUT REQUIREMENTS ARE UNLAWFUL AND WILL
      UNDERMINE THE STATES' CONTINUED ABILITY TO PROVIDE HEALTH
      BENEFITS TO THEIR NEEDY CHILDREN................................................17

      A.    The Requirement That States Provide Assurance That They Have Enrolled At
            Least 95 Percent of the Medicaid or SCHIP-Eligible Children in the State Below
            200 Percent of the Federal Poverty Is Unlawful.......................................18

      B.    States Have Little Control Over Whether the Number of Children in the Target
            Population Insured Through Private Employers Has Decreased by More Than
            Two Percent Over the Previous Five-Year Period.......................................21

      C.    States Face Difficult Hurdles in Preventing Employers from Changing Dependent
            Coverage Policies in a Manner That Would Favor a Shift to Public Coverage...22

      D.    The Letter's Required One-Year Waiting Period of Uninsurance Is Unlawful to
            the Extent That It Recognizes No Exceptions and, Even with Exceptions, Would
            Require Rulemaking.......................................................................22

E.    The Letter's Cost-Sharing Requirements Will Discourage Program
      Participation and Are Contrary to the Intent of the Statute..........................23

CONCLUSION...................................................................................................24

## TABLE OF AUTHORITIES

### Cases

Am. Frozen Foods Inst. v. United States, 855 F.Supp. 388 (Ct. of Int'l. Trade 1994)...............7

Batterton v. Marshall, 648 F.2d 694 (D.C. Cir. 1980)..............................................................6

Chrysler Corp. v. Brown, 441 U.S. 281, 315-16 (1979).............................................................6

Delta Air Lines, Inc. v. Kramarsky, 725 F.2d 146 (2d Cir. 1981)....................................22

FMC Corp. v. Holliday, 498 U.S. 52 (1990).................................................................22

General Motors Corp. v. Ruckelshaus, 742 F.2d 1561 (D.C. Cir. 1984)..............................6

Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 733 (1985)...................................22

Sweet v. Sheahan, 235 F.3d 80, 91 (2d Cir. 2000).....................................................6

### Statutes

**Federal**

5 U.S.C. § 553..............................................................................................6

29 U.S.C. § 1144(a)......................................................................................22

42 U.S.C. § 1396a(r)(2)(A).............................................................................15

42 U.S.C. §§ 1397aa-1397jj..............................................................................3

42 U.S.C. § 1397bb(b)......................................................................................3

42 U.S.C. § 1397bb(b)(1)(A).............................................................................14

42 U.S.C. § 1397bb(b)(3)(C).............................................................................16

42 U.S.C. § 1397bb(c).....................................................................................19

42 U.S.C. § 1397dd.........................................................................................13

42 U.S.C. § 1397ee...........................................................................................3

42 U.S.C. § 1397ff............................................................................................8

42 U.S.C. § 1397hh.........................................................................................16

42 U.S.C. § 1397jj(b)(1)...................................................................................14

**State**

Cal. Ins. Code § 12693 et seq…………………………………………………………........4, 8

Cal. Ins. Code § 12693.70(a)(6)(B), (C)…………………….………………………………..9

Conn. Gen. Stat. § 17b-292…………………………………………………………………4, 10

Mass. Gen. Laws ch. 118E, § 16C……………………………………………………4, 10, 11

N.M. Stat. Ann. § 27-2-12………………………………………………………………4, 11

### Regulations

42 C.F.R. § 435.601(d)…………………………………………………………………..15

42 C.F.R. § 457.1……………………………………………………………………………4

42 C.F.R. § 457.10…………………………………………………………………………14

42 C.F.R. § 457.200 et seq……………………………………………………………........8

42 C.F.R. § 457.310…………………………………………………………………………14

42 C.F.R. § 457.805………………………………………………………………………...4, 16

42 C.F.R. § 457.810………………………………………………………………………..16

### Other Authorities

Cindy Mann and Michael Odeh, Ctr. for Children and Families, Moving Backward: Status
Report on the Impact of the August 17 SCHIP Directive To Impose New Limits on States'
Ability to Cover Uninsured Children (Dec. 2007)……..…………………………………...15, 17, 18

Congressional Budget Office, The State Children's Health Insurance Program (May 2007)…….20

Covering Uninsured Children: The Impact of the August 17th CHIP Directive: U.S. Senate
Finance Subcommittee on Health Care Hearing (April 9, 2008) (statement of Alan Weil,
National Academy for State Health Policy)...………………………………………………18

Covering Uninsured Children: The Impact of the August 17th CHIP Directive: U.S. Senate
Finance Subcommittee on Health Care Hearing (April 9, 2008) (statement of Dennis Smith,
Center for Medicaid and State Operations, Centers for Medicare & Medicaid Services)…...…..20

Donna Cohen Ross and Aleya Horn, Center on Budget and Policy Priorities and Caryn Marks,
Kaiser Commission on Medicaid and the Uninsured, Health Coverage for Children and Families
in Medicaid and SCHIP: State Efforts Face New Hurdles (Jan. 2008)…..………………….23, 24

Genevieve M. Kenney, The Urban Institute, Medicaid and SCHIP Participation Rates:
Implications for New CMS Directive (Sept. 2007)……..………...................................................20

Judith Solomon and Donna Cohen Ross, Ctr. on Budget and Policy Priorities, Administration Moves to Eviscerate Efforts to Enroll Uninsured Low-Income Children in Health Coverage Through the Schools (Oct. 1, 2007)...........................................................................................................19

Letter from Dennis G. Smith, Director, CMS, to State Health Officials (Aug. 17, 2007)....passim

Paul Frontsin, Employee Benefit Research Institute, Sources of Health Insurance and Characteristics of the Uninsured: Analysis of the March 2007 Current Population Survey (Oct. 2007)..........................................................................................................................................21

Samatha Artiga and Molly O'Malley, Kaiser Commission on Medicaid and the Uninsured, Increasing Premiums and Cost Sharing in Medicaid and SCHIP: Recent State Experiences (May 2005)..........................................................................................................................................24

