**EXHIBIT 2**

NATIONAL ACADEMY
for STATE HEALTH POLICY

U. S. Senate Subcommittee on Health Care
Committee on Finance
"Covering Uninsured Children:
The Impact of the August 17th CHIP Directive"
April 9, 2008

Testimony of Alan Weil, JD, MPP
Executive Director
National Academy for State Health Policy (NASHP)

Chairman Baucus, Senator Grassley, Subcommittee Chairman Rockefeller, Senator Hatch, and members of the committee, my name is Alan Weil and I am the Executive Director of the National Academy for State Health Policy (NASHP), a non-profit, non-partisan organization dedicated to working with state leaders to identify emerging issues, develop policy solutions and advance state health policy and practice. Since the inception of the State Children's Health Insurance Program (SCHIP) in 1997, NASHP has reported on and supported the work of states to implement and strengthen coverage of low-income children through SCHIP. Thank you for the opportunity to appear before you today to discuss CMS's August 17 SCHIP directive and its implications for states.

At the request of SCHIP directors in states affected by the directive, NASHP convened a workgroup to discuss the August 17 directive. Conference calls were held between January and March 2008 to allow states within the workgroup to discuss the directive, share information, and consider the potential implications of the directive's requirements. My testimony is based upon what we have heard from state officials who work closely with the SCHIP program but I do not purport to speak on behalf of the states.

In my testimony I will make three points. First, because the directive was written and issued without any input from states, it includes provisions that are unattainable, outside the control of states, and poorly suited for achieving the purported goal of minimizing crowd out. Second, the CMS directive usurps Congressional authority with respect to both SCHIP and Medicaid. And third, the directive adds yet another level of uncertainty to states in a manner that impedes state action designed to achieve the statutory goal of reducing the number of children without health insurance.

## Lack of Input Yields Flawed Directive

On August 17, 2007, the Centers for Medicare and Medicaid Services (CMS) released a letter to state health officials (SHO #07-001) directing significant changes in policy for SCHIP and children's health coverage. This directive was issued without any notice and comment period, without consultation with states, and was not issued as part of a formal rulemaking process. The requirements in the August 17 directive prompted questions and concerns among states, especially among the 24 states that are immediately affected due to current or recently approved eligibility levels. Because the directive was written and issued without any input from states, it includes provisions that are unattainable, outside the control of states, and poorly suited for achieving the purported goal of minimizing crowd-out.

Although states have sought further guidance from CMS to address their concerns, CMS so far has not responded in writing to many of the detailed questions about the directive posed by individual states or to questions compiled from states by NASHP and submitted at the suggestion of CMS. Without further guidance, many states are struggling to determine whether they will be able to come into compliance. In many states, making the policy or eligibility changes that could

be required under the August 17 directive cannot happen overnight. States will need time to implement policy changes (including in some cases seeking legislative approval, rewriting forms, and reprogramming systems), to train workers, and to notify families who are enrolled or may apply of the new rules. Without further guidance from CMS, many states will likely be out of compliance when the guidance goes into effect on August 17, 2008.

As a result of our work with affected states, NASHP has identified four requirements in the August 17 directive as causing the greatest concern among states: 1) the 95 percent participation requirement; 2) the 12-month minimum waiting period; 3) the employer-sponsored insurance requirements; and 4) the cost-sharing requirements. These concerns are also discussed in a NASHP State Policy Briefing on this topic, which is being released today.

**1.    The 95 Percent Standard is Unattainable**

CMS's directive requires states covering children with "effective" family income above 250 percent of the federal poverty level to assure that they have enrolled in SCHIP or Medicaid 95 percent of children from families with income below 200 percent of the federal poverty level.[i] While states share the goal of maximizing enrollment of eligible uninsured children, many are concerned this participation requirement will undermine ongoing efforts to cover more low-income children. They are concerned about the feasibility of measuring participation given the absence of reliable data, and they observe that experience from other programs demonstrates that this standard is unattainable.