Teresa A. Coughlin and Mindy Cohen, The Urban Institute, for the Kaiser Commission on Medicaid and the Uninsured, A Race to the Top: Illinois's All Kids Initiative (Aug. 2007).......17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STATE OF NEW YORK, | : | |
| STATE OF ILLINOIS, | : | |
| STATE OF MARYLAND, | : | |
| STATE OF WASHINGTON, | : | No. 07-CV-8621 (PAC) (RLE) |
| | : | |
| Plaintiffs, | : | ECF Case |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES DEPARTMENT | : | |
| OF HEALTH AND HUMAN SERVICES, | : | |
| | : | |
| Defendant. | : | |

## AMICI CURIAE BRIEF OF THE STATES OF CALIFORNIA, CONNECTICUT, MASSACHUSETTS AND NEW MEXICO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The States of California, Connecticut, Massachusetts and New Mexico file this brief amici curiae in support of the plaintiff States of New York, Illinois, Maryland and Washington's (plaintiff States) opposition to the defendant U.S. Department of Health and Human Services' (HHS) motion to dismiss and in support of plaintiff States' motion for summary judgment. The amici states, as administrators of their State Children's Health Insurance Programs (SCHIP), wish to advise the Court of the significant harm that will result from implementation of the August 17, 2007 letter issued by HHS concerning administration of state children's health insurance programs. HHS' letter violates the Administrative Procedure Act and creates onerous, ultra vires restrictions on state SCHIP programs that effectively undermine the states' ability to provide health coverage to thousands of low-income children.

## STATEMENT OF INTEREST OF THE AMICI

For the past ten years, the States of California, Connecticut, Massachusetts and New Mexico have provided health insurance to thousands of needy children through their SCHIP programs. Throughout this period, HHS has consistently approved the manner in which the amici states have administered their programs, and the states have consistently complied with the agency's requests. At present, Connecticut and Massachusetts provide health insurance to children in their states who live in families with incomes up to 300 percent of the federal poverty level (FPL), California generally covers children in families with incomes up to 250 percent of the FPL (although extends coverage to certain children with family incomes up to 300 percent of the FPL) and New Mexico covers children in families with incomes up to 235 percent of the FPL.

On August 17, 2007, with no advance warning or opportunity for comment, HHS' Centers for Medicare & Medicaid Services (CMS) issued a letter to state health officials that fundamentally altered the rules governing the SCHIP program. While the new policy purported simply to "clarify" the rules governing coverage of children who live "in families with effective family income levels above 250 percent of the Federal poverty level," the letter's practical effect is to raise insurmountable obstacles to state coverage of these low-income children by imposing restrictions that are wholly inconsistent with the spirit and the letter of the law. Where the statute and HHS' own regulations contemplate discretion on the part of the states, CMS' letter takes it away. Where Congress' intent was to encourage expansive coverage, CMS' letter limits it. Had CMS adhered to the rulemaking requirements of the Administrative Procedure Act before issuing this letter, states would have had the opportunity to comment on the proposal and share their concern that the new requirements are so onerous that they will effectively undermine the states'

2

efforts to provide health care to some of their most vulnerable citizens. As it stands, CMS engaged in unlawful rulemaking, far beyond the scope of existing statutory and regulatory requirements.

The amici states, on behalf of the administrators of each state's SCHIP program, have a critical interest in ensuring that the rules under which they deliver health insurance to their needier children are fair, consistent and applied in accordance with the governing statute and regulations. The amici also have a compelling interest in ensuring that these children have access to the services to which they are entitled by law and that states benefit from the funding to which they are entitled. If CMS' letter is implemented, the fate of health insurance for thousands of low-income children in California, Connecticut, Massachusetts and New Mexico will be at risk.[1]

<u>OVERVIEW OF THE SCHIP PROGRAM AND CMS' AUGUST 17 LETTER</u>

When Congress enacted the SCHIP program in 1997 as Title XXI of the Social Security Act (Act), Pub. L. No. 105-33, 42 U.S.C. §§ 1397aa-1397jj (2000), it authorized federal reimbursement to the states for a percentage of their "child health assistance" expenditures made pursuant to the state's federally-approved SCHIP state plan. 42 U.S.C. § 1397ee. An outgrowth of the Medicaid program, SCHIP was intended to provide health insurance to "targeted low-income children," i.e., children living in low-income families who nonetheless fall above Medicaid eligibility limits. The SCHIP statute specifically allows each state to determine eligibility rules, including those related to income and resources. 42 U.S.C. § 1397bb(b).

---

[1] While CMS' letter has no immediate impact on New Mexico, where it covers children only up to 235 percent of the FPL, it joins in this matter because it believes that the letter unlawfully and unfairly restricts the state in its ability to amend its state plan should it wish to do so in the future.

3

Mirroring the statutory grant of discretion, the SCHIP regulations provide that "[w]ithin broad Federal rules, each State decides eligible groups, types and ranges of services, payment levels for benefit coverage, and administrative and operating procedures." 42 C.F.R. § 457.1 (2007).

In enacting SCHIP, Congress was concerned that the federal investment in children's health insurance would have the broadest possible impact. For this reason, Congress sought to avoid merely shifting already-insured children from employer-sponsored plans onto federally-subsidized plans. To ensure that the SCHIP program provided federal matching dollars on health coverage only for those without other coverage options, the SCHIP statute and implementing regulations required states to adopt "reasonable procedures" to ensure that public coverage does not substitute for, or "crowd-out," private, employer-sponsored group insurance plans. 42 C.F.R. § 457.805.

Following the federal Act's passage, California, Connecticut, Massachusetts and New Mexico, like all other states, enacted their own state SCHIP programs to provide health insurance to their "targeted low-income children." Cal. Ins. Code § 12693 et seq. (West 2007), Conn. Gen. Stat. § 17b-292 (West 2008); Mass. Gen. Laws ch. 118E, § 16C (West 2008), N.M. Stat. Ann. § 27-2-12 (West 2008). In accordance with the discretion granted to them by the federal statute, and with approval by HHS, Connecticut and Massachusetts chose to extend health insurance coverage to children living in families with incomes up to 300 percent of the FPL. Likewise, California extended coverage to children in families up to 300 percent of the FPL in a limited number of circumstances. As required by statute and regulation, the amici states also adopted effective crowd-out procedures, which have been consistently approved by CMS.