Many states already are targeting efforts to cover children with family incomes below 200 percent of poverty. States expend significant resources on outreach to find and enroll these eligible children, and they have instituted a variety of measures to improve enrollment and

retention practices. The vast majority of children with family incomes below 200 percent of the federal poverty level who are eligible for either Medicaid or SCHIP are covered.[ii]

Additionally, a number of states that cover children with family incomes above 250 percent of the federal poverty level have found that increasing eligibility has been instrumental in reaching more eligible low-income children below 200 percent of the federal poverty level. For example, under Illinois' universal children's coverage program, AllKids, approximately 70 percent of the 166,000 children that were enrolled when the program started had been low-income children previously eligible for Medicaid and SCHIP but unenrolled. Establishing higher eligibility levels can reinforce the message that children can qualify even if their parents are working and earning low to moderate incomes.

Another significant challenge states face is the difficulty with measuring participation of low-income children. States cannot easily measure participation rates for SCHIP and Medicaid using available data sources. National surveys, such as the Census Bureau's Current Population Survey (CPS), have very small sample sizes for individual states, and many states view their own state estimates as a more accurate representation of the number of uninsured. In addition, survey respondents in the CPS tend to underreport Medicaid or SCHIP coverage (instead saying they have private coverage or are uninsured). Other surveys, such as the Survey of Income and Program Participation or the National Health Information Survey, do not contain recent enough data or have other limitations for measuring participation rates in SCHIP and Medicaid.

CMS has indicated in phone calls with states that it believes there are data approaches that could be used to demonstrate 95 percent coverage of eligible children, including modifications of the CPS to account for underreporting of Medicaid/SCHIP. If some states can develop methods to document 95 percent participation rates, there still may be concerns about

the policy and political implications of using different data for different purposes within a state and across states. Without consistent data definitions and sources, both state and federal policy makers will be denied the most consistent and valid data possible. In addition, some states worry about the potential long-term impact of showing compliance with the 95 percent standard using data or methods that are not accepted universally. By using less than rigorous data or methods, states could adversely impact future SCHIP funding, depending on the allocation formula used.

The 95 percent requirement appears arbitrary to states. CMS has not provided a rationale for selecting this figure. The participation rates for Medicaid and SCHIP are already higher than for most other voluntary programs targeting low-income Americans. Participation in the federal Food Stamp Program is approximately 50 percent, roughly 30 percent below the participation rate for SCHIP[iii]. Even in a program like Medicare Part B, in which seniors are enrolled automatically unless they opt-out, the participation rate is at 95.5 percent[iv]. Since no state has met this standard under CPS estimates or has yet successfully convinced CMS that it has reached the standard, many states believe it is unrealistic and unattainable.

2.     **The One Year Waiting Period Contradicts SCHIP Program Goals**

CMS's directive requires states to establish – for children with family incomes above 250 percent of the federal poverty level – a minimum one year period of uninsurance before receiving coverage under SCHIP. Although requiring a period of uninsurance, also known as a waiting period, is not a new concept, states have had the flexibility to determine if a waiting period should be used and how long it should be. States have raised a number of concerns about the stringency of the new waiting period requirement related to its length and whether or not exceptions will be allowed.

5

In accordance with federal policy dating back to 2001,[v] states with SCHIP programs covering children with family income above 200 percent of the federal poverty level are responsible for monitoring, developing, and remaining ready, if necessary, to implement specific crowd-out prevention strategies.[vi] In addition, states with eligibility above 250 percent of the federal poverty level must have anti-crowd out strategies in place. Using the flexibility afforded through SCHIP, along with past experiences implementing strategies to deter crowd-out, states have policies in place that are aimed at reducing the likelihood of crowd-out in SCHIP programs.