With its August 17, 2007 letter, CMS exceeded its powers by imposing new requirements on the states and substantially changing the rules governing the provision of SCHIP health

4

coverage to "children in families with effective family income levels above 250 percent of the Federal poverty level."[2]  Reflecting its concern about "the potential for crowd-out" with higher income beneficiaries, CMS announced new rules for states that cover these children.  Issued without the benefit of the requisite notice and comment process, the letter requires that affected states now include specific crowd-out strategies in their state plans, including:

> (1) assuring that at least 95 percent of the children in the state below 200 percent of the FPL who are eligible for SCHIP or Medicaid are enrolled;

> (2) assuring that the number of children in the target population insured through private, employer-sponsored plans has not decreased by more than two percentage points over the prior five-year period;

> (3) preventing employers from changing their dependent coverage obligations on the part of families;

> (4) requiring a minimum of a one-year period of uninsurance for individuals prior to obtaining insurance through SCHIP; and

> (5) adopting cost-sharing requirements that are comparable (within one percent of the family income) to those charged by competing private plans, unless the state plan's cost-sharing is set at the statutory five percent cap.

The letter indicates that CMS "expect[s]" affected states to amend their SCHIP state plans within

---

[2]  A copy of the letter is attached hereto as Exhibit 1.  The applicability of the letter is unclear due to CMS' use of the term "effective family income," when the Act and implementing regulations apply only to "targeted low-income children."  Because neither the Act nor the regulations defines "effective," and the definition does not appear in CMS' letter, it is ambiguous as to how broadly and to whom the letter applies.  CMS officials have advised some states that "effective" family income means gross income, while other states are operating under the impression that effective income connotes a family's net income.

12 months. Should states fail to do so, "CMS may pursue corrective action."[3]

With the imposition of these additional requirements, the letter imposes new and substantive obligations on the states, significantly limits their discretion and represents a significant departure from longstanding agency policy. As such, the letter constitutes a legislative rule, which should have been promulgated in accordance with the notice and comment requirements of the Administrative Procedure Act. 5 U.S.C. § 553 (2000).

To determine whether a rule is legislative or interpretive, courts focus on the intended legal effect of the rule, not the stated intent of the agency. See General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C. Cir. 1984). Thus, "where necessary, the court will look behind the particular label applied by the agency . . . in order to discern its real intent and effect." Batterton v. Marshall, 648 F.2d 694, 705 n.58 (D.C. Cir. 1980). Legislative rules are those that "create new law, rights, or duties" and are intended to "bind members of the agency and the public." Sweet v. Sheahan, 235 F.3d 80, 91 (2d Cir. 2000). These types of rules are subject to the Administrative Procedure Act because "notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment." Chrysler Corp. v. Brown, 441 U.S. 281, 316 (1979).

---

[3] The letter imposes additional terms as well, requiring that states monitor and verify a family's health insurance status and report crowd-out data on a monthly basis. The letter is unclear as to whether verification of an applicant's insurance status must precede a determination of eligibility, a requirement that would delay the availability of health insurance for affected children. It is also unclear whether CMS intends the monthly reporting requirement to replace the existing requirement that directs programs to file "crowd-out" reports on a quarterly and annual basis. All these requirements make the provision of coverage to low-income children more difficult, are inconsistent with the purposes of the program and should have been subject to rulemaking. Until now, CMS has consistently approved the amici states' plan provisions on these matters.

Contrary to CMS' assertion, this letter cannot be classified as interpretive, as it does far more than simply clarify existing "reasonable procedures" with which states currently comply. Rather, the letter's requirements constitute substantive changes that go well beyond the scope of existing statutory and regulatory requirements. Thus, because this letter was issued without notice and comment, it is invalid.[4]

As a practical matter, the effect of the letter is to deprive states of federal funding for their coverage of thousands of low-income children because the letter imposes requirements so onerous that affected states will simply be unable to comply with all of them. To receive federal funding under the new standard, for example, states will be required to enroll 95 percent of their low-income children (a percentage matched only by Medicare, which has automatic enrollment) and will be held accountable for an employer's past coverage decisions. States are not in a position to do either.

ARGUMENT

I.    THE EFFECT OF CMS' LETTER IS TO DENY FUNDING
       FOR HEALTH CARE SERVICES FOR THOUSANDS
       OF NEEDY CHILDREN ACROSS THE STATES.

If California, Connecticut and Massachusetts are required to comply with all the requirements of the August 17 letter, the states will, in all likelihood, lose federal funding for health insurance for thousands of low-income children as the failure to comply subjects them to CMS enforcement actions that could potentially deny all federal reimbursement to the states

---

[4] For example, in Am. Frozen Foods Inst. v. United States, 855 F.Supp. 388 (Ct. of Int'l. Trade 1994), the statute imposed a duty on importers to conspicuously mark food containers. Id. at 391. Customs imposed new, specific labeling requirements in applying this statute. The court concluded that the detailed and restrictive requirements imposed by Customs did not interpret the statute, but rather imposed additional obligations on food importers and therefore violated the Administrative Procedure Act. Id. at 396.

7

under SCHIP. 42 U.S.C. § 1397ff; 42 C.F.R. § 457.200 et seq.[5] Faced with this loss, the states

may be forced to eliminate the health care assistance benefits that they currently provide to such

children. Alternatively, the states may elect to continue providing such assistance, at entirely

state expense. In that case, the funds that each state is required to expend to compensate for the

loss of federal reimbursement will negatively affect its ability to provide other necessary

governmental services and benefits.

A.    California's Federally-Approved SCHIP State Plan

California implemented its SCHIP program in 1998, and administers it as a combination

Medicaid expansion and separate SCHIP program. Cal. Ins. Code § 12693 et seq. California

runs the largest SCHIP program in the country, accounting for about 16 percent of all federal

SCHIP dollars in the 2007 federal fiscal year. The number of children covered in California

exceeds the combined total of children served by New York and Texas, the country's second and

third largest programs. Since 1998, California has amended its state plan twelve times; CMS has

approved each amendment, most recently in March 2006.

Generally, California's SCHIP program provides health insurance to children living in

families with incomes up to 250 percent of the FPL who are otherwise ineligible for "no share of

cost" Medicaid. However, the program extends coverage up to 300 percent of the FPL for

children up to age two born to mothers participating in the Access for Infants and Mothers

program, and for children living in three counties (San Mateo, Santa Clara and San Francisco)

that spend their own local funds to cover children between 250 and 300 percent of the FPL.