According to NASHP's most recent state survey, the most frequently reported means used to deter crowd-out is a waiting period for children previously covered by a private insurance policy.[vii] Although it is unclear at this time how many states will be affected the by August 17 directive, 19 of the 24 states[viii] that either provide or propose to provide coverage to at least some children in families with gross incomes above 250 percent of the federal poverty level already use waiting periods. While the 19 states' waiting periods range from 1 month to 6 months, most states require between a 3- and 6-month waiting period between leaving private coverage and joining SCHIP.[ix] All of the states requiring waiting periods recognize that there may be reasons for losing private coverage that are beyond the family's control, so they allow exceptions to the waiting periods for circumstances such as death of a parent or involuntary loss of employment. By contrast, the August 17 directive does not discuss exceptions and CMS has not indicated whether any exceptions to the standard will be considered.

States are also concerned that the new waiting period could create substantial administrative complexity. For example, states that cover children above 250 percent might be forced to modify or create new applications to address the need for two different standards -- children in families with income above 250 percent of the federal poverty level will have a

6

longer period of uninsurance than those at lower incomes if states retain shorter periods for these children. States fear that adopting this policy will further fragment the public health coverage system, which already can be complicated for the families it serves. Costly technical systems changes may be needed to process applications and determine eligibility.

States are also concerned about the adverse consequences of a longer waiting period for children's health. Requiring children to remain uninsured for a full year prior to enrolling in public coverage, especially if there are no exceptions, increases the risk to their health and development. Research indicates that children with gaps in health coverage greater than 6 months have the highest rates of unmet needs[x], and that children with gaps in coverage are less likely to report they have a usual source of care other than an emergency room compared with children insured for a full year[xi]. Gaps in coverage may deny children the preventative and diagnostic care that could have lasting implications for their healthy development.

Considering the success to date of SCHIP in providing children with important health coverage and the potential the CMS directive has to reverse some of that success, affected states largely view this waiting period provision as poor public policy. Requiring a standard one-year waiting period will reduce the state flexibility, impose unfunded administrative burdens, and will have potential negative consequences for children's health.

3. **Employer-Sponsored Insurance Coverage Erosion is Outside of States' Control**

The CMS directive requires that, if states are to cover children with gross family incomes above 250 percent of the federal poverty level, they must show that employer-sponsored insurance (ESI) rates for low-income children have not declined by more than 2 percentage points. States cannot control the rate of ESI erosion.

7

States recognize the benefits of private insurance coverage. As discussed, most states have requirements for waiting periods following the dropping of private coverage before a child may be covered by SCHIP. Some states also see premium assistance programs as a means to encourage families to utilize employer-sponsored insurance; nine states operated premium assistance programs in SCHIP in 2005.[xii] Bipartisan SCHIP reauthorization legislation proposed to amend the rules to make it easier for states to begin to offer premium assistance for SCHIP enrollees.

Despite their interest in promoting employer-sponsored insurance (ESI), states have no control over private employers' decisions to offer insurance coverage, as employer benefit plans are regulated under federal law. States are unable to provide regulatory or oversight assistance for employees working for employers that choose to self-insure. In 2007, 55 percent of employees with ESI were covered under a self-insured plan.[xiii] And, although states can regulate private insurance companies within their jurisdictions, states cannot change the decisions of individual employers regarding premiums or cost sharing imposed on the employee, or the type of coverage offered.

The erosion in ESI has occurred for both children *and* adults, a phenomenon believed to be driven primarily by factors other than public coverage expansion. ESI rates have declined for reasons outside of a state's control. Rising health care costs and premiums have had a great impact on the ability and inclination of employers to offer coverage to their employees.[xiv] Businesses have responded to rising costs by declining to offer benefits or by requiring more employee cost sharing. This increased cost sharing has forced many families, unable to absorb the increased cost, to drop health coverage. SCHIP and Medicaid have offset the decline in ESI

coverage this decade, but there is no clear evidence that public coverage has caused the erosion.[xv]

Changes in the U.S. economy this decade also have played a role in declining ESI rates. Fewer Americans are now employed in the manufacturing sector, which historically has had high levels of ESI coverage. More Americans are working in service and construction jobs, which are less likely to offer ESI coverage. In addition, between 2000 and 2004, millions more Americans went to work in small firms or became self-employed, and these groups of workers are less likely to have ESI coverage.[xvi] States consider it arbitrary to constrain the options for program design on the basis of factors almost entirely outside of their control.