As of late 2007, approximately 866,000 children participate in California's SCHIP

program. Of those, over 18,000 children live in families with incomes between 250 and 300

---

[5]   As noted above, New Mexico is not presently threatened with the loss of federal funding.

percent of the FPL, although some of these children may experience more than one period of enrollment during the year. Overall, the state expended $350 million on the program in fiscal year 2007 and received approximately $600 million in federal SCHIP funds.

In determining eligibility for its SCHIP population, California calculates a family's income based on its net household income. The state excludes certain income from the calculation by using income deductions derived from the state's Medicaid program. It also allows a disregard, i.e., an amount not included in a family's countable income for purposes of determining eligibility, for all income between 200 and 250 percent of the FPL. Cal. Ins. Code § 12693.70(a)(6)(B), (C). CMS has consistently approved this income counting methodology and the children who live in families with net incomes under 250 percent of the FPL should be unaffected by the CMS letter. Yet because CMS has not defined the term "effective family income" in its August 17 letter, it is possible that a number of California children currently considered below 250 percent of the FPL may exceed the threshold.

B.    Connecticut's Federally-Approved SCHIP State Plan

Connecticut's original SCHIP state plan was federally-approved by CMS on April 27, 1998, effective retroactive to January 1, 1998. Connecticut's state plan builds on its federally approved Medicaid state plan by covering children who are ineligible for assistance under Medicaid due to too much family income. Because Connecticut's Medicaid program covers all children with family incomes up to 185 percent of the FPL, that income level serves as the floor for Connecticut's SCHIP program. From the inception of the SCHIP program more than a decade ago, Connecticut's federally-approved SCHIP state plan has provided for the disregard of any family income between 235 and 300 percent of the FPL in determining eligibility for SCHIP.

9

As a result, children in families with gross incomes up to 300 percent of the FPL have been covered under the SCHIP state plan.[6]

As of April 1, 2008, approximately 15,900 children participate in Connecticut's SCHIP program, of whom almost 5,000 have gross family income that exceeds 250 percent of the FPL. If by "effective" income, CMS means net income, about 4,100 Connecticut children are affected by the CMS rule. If turnover within the program is factored in, the number of affected children may be closer to 7,500.

Connecticut expended almost $36 million on its SCHIP program in federal fiscal year 2007 and received approximately $23 million in federal reimbursement. Approximately $6 million of that amount was attributable to children in families with income over 250 percent of the FPL. The loss of such funding seriously undermines the state's continued ability to provide services.

C.     Massachusetts' Federally-Approved SCHIP State Plan

Massachusetts implemented its SCHIP program in 1998, following enactment of Chapter 170 of the Acts of 1997, Mass. Gen. Laws ch. 118E, § 16C. The program is administered as a combination Medicaid expansion and separate SCHIP program. Medicaid covers children in families with incomes up to 150 percent of the FPL. Until 2006, the separate SCHIP program covered children living in families with incomes between 150 percent and 200 percent of the FPL, picking up where the Medicaid expansion coverage left off.

---

[6] Connecticut has amended its SCHIP state plan several times in the intervening years, but never with respect to income disregards. The disregards have remained in place, unchallenged by CMS for more than a decade. Moreover, Connecticut's coverage of children in families up to 300 percent of the FPL has been codified into state law. Conn. Gen. Stat. § 17b-292(a). Thus, Connecticut cannot come into compliance with the August 17 letter merely by administratively amending its SCHIP state plan.

In 2006, with the passage of the Commonwealth's landmark health care reform legislation, Massachusetts' separate SCHIP program expanded coverage to include children with family incomes up to 300 percent of the FPL. This expansion was enacted as a central component of health care reform in an effort to provide health coverage to as many Massachusetts residents as possible. Ch. 58 of the Acts of 2006, § 26, Mass. Gen. Laws ch. 118E, § 16C (3). Like California and Connecticut, Massachusetts covers children with family income up to 300 percent of the FPL through the use of approved income disregards.

CMS approved this statutory expansion as part of the Commonwealth's most recent state plan amendment, which became effective July 1, 2006. Since that time, and relying on CMS' approval of the state plan, the Commonwealth has been able to make health coverage available to many more low-income children. As of February 2008, program enrollment has grown by 19,000 children as a result of the expansion. Of those 19,000 children, roughly 6,000 live in families with incomes between 250 and 300 percent of the FPL.

Massachusetts expended $327 million on its SCHIP program in federal fiscal year 2007, and received approximately $212 million in federal reimbursement. $9.3 million of that amount was attributable to children in families with income over 250 percent of the FPL. Accordingly, factoring in turnover, the loss of at least $9.3 million affects the ability of approximately 11,000 Massachusetts children to receive health care coverage in a year. Particularly in Massachusetts, where adequate funding of each component of the state's health reform is critical to its success, the loss of federal funding will have an enormous impact.

D.    New Mexico's Federally Approved SCHIP State Plan

New Mexico implemented its SCHIP program in 1999, as an expansion of its existing Medicaid program. N.M. Stat. Ann. § 27-2-12. The program, administered by the New Mexico

11

Human Services Department Medical Assistance Division, covers children in families with incomes up to 235 percent of the FPL.

Since implementation, CMS has consistently approved New Mexico's state plan, most recently in September 2007. Pursuant to the plan, New Mexico imposes co-payments on participants in the SCHIP program, with the exception of Native Americans, and imposes a six-month waiting period before a child previously insured through other means may become eligible for SCHIP.

As of March 2008, New Mexico serves approximately 9,700 children through its SCHIP program. In federal fiscal year 2007, the state expended $62 million on its SCHIP program and received approximately $50 million in federal reimbursement.

Unlike the other amici states, the CMS letter has yet to have a direct impact on New Mexico's current program. However, in the near future, New Mexico may wish to implement program changes with regard to income eligibility determinations and crowd-out provisions. Any such changes would be affected by the CMS letter, and the limitations imposed by the letter may deny coverage to large numbers of New Mexico's neediest children.