### 4. The Cost-Sharing Requirement is Unworkable

For children with gross family income above 250 percent of the federal poverty level, CMS directs states to adopt a cost-sharing requirement that is comparable (within one percent of the family income) to that of a competing plan sold in the state's private insurance market unless the cost requirement of the public plan is set at the federal cap of five percent of family income.[xvii] It appears through its directive, that in addition to the already established cost-sharing maximum, CMS is suggesting there also should be a *minimum* cost-sharing requirement.

Of the states that could be most affected by CMS's directive, 22 of them currently include or have proposed to include cost sharing within their SCHIP programs for children in families with incomes above 250 percent of the federal poverty level.[xviii] States establish cost-sharing provisions with caution, knowing that levels that are too high will deter eligible families from enrolling in the program and needy children from obtaining necessary services. Even if cost-sharing provisions borrowed from private health plans deter crowd-out, they may come at the cost of other critical SCHIP program goals of coverage and access.

9

States will not be held to the five percent of family income standard if it can prove to CMS that the state's SCHIP cost-sharing requirement is not more favorable by more than one percent of family income when compared to a competing private plan's cost sharing requirement.[xix] Most states find that comparison to be unfeasible, considering the improbability that child-only coverage is being sold currently within each state's private insurance market. If child-only plans are not on the market, states are left to look at privately sold family plans for comparison. A valid comparison of cost sharing between SCHIP coverage and private family coverage is unlikely, due to the higher cost of adult health care services, which is often balanced by higher cost-sharing requirements within private family coverage.

## The Directive Usurps Congressional Authority

The CMS directive usurps Congressional authority with respect to both SCHIP and Medicaid. While the directive itself does not mention Medicaid, CMS has indicated that it intends to apply the directive to Medicaid programs.

Medicaid expansion SCHIP programs *must* follow federal Medicaid rules regarding enrollment and cost sharing. Under Medicaid law and rules, states cannot use waiting periods and they are limited to cost-sharing provisions far smaller than 5 percent of family income. The CMS directive requires states to adopt policies that contravene the Medicaid statute. In addition, because some aspects of the directive are literally impossible to achieve, it has the effect of capping SCHIP eligibility at 250 percent of the federal poverty level, which contravenes statutory language and bipartisan compromise legislation passed but vetoed.

## The Directive Adds to Uncertainty which Undermines Program Goals

It is a particularly unstable time for SCHIP. Although the Medicare, Medicaid, SCHIP Extension Act has provided SCHIP with additional funding to help prevent state shortfalls in the current fiscal year, SCHIP still has not been reauthorized. While the reauthorization process has dragged on, many states have been unable to adequately plan for future coverage expansions that build on past success in covering eligible children. States, dealing with an economic slowdown, are reluctant to commit significant new state resources without a commitment of federal funding to support any coverage initiatives. Even with the uncertain future of reauthorization, some states have moved forward, which is a testament to state commitment to SCHIP and coverage for low-income children. However, many states that had planned initiatives to cover more uninsured children are putting their plans on hold without more certainty on funding.

The August 17 CMS directive is yet another challenge for states in managing their programs and threatens future coverage expansions. States that currently cover children above 250 percent of the federal poverty level face the prospect of being required to cut back their programs and turn children away who they would have covered in the past. States that have recently approved expansions above the 250 percent threshold have been stopped in their tracks from seeking CMS approval because they have not proven compliance with the CMS directive.

## Conclusion

The premise of the SCHIP federal-state partnership is that state flexibility within a capped federal grant will yield exceptional progress toward a critical national goal. Indeed, ten years of experience proves this to be the case.

States are authorized under current law to extend SCHIP coverage to and beyond 250 percent of the federal poverty level. States make this choice because they know that insurance coverage is often unaffordable to families with incomes at this level. While 250 percent of FPL

11

is approximately median income for a family of four in Arkansas, it is barely half the median in New Jersey. In states with higher median incomes, many families need assistance obtaining health insurance despite the fact that their income would be sufficient to put them squarely in the middle class if they lived in a different state. States share the national goal of deterring crowd out, but they also know that this goal needs to be balanced against other critical program goals such as providing high quality coverage and access to health care services.