II.    THE REQUIREMENTS OF THE CMS LETTER ARE
       INCONSISTENT WITH THE SCHIP STATUTE AND REGULATIONS
       AND THUS CONSTITUTE UNLAWFUL RULEMAKING.

The provision of federal SCHIP funds to the states for the health coverage they provide to uninsured "targeted low-income children" is dependent upon the state's submission of a state plan that meets the Act's statutory and regulatory requirements. Assuming that the state's plan meets those criteria, it is entitled to receive capped federal reimbursement for a percentage of the

expenditures it incurs in providing "child health assistance" benefits to eligible children.[7] Two such criteria, of central importance in this matter, are (1) the state's determination of program eligibility on the basis of family income and (2) the state's development of "reasonable procedures" to prevent crowd-out. Historically, CMS has consistently approved the amici states' treatment of these criteria. However, the August 17 letter makes it clear that such approval will no longer be forthcoming.

A.    CMS' Letter Is Inconsistent with Congress' Intent to Grant States
      Discretion in Making Income Determinations for Their SCHIP Programs.

Given the almost insurmountable barriers imposed by the August 17 letter, the amici states question whether the letter reflects not only the agency's concern about "crowd-out" but perhaps, more fundamentally, a view that states should be restricted in their practice of covering children at the higher end of the low-income spectrum.[8] This view is wholly inconsistent with what Congress intended and it imposes unnecessary obstacles to the efforts of states with high costs of living such as California, Connecticut and Massachusetts to make affordable health insurance available to all children.

When Congress enacted SCHIP, it intentionally gave states wide discretion in determining how income will be counted for eligibility purposes. Each state's child health plan

---

[7] States are not reimbursed solely on the basis of their expenditures. To the contrary, the amount that each state receives is capped by its allotted share of block grant funds that are made available each year by Congress. A state's allotment of the total block grant funding is determined by a statutory formula that takes into account a number of factors, including the number of low income uninsured children in the state. 42 U.S.C. § 1397dd. Thus, in addition to the administrative supervision provided by CMS, Congress can indirectly control the state's exercise of discretion under the Act by controlling the amount of the annual appropriation.

[8] A review of the Administration's budget for FY 2009 lends credence to this view. As proposed, the Administration would target SCHIP funds to children with family incomes below 200 percent of the FPL and establish a "hard cap" for SCHIP eligibility at 250 percent of the FPL based on a family's gross income, without accounting for income disregards.

is required to describe "the standards used to determine the eligibility of targeted low-income children for child health assistance under the plan." 42 U.S.C. § 1397bb(b)(1)(A). The term "targeted low-income children" is defined expansively so as potentially to include children from families with incomes over 200 percent of the FPL. Specifically, 42 U.S.C. § 1397jj(b)(1) reads as follows:

> . . . [T]he term "targeted low-income child" means a child –
>
>> (A) who has been determined eligible by the State for child health assistance under the State plan;
>> (B) (i) who is a low-income child, or
>>     (ii) is a child –
>>      (I) whose family income (as determined under the State child health plan) exceeds the Medicaid applicable income level . . . , but does not exceed 50 percentage points above the Medicaid applicable income level . . . (emphasis added).

Congress specifically defined the term "targeted low-income child" (1) to allow the use of an income limit of 50 percentage points higher than the applicable Medicaid income level for children in the state (in lieu of the 200 percent of the FPL standard inherent in the definition of a "low income child") and (2) to authorize explicitly a state's discretion to compute family income in the manner specified by the state in its SCHIP state plan. CMS regulations mirror the statute, defining a "targeted low-income child" as a child with family income either at or below 200 percent of the FPL or 50 points higher then the state's Medicaid income eligibility limit for children. 42 C.F.R. § 457.310. The term "family income" is defined as meaning "income as determined by the State ..." 42 C.F.R. § 457.10.

By these very terms, Congress and CMS recognized the states' authority to provide coverage to children in families with incomes over the cap that CMS now imposes. Through the use of income counting methodologies that disregard specified types and amounts of income, states were granted wide latitude in determining a family's countable income for eligibility

purposes.[9]  Any suggestion by CMS that the states are administering the program improperly by

covering higher income children is unfounded.  To the contrary, the regulations appropriately

give high cost of living states the flexibility to adapt their SCHIP programs to individual state

needs.  CMS has repeatedly approved the SCHIP state plans of California, Connecticut and

Massachusetts, as well as many other states that cover children in these higher income brackets.[10]

Even now, CMS does not directly call for the outright prohibition on states covering such

children.  Instead, it seeks to impose requirements that, as a practical matter, will make such

coverage impossible.

---

[9]  Consistent with its approach to other public assistance programs, Congress afforded states
discretion to determine how income is to be determined in the SCHIP program.  SCHIP builds
on the Title XIX Medicaid program by allowing the coverage of children whose family income
exceeds the Medicaid income eligibility limit but, as determined by the state, is below specified
levels.  In the Medicaid context, Congress addressed the income counting dilemma by generally
providing that the states must use the "same methodology" as is employed in the most closely
related federal-state "cash assistance" program.  For children, this is the former Aid to Families
with Dependent Children (AFDC) program, codified at Title IV A of the Social Security Act.  42
U.S.C. § 1396a(r)(2)(A).  The former AFDC program, now replaced by the Temporary
Assistance to Needy Families program, required that certain deductions be taken from gross
income for purposes of determining eligibility, and allowed other deductions to be taken at state
election.  Furthermore, if a state wished to be more liberal than AFDC in its income counting
methodologies, the Medicaid Act expressly allows the states to employ "less restrictive
methodologies" in their programs.  42 U.S.C. § 1396a(r)(2)(A); 42 C.F.R. § 435.601(d).  Thus,
the use of income counting methodologies, including income disregards, is expressly allowed in
the Medicaid program, on which SCHIP is based.

[10]  As of December 2007, at least eleven states cover children with family incomes over 250
percent of the FPL.  In addition, Rhode Island and Washington, as well as California, currently
set their income eligibility limits at 250 percent of the FPL and may be affected by the CMS
letter because they use various deductions to calculate "net income."  Four other states have
curtailed coverage expansions due to the letter.  Cindy Mann and Michael Odeh, Ctr. for
Children and Families, Moving Backward: Status Report on the Impact of the August 17 SCHIP
Directive To Impose New Limits on States' Ability to Cover Uninsured Children (Dec. 2007)
available at http://ccf.georgetown.edu/index/moving-backward-status-report-of-aug-17-2007-
directive?highlight=moving%20backward.