The August 17 directive imposes a single set of policies on a diverse nation. The directive is poorly crafted because it was written and issued without any input from states. The directive includes provisions that are unattainable, outside the control of states, and poorly suited for achieving the purported goal of minimizing crowd out. The directive usurps Congressional authority and impedes state actions designed to achieve the statutory goal of reducing the number of children without health insurance. The level of state concerns about the directive suggests that review and modification, in consultation with states, is warranted prior to enforcement of the directive.

---

[i] While not defined in the directive, based on state conversations with CMS, the agency's reference to effective income appears to refer to gross income.

[ii] 79 percent of Medicaid-eligible children and 63 percent of SCHIP-eligible children are covered nationwide. From: Cindy Mann, Michael Odeh. *Moving Backward: Status Report on the Impact of the August 17 SCHIP Directive To Impose New Limits on States' Ability to Cover Uninsured Children* (Washington, DC, Georgetown University Health Policy Institute, Center for Children and Families, December 2007).

[iii] Government Accountability Office. *Means-tested Programs: information on Program Access Can Be An Important Management Tool* (Washington, DC: Government Accountability Office, May 2005)

[iv] D.K.Remler and S.A. Glied. "What Other Programs Can Teach Us: Increasing Participation in Health Insurance Programs," *American Journal of Public Health*, Volume 93, Number 1, 2003:67-74.

[v] CMS. Federal Register, January 11, 2001 Vol. 66, No. 8., p.2603. http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=2001_register&docid=page+2639-2688.pdf

[vi] Neva Kaye, Cynthia Pernice, and Ann Cullen, *Charting SCHIP III: An Analysis of the Third Comprehensive Survey of State Children's Health Insurance Programs* (Portland, ME: National Academy for State Health Policy, September 2006), 43.

[vii] Ibid., 43.

[viii] North Carolina and Ohio have enacted legislation to increase the income eligibility for their SCHIP programs, but are currently undecided regarding their programs' waiting period.

[ix] Donna Cohen Ross, Aleya Horn, and Caryn Marks, *Health Coverage for Children and Families in Medicaid and SCHIP: State Efforts Face New Hurdles* (Center for Budget and Policy Priorities: Washington, DC and Kaiser Commission on Medicaid and the Uninsured: Washington, DC, January 2008), 10.

[x] Laura Summer and Cindy Mann, *Instability of Public Health Insurance Coverage for Children and Their Families: Causes, Consequences, and Remedies* (Georgetown University Health Policy Institute: Washington, DC & The Commonwealth Fund: New York, NY, June 2006) 14-15.

[xi] Summer and Mann, 2006, 14-15

[xii] Kaye, Pernice, and Cullen, op. cit.

[xiii] Kaiser Family Foundation and Health Research and Education Trust, *Employer Health Benefits: 2007 Annual Survey* (Menlo Park, CA:2007). http://www.kff.org/insurance/7672/upload/EHBS-2007-Full-Report-PDF.pdf

[xiv] Center on Budget and Policy Priorities, "Is Medicaid Responsible for the Erosion of Employer-Based Health Coverage?" September 22, 2006, accessed at http://www.cbpp.org/9-22-06health.htm.

[xv] Ibid

[xvi] John Holahan and Allison Cook. *Health Affairs* 27, no. 2 (2008): w135–w144 (published online 20 February 2008; 10.1377/hlthaff.27.2.w135)]

[xvii] Under SCHIP federal regulation, total cost sharing, including premiums and co-payments, may not exceed 5 percent of family income. For more information see *Charting SCHIP III*

[xviii] Kaye, Pernice, and Cullen, op. cit.

[xix] Center for Medicaid and Medicare State Operations, Health Official Letter (Baltimore, MD: U.S. Department of Health and Human Services, August 2007), SHO #07-001.