B.    CMS' Letter Is Inconsistent with Congress' Intent to
      Grant States Discretion in Devising Their Own
      "Crowd-Out" Provisions, and Its Own Regulations.

Similarly, the SCHIP Act and its implementing regulations direct participating states to

devise "crowd-out" provisions but do not dictate the form such provisions must take.  By

"crowd-out," CMS means the substitution of government subsidized health coverage under

SCHIP for coverage that would otherwise be available to the child under employer-sponsored,

group health plans.  Specifically, the Act requires only that states include in their SCHIP state

plans:

> . . . a description of procedures to be used to ensure –

. . .

> (c)  that the insurance provided under the State child health
>      plan does not substitute for coverage under group health plans . . .

42 U.S.C. § 1397bb(b)(3)(C).  In addition, states are to include within their annual reports to

CMS an assessment of whether their programs result in "crowd-out." 42 U.S.C. § 1397hh.  The

implementing regulations similarly require SCHIP state plans to include "a description of

reasonable procedures to ensure that health benefits coverage provided under the State plan does

not substitute for coverage provided under group health plans . . ." 42 C.F.R. § 457.805.

Accordingly, the SCHIP Act and its implementing regulations afford the states wide discretion to

determine their own "reasonable" crowd-out procedures.  CMS' attempt to prescribe specific,

mandatory crowd-out procedures in the letter is inconsistent with this grant of discretion.[11]

---

[11]  The only circumstance in which CMS imposes specific, mandatory crowd-out procedures is in
the administration of state premium assistance programs.  See 42 C.F.R. § 457.810.  CMS
cannot, by mere letter, add a series of new, mandatory requirements applicable to coverage for a
specific class of children (those in families with "effective" income over 250 percent of the
FPL).  If CMS wishes to impose mandatory requirements beyond those already adopted by
regulation, it must amend the existing regulations through proper notice and comment
rulemaking.

III.    CMS' NEW CROWD-OUT REQUIREMENTS ARE UNLAWFUL AND
        WILL UNDERMINE THE STATES' CONTINUED ABIILITY TO
        PROVIDE HEALTH BENEFITS TO THEIR NEEDY CHILDREN.

According to its August 17, 2007 letter, CMS "will expect" each state with "an effective
[income eligibility] level of 250 percent of the FPL" to adopt the specific crowd-out procedures
identified in the letter.  Should states fail to amend their SCHIP state plans accordingly, CMS
may pursue corrective action."[12]  The CMS letter makes it essentially impossible for states to
cover children with family incomes higher than 250 percent of the FPL.

For California, Connecticut and Massachusetts, this denial translates into thousands of
affected children.  For the programs themselves, the requirements of the letter create an
unnecessary administrative burden where the states already have CMS-approved procedures in
place to address this issue and there is no evidence to support the notion that limiting eligibility
prevents crowd-out.  To the contrary, evidence suggests that, if anything, expanding eligibility
has a positive impact on increased participation rates among previously eligible, lower income
children.[13]  Moreover, despite being added under the rubric of crowd-out, several of the

---

[12]  The CMS letter states that "[w]e would not expect any effect on current enrollees from this
review strategy . . . ," apparently authorizing the "grandfathering" of current enrollees.  It must
be noted, however, that the turnover rate for children assisted under the program is high, with all
of the amici states experiencing a rate of at least 50 percent.  Any "grandfathering" of current
children will not prevent thousands of new children applying for assistance from being harmed,
or prevent the states from experiencing the loss of federal revenue that they are entitled to
receive.

[13]  Mann and Odeh, supra at 4.  See also Teresa A. Coughlin and Mindy Cohen, The Urban
Institute, for the Kaiser Commission on Medicaid and the Uninsured, A Race to the Top:
Illinois's All Kids Initiative (Aug. 2007), available at
http://www.kaiserfamilyfoundation.org/uninsured/7677.cfm.

17

requirements have little to do with crowd-out, or the "reasonable procedures" intended to prevent it.[14]

      A.      The Requirement That States Provide Assurance That They Have Enrolled At Least 95 Percent of the Medicaid or SCHIP-Eligible Children in the State Below 200 Percent of the Federal Poverty Is Unlawful.

According to the August 17 letter, a state will only be permitted to cover children at the higher income levels if it provides an assurance that it has enrolled at least 95 percent of the children in the state below 200 percent of the FPL who are eligible for either SCHIP or Medicaid. Despite CMS' claim that this assurance somehow serves to prevent crowd-out among higher income children, the requirement only addresses how effective the state has been in enrolling lower income children in the program. In other words, it relates to the outcome achieved, not to the reasonableness of the procedures employed. CMS' characterization of this requirement as a clarification of the existing "reasonable procedures" requirement is inaccurate.

CMS' letter asks the impossible. The *only* health insurance program that comes close to reaching 95 percent enrollment is the Medicare program, which has automatic enrollment. Thus, no matter how diligent a state's efforts, the 95 percent enrollment is tantamount to a prohibition on covering children with family incomes over 250 percent of the FPL.[15]

---

[14] For a discussion of the letter's implications for the states generally, see Covering Uninsured Children: The Impact of the August 17th CHIP Directive: U.S. Senate Finance Subcommittee on Health Care (April 9, 2008) (statement of Alan Weil, National Academy for State Health Policy), available at http://finance.senate.gov/hearings/testimony/2008test/040908awtest.pdf. A copy of the statement is attached hereto as Exhibit 2.

[15] "No means-tested program where people have to apply and be reviewed for eligibility has reached this high standard of participation." Mann and Odeh, supra note 8, at 2. The low-income subsidy for the Medicare Part D benefit achieves a participation rate of only approximately 43 percent. Nationally, participation rates for SCHIP and Medicaid approximate 63 and 79 percent, respectively. Id.

One of the most effective means of increasing program enrollment is to engage in extensive outreach. To this end, participating states are, by law, required to engage in outreach and coordination with other health insurance programs. 42 U.S.C. § 1397bb(c). California, Connecticut, Massachusetts and New Mexico employ aggressive outreach efforts, all of which have been approved by CMS in their state plans. For example, all the states operate extensive "out station locations," use a simplified application process, and assist applicants with necessary paperwork. To date, CMS has never questioned the adequacy of the amici states' outreach efforts.[16]

Moreover, the 95% enrollment requirement is problematic because a number of eligible low-income children will not be covered by an assistance program no matter how vigorous a state's outreach efforts. Families fall in and out of poverty (and, therefore, in and out of eligibility requirements) as a result of a host of factors, including the death of the employed parent, divorce and job loss. Yet, they do not necessarily apply for health care assistance for their children as soon as they lose a job or experience a death or divorce, but wait out of hope that their circumstances will improve. Parents who are illiterate or who do not speak English may be less likely to apply for assistance, no matter how diligent the state's outreach efforts.

Finally, no solid data on enrollment levels exist. CMS has not specified in its letter the data source it will use or how it will gauge whether states have met the 95 percent benchmark.

---

[16] Despite CMS' stated concern about the adequacy of the states' efforts to enroll lower income children in Medicaid and SCHIP, it recently issued regulations that will significantly curtail state outreach efforts in an area that has been the most successful, i.e., arrangements with local public schools to enroll lower income children in Medicaid. The rule became final on December 28, 2007; a moratorium on its implementation is scheduled to expire on June 30, 2008. See Judith Solomon and Donna Cohen Ross, Ctr. on Budget and Policy Priorities, Administration Moves to Eviscerate Efforts to Enroll Uninsured Low-Income Children in Health Coverage Through the Schools (Oct. 1, 2007), available at http://www.cbpp.org/9-17-07health.htm.

State agencies are familiar with the children who apply for and receive assistance from their

programs but they do not have first-hand knowledge of the number, eligibility or circumstances

of children under 200 percent of the FPL who have *not* applied for assistance.  The only current

source of related data is that compiled by the Current Population Survey (CPS).  That body of

data, however, only measures children *covered by*, not *eligible for*, SCHIP or Medicaid.  CMS

has also failed to identify the point in time at which enrollment is to be measured, i.e., a fixed

point in time during the year, during any particular month of the year, or some other measure.[17]

In the absence of authoritative guidance from CMS, it is impossible for the amici states to even

attempt compliance with this requirement.[18]

---

[17]  Moreover, because the CPS data addresses the total number of children under 200 percent of
the FPL but does not address the eligibility of those children for public assistance programs, it is
of limited utility for purposes of providing the required assurance.  The data's reliability is also
questionable.  See Congressional Budget Office, The State Children's Health Insurance Program
(May 2007) 9, available at http://www.cbo.gov/ftpdocs/80xx/doc8092/05-10-SCHIP.pdf;
(Coverage in public programs such as Medicaid is underreported . . ."); Genevieve M. Kenney,
The Urban Institute, Medicaid and SCHIP Participation Rates: Implications for New CMS
Directive (Sept. 2007), available at http://www.urban.org/Uploaded
F/411543_Medicaid_Schip.pdf (". . . there are serious methodological challenges associated with
obtaining valid state-level participation rate estimates given the currently available data.")

[18]  While CMS officials have made oral representations to Connecticut and Massachusetts that
their programs might satisfy the 95 percent enrollment requirement and have recently testified
that they "suspect" that a number of states are meeting the threshold, none of the states have
received any official communication from CMS on this point.  (Statement of Dennis G. Smith,
Director, Center for Medicaid and State Operations, Centers for Medicare & Medicaid Services,
before the U.S. Senate Finance Subcommittee on Health Care (April 9, 2008)).  CMS has not
provided any of the states with a written acknowledgement that the state has satisfied the
requirement.  Thus, the states are placed in the untenable position of hoping that CMS'
"suspicion" prevails while still being held to the requirements of the letter.  (Based on the
methodology that CMS has employed as recently as August 2007, 41 of the 50 states, including
California, Connecticut, Massachusetts and New Mexico achieved the required 95 percent
participation rate, with many exceeding a rate of 100 percent.  However, the methodology, while
favorable to the states, has been soundly criticized.  Kenney, supra at 2-4.)  The fact that New
York, which was on the list of compliant states, had its state plan denied in part because of its
failure to meet the enrollment requirement, underscores the validity of the amici states' concerns.

Had CMS complied with the rulemaking requirements, the states would have had the opportunity to express these concerns.

B.    States Have Little Control Over Whether the Number of Children in the Target Population Insured Through Private Employers Has Decreased by More Than Two Percent Over the Previous Five-Year Period.

The requirement that states be able to establish that the number of children in the target populations insured through private employers has not decreased by more than two percent over a five-year period imposes an unfair and overwhelming burden on the amici states. First, this assurance cannot be said to constitute a "clarification" of the reasonable crowd-out procedures that state agencies are required to adopt, as it does not mandate that states either take any particular action or utilize any particular procedure to deter crowd-out.[19]

Second, CMS is asking state agencies to assume responsibility for the coverage decisions of private employers made in a previous five-year period. Employer coverage has declined sharply for all groups of Americans, including children. It is unreasonable to expect state agencies to somehow alter this trend.[20]

---

[19]    The August 17 letter does not define the term "target population," leaving it unclear as to whether the term refers to children with "effective" family income over 250 percent of the FPL who are eligible under the state's SCHIP program, children under 200 percent of the FPL as suggested by CMS, or some other "target" group of eligible children.

[20]    Between 2000 and 2006, rates of employer-sponsored coverage fell four percentage points for non-elderly adult workers and almost nine percentage points for all children under 18, irrespective of income. See Paul Fronstin, Employee Benefit Research Institute, Sources of Health Insurance and Characteristics of the Uninsured: Analysis of the March 2007 Current Population Survey (Oct. 2007), available at http://www.ebri.org/publications/ib/index.cfm?fa= i.e., amounts not included in a family's countable income for purposes of determining eligibility main&doc_type=1.

C.    States Face Difficult Hurdles in Preventing Employers
from Changing Dependent Coverage Policies in a
Manner That Would Favor a Shift to Public Coverage.

The August 17 letter's requirement that states "prevent[] employers from changing

dependent coverage policies that would favor a shift to public coverage" poses an

insurmountable burden for state Medicaid and state health agencies.  As a practical matter,

requirements preventing employers from changing their benefit plans by dropping health care

coverage for dependents can only be adopted by statute, rather than by agency action.  Moreover,

the Employment Retirement Income Security Act, 29 U.S.C. § 1144(a), may create obstacles to

the passage of state laws that attempt to prescribe benefits that must be provided by employer-

sponsored benefit plans.  See FMC Corp. v. Holliday, 498 U.S. 52 (1990); Metro. Life Ins. Co. v.

Massachusetts, 471 U.S. 733 (1985); Delta Air Lines, Inc. v. Kramarsky, 725 F.2d 146, 147 (2d

Cir. 1981).

D.    The Letter's Required One-Year Waiting Period of Uninsurance
Is Unlawful to the Extent That It Recognizes No Exceptions
and, Even with Exceptions, Would Require Rulemaking.

The one-year waiting period imposed by the CMS letter cannot be justified as an

"interpretation" of the statutory requirement that SCHIP not substitute for coverage under group

health plans because the waiting period applies without regard to whether coverage under a

group health plan is available.  Instead, the only effect of the requirement is to deny health care

coverage to thousands of children who, in fact, have no access to employer-sponsored health

insurance and to deny federal reimbursement to the states for the assistance that they provide

these children pursuant to their SCHIP programs.  Debilitating life-threatening illnesses do not

wait for the mandatory, one-year waiting period prescribed by CMS.  Moreover, in a complete

departure from its regulations, CMS' letter recognizes no exceptions to the waiting period

requirement.  The amici states already impose waiting periods of less than one year, with the

22

requisite exceptions, as part of their reasonable crowd-out procedures.[21] No need has been demonstrated for the imposition of a longer period of time.

      E.    The Letter's Cost-Sharing Requirements Will Discourage Program Participation and Are Contrary to the Intent of the Statute.

The letter's call for what will inevitably result in increased cost-sharing on the part of families is ill-advised and unwarranted. CMS' letter requires that, for children in families with incomes over 250 percent of the FPL, the cost-sharing imposed under SCHIP must be comparable to that which would be imposed under "competing private plans," unless the SCHIP cost-sharing amount is already set at the five percent family cap. This requirement is problematic for several reasons. First, CMS does not define the term "competing private plans," again leaving the states in the position of trying to determine what is required of them. Second, even were that term defined, the states may simply not have the data available to them to conduct the comparison that the letter requires and the plans may decline to provide it as confidential. Thus, cost-sharing would revert to the five percent cap. Finally, while all of the amici states impose cost-sharing on program participants, none charge amounts that approximate the levels charged in the private sector or at five percent of a family's income. Imposing SCHIP cost-

---

[21] Most other states will be similarly affected by the new one-year waiting period requirement, as few states impose such a lengthy waiting period. See Donna Cohen Ross and Aleya Horn, Center on Budget and Policy Priorities and Caryn Marks, Kaiser Commission on Medicaid and the Uninsured, Health Coverage for Children and Families in Medicaid and SCHIP: State Efforts Face New Hurdles (Jan. 2008), available at http://kff.org/medicaid/upload/7740.pdf.

sharing at either of these levels will inevitably lead to reduced participation and utilization.[22]
Such a result is antithetical to SCHIP's purpose of meeting the needs of low-income children.
Had CMS adhered to the required rulemaking requirements, the states could have expressed
these concerns.

## CONCLUSION

For all of the foregoing reasons, the States of California, Connecticut, Massachusetts and
New Mexico urge the Court to deny the United States' motion to dismiss and to grant the
plaintiff States' motion for summary judgment.  Decisions of fundamental importance, affecting
the ability of the states to provide federally-subsidized child health care assistance to targeted
low-income children, need to be made through deliberative processes that include notice and
comment.

EDMUND G. BROWN JR.
ATTORNEY GENERAL
STATE OF CALIFORNIA

BY:    *Jennifer M. Kimberg*
Douglas Press  CA State Bar No.#168740
Senior Assistant Attorney General
Jennifer M. Kim, CA State Bar No. #178364
Supervising Deputy Attorney General
California Department of Justice
300 South Spring Street
9th Floor, North Tower
Los Angeles, CA  90013
Tel: (213) 897-2443
Fax: (213) 897-2805

---

[22]  See  Donna Cohen Ross and Aleya Horn, Center on Budget and Policy Priorities and Caryn
Marks, Kaiser Commission on Medicaid and the Uninsured, Health Coverage for Children and
Families in Medicaid and SCHIP: State Efforts Face New Hurdles 8 (Jan. 2008), available at
http://kff.org/medicaid/upload/7740.pdf, citing Samatha Artiga and Molly O'Malley, Kaiser
Commission on Medicaid and the Uninsured, Increasing Premiums and Cost Sharing in
Medicaid and SCHIP: Recent State Experiences (May 2005), available at
http://www.kff.org/medicaid/loader.cfm?url=/commonspot/security/getfile.cfm&PageID=53261.

RICHARD BLUMENTHAL
ATTORNEY GENERAL
STATE OF CONNECTICUT

BY:    _Hugh Barber /cp_
       Hugh Barber
       Assistant Attorney General
       Federal Bar No. ct05731
       55 Elm Street
       P.O. Box 120
       Hartford, CT  06141-0120
       Tel: (860) 808-5210
       Fax: (860) 808-5385


MARTHA COAKLEY
ATTORNEY GENERAL
COMMONWEALTH OF MASSACHUSETTS

BY:    _Emily R. Paradise_
       Emily R. Paradise  BBO # 566637
       Quentin A. Palfrey  BBO # 655547
       Assistant Attorneys General
       One Ashburton Place
       Boston, MA  02108
       Tel:  (617) 727-2200
       Fax:  (617) 573-5386


BILL RICHARDSON
GOVERNOR
STATE OF NEW MEXICO

BY:    _Justin Miller/cp_
       Justin Miller, NM Bar # 23197
       Deputy Chief Counsel
       Office of the Governor
       State Capitol Building, Suite 400
       Santa Fe, NM  87501
       Tel: (505) 476-2236
       Fax: (505) 476-2207

25