UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

| | | |
|---|---|---|
| STATE OF NEW YORK, STATE OF ILLINOIS, STATE OF MARYLAND, STATE OF WASHINGTON, | : | 07 Civ. 8621 (PAC) |
| | : | |
| Plaintiffs, | : | OPINION & ORDER |
| - against - | : | |
| | : | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES | : | |
| | : | |
| Defendant. | : | |

------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

This case involves the administration of the State Children's Health Insurance Program ("SCHIP"), a joint federal-state program which provides insurance to children from low-income families who exceed Medicaid income limitations, but nonetheless may be unable to afford health insurance. In providing coverage to these children, the statute requires that such coverage not "crowd out" private insurance that the children might have or otherwise obtain. On August 17, 2007, the Centers for Medicare and Medicaid Services ("CMS")—a branch of the U.S. Department of Health and Human Services ("HHS")—wrote to state health officers (the "SHO Letter"), enumerating certain standards by which CMS would review state SCHIP plan amendments when states seek to insure children from families whose income is higher than 200% of the Federal Poverty Level ("FPL"). The SHO Letter also stated that state plans in excess of that level had one year to come into compliance with the SHO Letter standards.

Plaintiffs seek declaratory and injunctive relief in response to the SHO Letter, which they claim unlawfully promulgated new requirements.  New York, Illinois, Maryland, and Washington ("Plaintiffs") filed their original complaint on October 4, 2007 against HHS under Title XXI of the Social Security Act, 42 U.S.C. §§ 1397aa-jj, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500-706. Plaintiffs amended their complaint on March 13, 2008.  The parties now cross move for relief.

Defendant moves to dismiss the case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), claiming that this Court lacks subject matter jurisdiction because: (1) the case is unripe; (2) the SCHIP judicial review provisions authorize direct appellate review, rather than review by a district court; and (3) the SCHIP judicial review provisions preclude review under the Administrative Procedure Act.  Additionally, Defendant argues that even if the Court finds that it has jurisdiction, Plaintiffs' case should be dismissed because the SHO Letter is a policy statement, not a legislative rule, and thus CMS did not have to promulgate the standards in the letter through the APA's notice-and-comment rulemaking procedures. See 5 U.S.C. § 553 (rulemaking procedures and exceptions for interpretive rules and general policy statements).

Plaintiffs move for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure on their claims that CMS improperly issued the SHO Letter without undertaking a required rulemaking procedure.  Plaintiffs ask the Court to: (1) declare that the SHO Letter represents legislative rulemaking subject to the notice-and-comment requirements of 5 U.S.C. § 553; (2) find that CMS failed to follow the appropriate notice-and-comment requirements; (3) enjoin CMS from disapproving or giving effect to a disapproval of any state SCHIP plan or plan amendment using the criteria in the SHO Letter; and (4) direct CMS to review state SCHIP plan amendments using only properly promulgated regulations.

2

For the reasons that follow, the Court finds that the case is not ripe for review, that the SCHIP judicial review provisions preclude review of this matter in federal district court, and that Plaintiffs cannot sue under the APA because they have another adequate method of review in the appeals courts.  The Court notes that dismissal at this stage does not in any way connote approval of the SHO Letter, its contents, or the method of its promulgation and implementation.  The Court does not reach the merits of Plaintiffs' claims—that CMS improperly promulgated the standards in the SHO Letter—because Plaintiffs have not exhausted their administrative remedies and Plaintiffs suffer no hardship from the temporary withholding of judicial review.

Each state is free to challenge the SHO Letter, as well as the methodology of its promulgation and implementation, when CMS completes its review of any state plan submitted for CMS's approval, or when CMS attempts to revoke a state plan for non-compliance with the appropriate statutory and regulatory requirements.  Further, the Court notes that granting the relief Plaintiffs seek does not vindicate any state rights, but rather only delays review of CMS's actions, including the SHO Letter.  HHS would appeal a decision in favor of the states, and if the Circuit Court affirmed, the SHO Letter would be invalidated.  But that would not result in the approval of any state plan because CMS would be able—even without regard to the SHO Letter—to reach a decision adverse to the states for not having in place reasonable anti-crowd-out provisions.  It would be simpler, more efficient, and more economical for CMS to review each states' plan upon the time schedule statutorily mandated, and then for the states to seek the statutorily preferred appellate review, on a full administrative record, on precisely what CMS did and the reasons for its actions.  Accordingly, Defendant's motion to dismiss is GRANTED and the Plaintiffs' motion for summary judgment is DENIED.

# BACKGROUND[1]

## I.   The SCHIP Program

### A.   Procedures for State-Plan Approval

Congress enacted SCHIP in the Balanced Budget Act of 1997, Pub. L. 105-33, 111 Stat. 251, under Title XXI of the Social Security Act, 42 U.S.C. §§ 1397aa–1397jj.  Its purpose is to "provide funds to States to enable them to initiate and expand the provision of child health assistance to uninsured, low-income children in an effective and efficient manner that is coordinated with other sources of health benefits coverage for children." 42 U.S.C. § 1397aa(a). The program, unlike Medicaid, is not an entitlement to individuals, but rather a block grant to the states.  SCHIP has often been referred to as an "administrative experiment in federalism." See, e.g., Robert F. Rich, et al., The State Children's Health Insurance Program:  An Administrative Experiment in Federalism, 2004 U. Ill. L. Rev. 107 (2004).  SCHIP essentially creates a cooperative relationship between the federal and state governments; the federal government provides the basic policy framework and primary funding, while the states direct program administration.

Congress made clear that one of its concerns was that the SCHIP money not be used for children who already had coverage but might opt for a state plan because of reduced rates. See 42 C.F.R. § 457.805 ("The State plan must include a description of reasonable procedures to ensure that health benefits coverage provided under the State plan does not substitute for coverage provided under group health plans.").  The program was designed to prevent "crowd out," and the chief targets of the plan were to be uninsured children from low-income families. Id. § 457.1.  The SCHIP legislation requires the states to submit a state plan setting forth how the

---

[1]   The facts in this section are derived from Plaintiffs' complaint, the parties' statements of fact submitted pursuant to Local Rule 56.1, and supporting affidavits and exhibits, unless otherwise specified.

state intends to use the SCHIP funds.  CMS approves or disapproves the plan. See 42 U.S.C. §

1397aa(b).  States may challenge CMS's rejection of a plan in an appeal to the appropriate

circuit court. See 42 U.S.C. § 1316(a)(3); see also Background Section B infra p. 6-7.

Among other information, the state plan must include a description of procedures the

state intends to implement to ensure that the only children furnished assistance are those whose

family income is either: (1) at or below 200% of the federal poverty level (FPL),[2] or (2) no more

than 50 percentage points higher than that state's Medicaid eligibility threshold in 1997 (which

varies among states but is generally below 200% of the FPL). Id. at §§ 1397bb(b)(3)(A),

1397jj(b)(1), 1397jj(c)(4).  Specifically, SCHIP's implementing regulations require states to

adopt "reasonable procedures" to prevent substitution, or crowd out, of private health plans. 42

C.F.R. § 457.805.  States have adopted different procedures to prevent substitution, and CMS's

authority to expand and require specific procedures is an issue in this case.

CMS allocates funds to states according to a statutory formula that takes into account the

number of children in low-income households, the number of such children who are uninsured,

and a geographic cost factor for health care wages. 42 U.S.C. § 1397dd.  As of March 2008,

Congress had provided nearly $40 billion for the program.  SCHIP, however, is a jointly funded

program: it requires states to provide some matching funds in order to receive federal dollars.

Specifically, the federal matching rate varies among states from 65% to 83%. See 42 C.F.R.

457.622.

A state implements SCHIP by choosing one of three options: creating a separate, stand-

alone health insurance program; expanding its existing Medicaid program; or a combination of

the two options. 42 U.S.C. § 1397aa(a); 42 C.F.R. § 457.70.  A state that expands its Medicaid

---

[2]     The federal poverty level is $21,200 for a family of four, except for in Alaska and Hawaii. See 73 Fed. Reg.
3,971 (Jan. 23, 2008).

program must provide SCHIP enrollees with the same benefits included in its Medicaid program. States that create stand-alone or combination programs have a variety of benefit-package options. 42 U.S.C. § 1397cc(a)–(d).  States are also granted latitude, within certain prescribed federal guidelines that vary depending on family income levels, to set cost-sharing requirements and premium levels. Id. § 1397cc(e).

States are charged with setting their own eligibility standards, although there are broad federal eligibility guidelines.  As previously stated, states must limit eligibility to children whose "family income" is either at or below 200% FPL or no more than 50 percentage points higher than that state's 1997 Medicaid eligibility threshold.  But the term "family income" is loosely defined as "income as determined by the State for a family as defined by the State." 42 C.F.R. § 457.10 (emphasis added).

As of March 2008, at least 17 states had taken advantage of this broad language to widen their eligibility standards by disregarding substantial portions of a family's earnings, thereby opening up their SCHIP programs to higher-income families. (See Memorandum of Law in Support of Defendant's Motion to Dismiss ("HHS Mem.") at 4.)  This is the subject of Defendant's main objection.  As HHS notes, "plaintiff New York . . . is presently seeking to expand coverage to children with effective family incomes of up to 400 percent of the FPL . . . by amending its definition of 'family income' to exclude income up to 200 percent of the FPL." Id.

### B.  Administrative Review and Appeal Procedures

The SCHIP statute incorporates by reference the administrative and judicial review provisions available to Medicaid under 42 U.S.C. § 1316. See 42 U.S.C. § 1397gg(e)(2).  CMS has 90 days to disapprove a state plan after submission. 42 C.F.R. § 457.160.  A state plan is

considered approved after 90 days unless CMS sends notice of disapproval or notice that it needs additional information from the state.[3] Id.  Where CMS disapproves a state's SCHIP plan, the state may request reconsideration within 60 days after the disapproval. 42 U.S.C. § 1316(a)(2); 42 C.F.R. § 457.203(a).  Following reconsideration, the state may challenge the agency's decision in a full hearing on the record. 42 C.F.R. § 457.203(b)-(c).  If the CMS Administrator determines that the disapproval was incorrect, CMS will pay the incorrectly denied funds in a lump sum. Id. § 457.203(d).

CMS also has the authority to initiate non-compliance proceedings against states when the Administrator determines that a state plan no longer meets CMS requirements. See 42 C.F.R. § 457.204  Before CMS may withhold funds, however, a state is entitled to a hearing. 42 U.S.C. §§ 1397ff(c), (d); 42 C.F.R. §§ 457.203, 457.204.  CMS generally does not hold a hearing until attempting to resolve the issue through informal negotiations. 42 C.F.R. § 457.204(a)(2).  If a hearing is necessary and the Administrator finds that the state plan is in substantial non-compliance, CMS may withhold future payments. Id. § 457.204(d).

Appeals of the Administrator's final determination of a state plan are taken directly to "the United States court of appeals for the circuit in which such State is located." 42 U.S.C. § 1316(a)(3).

## II.  The State Health Official (SHO) Letter of August 17, 2007

The dispute in this case flows from CMS's letter to state health officials on August 17, 2007, which "clarifie[d]" how CMS would apply the regulatory requirements when reviewing state requests to extend SCHIP coverage to children in families earning 250% or higher of FPL. (See Plaintiffs' Amended Complaint ("Am. Compl.") Ex. B at 1.)  The letter, signed by CMS Director Dennis G. Smith, noted that existing regulations at 42 C.F.R. § 457.805 provide that

---

[3]        This request for additional information is sometimes referred to as a "Stop the Clock" letter.

states must have "reasonable procedures" to prevent substitution of SCHIP coverage for private health coverage.

The SHO Letter specified five types of crowd-out strategies that states have adopted: (1) imposing waiting periods between dropping private coverage and SCHIP enrollment; (2) imposing cost-sharing at approximate amounts to the cost of private coverage; (3) monitoring health insurance status at the time of application; (4) verifying family insurance status through databases; and (5) preventing employers from changing dependent coverage policies that would favor a shift to public coverage. (Id.)  The SHO Letter did not specify whether any state had adopted all five strategies.  Nonetheless, CMS's letter stated that the agency was:

> [C]larifying that the reasonable procedures adopted by States to prevent crowd-out pursuant to 42 C.F.R. 457.805 should include the above five general crowd-out strategies with certain important components.  As a result, we will expect that, for States that expand eligibility above an effective level of 250 percent of the FPL, the specific crowd-out strategies identified in the State child health plan to include all five of the above crowd-out strategies, which incorporate the following components as part of those strategies:

(Id. at 1-2.)

The three components listed were: (1) the level of cost-sharing imposed on SCHIP beneficiaries "must" not be more favorable than the cost-sharing under the private plan by more than 1% of family income, unless the plan's cost was set at the 5% family cap; (2) the state "must" establish a minimum one-year period of uninsurance, with no exceptions listed; (3) monitoring and verification "must" include information about the availability of coverage from noncustodial parents. (Id. at 2.)

Additionally, the SHO Letter noted that CMS would "ask" states that were applying to expand SCHIP programs to "higher income populations" to make the following assurances: (1) that the state has enrolled at least 95% of the children in households earning below 200% of FPL

who are eligible for either SCHIP of Medicaid; (2) that the number of children in the target population insured through private employers has not dropped by more than 2% over the prior 5 years; (3) that the state is current with all reporting requirements and reports the crowd-out data on a monthly basis. (Id.)

Finally, the letter stated that CMS "expect[ed] affected States to amend their SCHIP state plan . . . in accordance with this review strategy within 12 months, or CMS may pursue corrective action."  The letter further noted that it would have no effect on current SCHIP enrollees. (Id.)

## III. The Plaintiff States' SCHIP Programs and Reactions to the SHO Letter

### A.  New York

Each of the plaintiff states has a unique SCHIP program.  New York's plan is called Child Health Plus ("CHPlus").  It was started in 1991, before enactment of the federal program, and became a federally approved SCHIP plan in 1998.  As of August 2007, CHPlus included nearly 400,000 children, making it the second-largest SCHIP program in the country.  From 1997 to 2005, the program reduced the number of uninsured children in the state by 40%.  Since July 1, 2000, CHPlus has provided coverage to children whose family income is up to 250% of the FPL.

In 2007, the New York State legislature enacted an expansion of the CHPlus program to cover children whose family income is up to 400% of FPL, contingent upon the availability of federal funds.  The expanded plan would cover an additional 72,000 children from families with incomes between 250% and 400% of the FPL.  On April 12, 2007, in accordance with the newly enacted law, New York's Department of Health submitted a state plan amendment to CMS that included the enacted proposals ("SPA #10"). (See Declaration of Judith Arnold ("Arnold Decl.")

9

¶ 10.)  New York's plan amendment included measures designed to reduce diversion from private coverage, also known as crowd-out:  (1) families would pay higher co-premiums as their income moved up the scale, ranging from $9 to $60 per child; and (2) New York would impose a 6-month period of uninsurance for those children from families above 250% of FPL who drop an employer-based health plan, with certain exceptions. (See Am. Compl. ¶ 24.)

On August 20, 2007, following receipt of the SHO Letter, New York State representatives spoke with CMS staff and, according to the Plaintiffs, were told that New York's proposed amendment would be expected to comply with the requirements listed in the letter, which were now mandatory. (See Arnold Decl. ¶ 20.)  CMS also notified Maryland and Washington State representatives in informal telephone conversations that the SHO Letter requirements were mandatory, according to Plaintiffs. (See Declaration of Susan J. Tucker ("Tucker Decl.") ¶ 17; see also Declaration of Roger Gantz ("Gantz Decl.") ¶ 32.)  Following their telephone conversation with CMS, New York representatives submitted written responses to CMS's questions about New York's plan to expand coverage to children in families with income up to 400% of FPL. (See Arnold Decl. ¶ 20.)

On September 7, 2007, CMS disapproved New York's proposed amendment. (Id. Ex. 10.)  CMS's letter rejecting New York's proposal stated that the proposed amendment failed to comply with SCHIP's goals of providing health-care assistance to uninsured children in coordination with private health care coverage.  Specifically, New York "failed to provide assurances that the State has enrolled at least 95 percent of the children in the core targeted low-income child population . . . As outlined in an August 17, 2007, letter to State Health Officials, such assurances are necessary to ensure that expansion to higher income populations does not interfere with the effective and efficient provision of child health assistance." (Id. at 1.)

CMS's rejection letter also pointed out that New York had failed to include a 1-year uninsurance period for children in the 250% and over FPL range, nor had New York proposed cost-sharing measures in line with the guidelines of the SHO Letter. (Id. at 2.)  The letter stated that the "disapproval is consistent with August 17, 2007, letter to State Health Officials." (Id.)

New York requested reconsideration of CMS's disapproval on October 31, 2007.  On November 30, 2007, Defendant responded, setting a hearing date for January 16, 2008.  That hearing was postponed, and the parties are currently briefing the issues for the reconsideration hearing, with the final briefs to be filed by February 2, 2009.

### B.  Maryland

Of the four plaintiff states, only Maryland's program currently provides SCHIP assistance to children in families earning above 250% of FPL, the threshold at which the SHO Letter guidelines apply.  Maryland's program, called Maryland Children's Health Program ("MCHP"), is a Medicaid expansion program.  Since 2001, MCHP has covered health care for children from families with incomes at 200% to 300% of FPL for a premium ranging from $45-$57 per month. (See Tucker Decl. ¶ 5; Am. Compl. ¶ 26.)  In its free MCHP program, Maryland covers 82,703 children with family incomes too high for Medicaid but no greater than 185% of FPL, and 9,449 children with family incomes between 185% and 200% of FPL.  In the paid program for families between 200% and 300% FPL, Maryland covers 11,588 children, as of March 2008. (Tucker Decl. ¶ 9.)  To prevent crowding out, Maryland declares ineligible any applicant with benefits from an employer-sponsored health plan.  Maryland also imposes a 6-month waiting period for MCHP applicants who voluntarily terminate coverage under an employer-sponsored plan. (Id. ¶ 11.)

CMS renewed Maryland's SCHIP program on August 29, 2008. (<u>See</u> Nov. 25, 2008 Letter from Serrin Turner ("Nov. 25, 2008 Turner Letter") Ex. B.)  In the letter notifying Maryland of CMS's approval, however, CMS noted that Maryland "must continue to work with CMS regarding compliance with the assurances and requirements outlined in the [SHO Letter]." (<u>Id.</u> at 2.)  Additionally, the terms and conditions of Maryland's approval included a requirement that Maryland demonstrate compliance with the crowd-out strategies and assurances listed in the SHO Letter. (<u>See id.</u> ¶ 17.)  At oral argument in this case a Maryland representative referred to the state's situation as "operat[ing] under a cloud" of uncertainty about whether CMS would ever initiate noncompliance proceedings against Maryland. (<u>See</u> Nov. 20, 2008 Oral Argument Transcript ("Tr.") 52:22-53:10.)  Nonetheless, Maryland's MCHP is providing coverage for children whose families earn up to 300% of FPL.

### C.  Washington State

Washington's SCHIP program covers children from families with income between 200% and 250% of FPL. (<u>See</u> Gantz Decl. ¶ 6.)  As of April 2008, the plan covered approximately 13,000 children.  Co-pay premiums are $15 a month per child, capped at $45 per month.

In 2007, the Washington legislature authorized the expansion of the state's SCHIP program to include children from families with incomes up to 300% of FPL, effective January 1, 2009. (<u>Id.</u> ¶ 8.)  Washington's plan to expand SCHIP coverage includes several strategies to avoid private health plan substitution:  (1) families must disclose employer-based coverage under penalty of perjury; (2) families must enroll children in employer-based health programs when it is cost-effective for the state to contribute to such care; (3) families in the SCHIP expansion group will have a four-month waiting period; (4) families will pay a monthly premium based on a sliding scale. (<u>Id.</u> ¶ 11; Am. Compl. ¶ 31.)

Washington filed its proposal to increase coverage to children in families earning 300% of FPL on April 19, 2008. (See Supplemental Declaration of Kevin Cornell ("Supp. Cornell Decl.") ¶ 5.)  On April 24, CMS sent Washington a "Stop the Clock" letter which noted in an enclosure that Washington "will need to adhere to the August 17th 2007 State Health Official (SHO) Letter requirements." (See id. Ex. A at 3.)  Following responses from Washington, CMS sent another Stop the Clock letter on October 16, 2008, noting that its "major concerns" related to Washington's crowd-out procedures. (Id. Ex. E at 1.)  CMS and Washington subsequently had telephone conversations relating to Washington's amended SCHIP plan and CMS's concerns with specific crowd-out procedures. (See id. ¶¶ 11-13.)  CMS has not formally taken action approving or disapproving Washington's amended plan.

**D.  Illinois**

Illinois' program, called All Kids, is a comprehensive health insurance program for children of any income level. (See Am. Compl. ¶ 33.)  The state's SCHIP program claims matching federal funds for: unborn children with mothers earning at or below 200% of FPL and not eligible for Medicaid; children between 6 and 18 in families earning 100% to 200% of FPL; and children from birth to 5 years in families with income at 133% to 200% of FPL. (Id. ¶ 35.)  Effective July 1, 2006, Illinois extended All Kids coverage to all uninsured children regardless of family income.  The state has not sought to amend its SCHIP plan to claim matching federal funding because Illinois has exhausted its SCHIP allotment. (Id. ¶ 37.)

**IV.  CMS Action with Regard to Other States: Rhode Island and Missouri**

CMS has approved at least two state SCHIP plans that deviated from the terms listed in the SHO Letter.  For instance, CMS approved a Rhode Island proposal that did not include a mandatory 12-month uninsurance period for children in the above-250% FPL range. (See Second

Declaration of Serrin Turner ("Turner 2nd Decl.") Ex. B.)  As an alternative to the one-year

waiting period, Rhode Island proposed mandating enrollment in its premium assistance program

for any SCHIP-eligible applicant who also had access to employer-sponsored insurance.  CMS

found that this alternative satisfied its concerns over crowding out. (Id. at 2.)

Likewise, CMS approved a Missouri SCHIP plan that provides benefits to children in

families with income above 250% FPL.   The Missouri plan complies with the standards of the

SHO Letter, except that it provides for a 6-month period of uninsurance, rather than a 12-month

period. (See Nov. 25, 2008 Turner Letter Ex. D at 2.)  CMS approved the plan, however, because

Missouri proposed alternative strategies to prevent crowd-out.  Specifically, children in families

with income above 150% FPL are not eligible for the SCHIP program if the family has access to

"affordable" insurance coverage, with an adjustable standard for affordability based on family

size and income.  Additionally, uninsured children from families at 225% FPL are not eligible

until 30 days after the SCHIP application is received and the premium paid.  CMS determined

that these and other assurances provided "an acceptable alternative strategy to limit crowd-out."

(Id.)

## V.  CMS Clarifications of the SHO Letter

Defendant has supplemented its SHO Letter on several occasions.  On January 28, 2008,

CMS sent a clarification letter to SCHIP directors in states that covered children in families

earning above 250% of the FPL. (See Tucker Decl. Ex. 3.)  The letter specified that those states

had until August 16, 2008 "to come into compliance with the required crowd-out strategies and

assurances laid out in the August 17th SHO for new enrollees." (Id.)  The January 28 letter also

noted that the guidance in the SHO Letter "was specifically designed to apply to new applicants,

rather than to individuals currently served by the program." (Id.)

CMS also sent a letter to all state health officials on May 7, 2008, clarifying questions about the SHO Letter. (See Turner 2nd Decl. Ex. A.)  Referring to the 12-month period of uninsurance required by the SHO Letter, the May 7 letter stated that "CMS will review alternative proposals from States, and the justification for them.  We will also consider exceptions for categories of individual enrollees . . . if the State furnishes justifications and data demonstrating a low substitution risk." (Id. at 2.)  Referring to the required assurance that 95% of all children in the target population were already enrolled, the May 7 letter stated that CMS "will continue to work individually with affected States on different approaches to document this assurance." (Id.)  Finally, referring to CMS's goal of preventing crowd out, the May 7 letter noted that "[b]ecause State programs . . . vary widely, we will continue to work with affected States and review requests for alternative approaches on a case-by-case basis to ensure compliance with these existing requirements of law." (Id.)

**DISCUSSION**

**I.  Motion to Dismiss Standard**

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a case for lack of subject matter jurisdiction.  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  The burden of proving jurisdiction falls on the party asserting it. See Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996).

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint if the complaint fails to state a claim for which relief can be granted.  Where a defendant moves to dismiss a complaint under Rule 12(b)(1) as well as under other grounds,

however, "the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." Rhulen Agency, Inc. v. Alabama Ins. Guaranty Ass'n, 896 F.2d 674, 678 (2d Cir. 1990) (citing 5 C. Wright and A. Miller, Federal Practice and Procedure, § 1350, p. 548 (1969)).  Thus, courts must first resolve jurisdictional questions before ruling on the merits of an issue; to act otherwise risks "offend[ing] fundamental principles of separation of powers." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).  Finally, "[w]hen considering a motion to dismiss for lack of subject matter jurisdiction or for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint." Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998).

## II.  Ripeness

The ripeness principle refers to whether a court has jurisdiction to hear a dispute. Jurisdictional questions contain two overlapping ripeness issues, and "[b]oth are concerned with whether a case has been brought prematurely," even though they protect against prematurity in different ways. Simmonds v. INS, 326 F.3d 351, 357 (2d Cir. 2003).  The first issue is constitutional ripeness, which refers to the basic requirement under the Case or Controversy Clause of Article III that the question at issue emanate from an actual dispute. Id.  Constitutional ripeness is not in question in this matter, as the parties have an actual dispute over the meaning and promulgation of the SHO Letter.

Additionally there must be prudential ripeness: a court does not have jurisdiction over a dispute if "the case will be better decided later and [] the parties will not have constitutional rights undermined by the delay." Id. (emphasis in original); see also Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967) ("[The ripeness doctrine's] basic rationale is to prevent the courts,

16

through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.").  The APA requires that an agency action be final before a claim is ripe for review by the courts.  See 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."); see also Air Espana v. Brien, 165 F.3d 148, 152 (2d Cir. 1999).

The determination of prudential ripeness triggers a two-step inquiry, evaluating "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Labs., 387 U.S. at 149.  This determination involves a "pragmatic balancing of those two variables and the underlying interests which they represent." Ciba-Geigy Corp. v. EPA, 801 F.2d 430, 434 (D.C. Cir. 1986).

The fitness analysis is "concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur." Simmonds, 326 F.3d at 359 (quoting Isaacs v. Bowen, 865 F.2d 468, 478 (2d Cir. 1989)).  A claim will not be ripe where it is directed "at possibilities and proposals only, not at a concrete plan which has been formally promulgated and brought into operation." Bowen, 865 F.2d at 477.  The claim may also fail for ripeness when a plaintiff has not exhausted administrative remedies and judicial review would be benefitted by waiting for the agency's views on how best to interpret the agency's regulation. See Am. Sav. Bank, FSV v. UBS Fin. Servs., Inc., 347 F.3d 436, 440 (2d Cir. 2003).  Conversely, an issue may be ripe where it "would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." New York

Civil Liberties Union v. Grandeau, 528 F.3d 122, 132 (2d Cir. 2008) (quoting Simmonds, 326 F.3d at 359).

Taken together, the fitness analysis requires "consideration of a variety of pragmatic factors: whether the agency's actions or inactions challenged in the law suit are 'final;' whether the issues presented for review are primarily legal as opposed to factual in nature; and whether administrative remedies have been exhausted at least to the extent that an adequate factual record has been established." Seafarers Int'l Union v. United States Coast Guard, 736 F.2d 19, 26 (2d Cir. 1984) (citing Abbott Labs., 387 U.S. at 149-51).

The hardship analysis, the second step of the ripeness review, examines "whether and to what extent the parties will endure hardship if the decision is withheld." Simmonds, 326 F.3d at 359.  The mere possibility of hardship is not enough to make a case ripe; instead, the courts must ask "whether the challenged action creates a direct and immediate dilemma for the parties." NYCLU, 528 F.3d at 134 (citation omitted).

### A.  Fitness of CMS's Actions for Review

Defendant argues that Plaintiffs' case is unripe because the SHO Letter does not represent final agency action and that the case will only become ripe for review upon completion of CMS's review of the state plan or revocation of a state plan already approved.  Further, Defendant argues that Plaintiffs' challenge turns on factual issues that require further administrative development, and judicial review is impossible in the absence of an administrative record.  Plaintiffs argue that their claim is ripe for review because the language of the SHO Letter and CMS's interpretation of the letter show that the letter is final agency action which imposes new regulatory requirements.  Plaintiffs also argue that the issues are purely legal, so no further fact finding is necessary.

Agency action is generally final and reviewable upon the satisfaction of two conditions: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal citations and quotations omitted).

The SHO Letter does not represent final agency action.  It does not so much mark the end of the agency's decision-making process, but rather the beginning of the evaluative process. In a practical sense, the letter does not pass judgment on any particular state health plan.  CMS argues that the letter only provides policy guidance.  Even if it does more than that, the Court still cannot know how CMS will apply the letter to individual state plan amendments because the letter applies broadly.  CMS has shown in its followup communications that it will consider plan amendments on a case-by-case basis.  For instance, CMS's May 7, 2008 letter to state health officials notes that as to the 12-month period of uninsurance required in the SHO Letter, "CMS will review alternative proposals from States, and the justification for them." (See Turner 2nd Decl. Ex. A.)  The same letter outlines other instances where CMS says that it will work with affected states on alternative proposals. (Id.)  CMS also showed its flexibility in its approach to the Rhode Island and Missouri SCHIP plan amendments, approving those amendments even though the plans did not meet all the standards in the SHO Letter.

Whether the SHO Letter represents a final agency determination or only a tentative policy outline would be best determined after the administrative hearing and review process is complete. See Air Espana, 165 F.3d at 153 (noting that specific regulations providing for administrative appeals and review show that the agency's "decisionmaking process is not complete until the appeal is decided by the [agency]"); Seafarers, 736 F.2d at 26 (agency action

not final until "process of administrative decision-making has reached a stage where judicial review will not be disruptive of the agency process.") (citation and quotation omitted).  CMS has a formal review process codified by statute. See 42 U.S.C. § 1397gg(e)(2); 42 U.S.C. § 1316(a)(2); 42 C.F.R. § 457.203.  Plaintiffs have not yet availed themselves of this process, and prudence requires that the Court wait to pass judgment until it is clear how CMS interprets and applies the SHO Letter. See Ciba-Geigy, 801 F.2d at 436 ("The interest in postponing review is powerful when the agency position is tentative.").

This is not a case that "would not benefit from any further factual development." NYCLU, 528 F.3d at 132.  To the contrary, the Court needs further factual development to determine the precise status of the SHO Letter.  Plaintiffs point to the mandatory language in the SHO Letter to show that CMS's position is not tentative.  Certain language in the letter appears to support the Plaintiffs' position: states "should include" all five crowd-out strategies; CMS "will ask" for states to make specific assurances to prevent substitution; the cost-sharing under the state plan "must not" be more favorable to the public plan by more than 1% of the family income; the state "must establish" a 12-month period of uninsurance; CMS "will apply" this review strategy to state plans; CMS "expect[s]" affected states to amend their SCHIP plans within 12 months, or CMS may pursue corrective action.  These phrases and words indicate a certain finality to CMS's decision making, but for reasons already discussed, CMS appears to be willing to, and has worked with, certain states to find alternatives to the seemingly mandatory requirements in the SHO Letter.

There is also little indication of how CMS will enforce the so-called requirements in the letter.  For instance, CMS has not pursued corrective action against Maryland, even though Maryland apparently has not yet complied with all the crowd-out procedures listed in the letter.

At oral argument CMS noted that "the agency has no plans at this time to initiate the compliance actions" against states covering children in families earning above 250% of FPL. (See Tr. 6:05-08.)  Of the four plaintiff states, only New York has challenged CMS's disapproval of its state plan.  Until the administrative review process is complete, it is unclear what effect the SHO Letter will have on CMS's final determination.  While it is apparent that CMS is using the SHO Letter to guide its review of state plan amendments in some manner, there are substantial unresolved questions about enforcement and application of the SHO Letter guidelines.  This is a case where judicial "review will only benefit by awaiting the [agency's] views." See Am. Sav. Bank, 347 F.3d at 440.

The SHO Letter does not create obligations or legal consequences for the plaintiffs.  A state does not face any legal obligation to change its plan until the CMS Administrator initiates non-compliance proceedings. See 42 C.F.R. § 457.204.  But a state is entitled to a hearing on the record before CMS may withhold funds. Id.  States face no legal consequences until the Administrator's final determination.  Here, as discussed, only New York has challenged the initial rejection of its amended plan.  Until New York's appeal is heard and determined, New York faces no legal consequences. See Air Espana, 165 F. 3d at 153 (finding that the plaintiffs' rights and obligations were not affected until the agency made a final determination of the plaintiffs' case on appeal).  Accordingly, Plaintiffs' case is not fit for review at this time.

### B.  Hardship to the States in Withholding Review

Plaintiffs argue that they will suffer hardship without review because the SHO Letter imposes new rules that present them with a costly choice: comply with the SHO Letter or forfeit federal funding for part of their SCHIP plans.  A party suffers hardship when, by withholding judicial resolution, the challenged regulation "creates a direct and immediate dilemma for the

parties." <u>Marchi v. Bd. of Coop. Educ. Servs.</u>, 173 F.3d 469, 478 (2d Cir. 1999).  Not all

potential harms cause hardship, however, as "[t]he mere possibility of future injury, unless it is

the cause of some present detriment, does not constitute hardship." <u>Simmonds</u>, 326 F.3d at 360.

In the seminal ripeness case <u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136 (1967), the

Court found that the plaintiffs suffered hardship because they faced an immediate dilemma: incur

the substantial costs of changing their business practices to comply with the challenged

regulation, or follow their present course of business and risk "serious criminal and civil

penalties." <u>Abbott Labs.</u>, 387 U.S. at 152-53.  Plaintiffs here do not face such a stark choice.

If Plaintiffs choose not to abide by the SHO Letter guidance, it is not clear that they will

face any penalties, other than the possible rejection of their SCHIP plan amendment, which can

be challenged in federal circuit court.  While the SHO Letter threatens "corrective action" from

CMS if affected states do not amend their SCHIP plans by August 16, 2008, only Maryland is an

affected state because it is the only one the four plaintiffs currently providing SCHIP coverage to

children in families earning more than 250% of FPL.  New York, Washington, and Illinois face

no threat of corrective action or revocation from the SHO Letter.  The only hardship that those

states can identify is deprivation of federal funding to increase their SCHIP plan coverage to

children at higher family income ranges—funding that will have to be replaced through the state

coffers.[4]  While plaintiff states plan to increase their SCHIP coverage so as to make them

affected states under the SHO Letter guidelines, their plans require approval by CMS, even in the

absence of the SHO Letter.  Thus, requiring Plaintiffs to submit their plans through the plan

amendment process before Plaintiffs challenge the process in court does not present the type of

hardship or dilemma contemplated in <u>Abbott Laboratories</u>. <u>See</u> <u>Reno v. Catholic Soc. Servs.</u>,

---

[4]     New York, for example, spent $118 million in state funds to enact CHPlus in the absence of federal
funding. <u>See</u> Arnold Decl. ¶ 25.

Inc., 509 U.S. 43, 58 (1993) (finding a challenge not ripe where the regulation at issue did not impose immediate penalties but did limit access to a government benefit by requiring each person desiring the benefit to take further administrative steps).  There is no hardship for New York, Washington, and Illinois due to the SHO Letter because they would have faced the same CMS review on their plan amendment.  CMS, on review, could have disapproved the states' plan amendments.  Until the administrative review process is complete and Plaintiffs face disapproval of their plans or a disallowance of an existing plan, the Plaintiffs cannot suffer a hardship.

Maryland, a state offering SCHIP coverage to children at above 250% FPL, is in a slightly different position than the other Plaintiff states, but its claim is likewise unripe.  Despite the threat of compliance proceedings against states that did not amend their plan by August 16, 2008, CMS has brought no such proceeding against Maryland.  In fact, CMS approved Maryland's program but required only that Maryland "must continue to work with CMS" to come into compliance with the crowd-out strategies in the SHO Letter. (See Nov. 25, 2008 Turner Letter Ex. B at 2.)

Even if Maryland operates its SCHIP program under the threat of CMS initiating compliance proceedings, a threat alone does not make Maryland's challenge ripe. See Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 810-11 (2003) (rejecting plaintiff's hardship claim because announcement of the regulation, without enforcement, resulted in no practical harm to plaintiff and "mere uncertainty as to the validity of a legal rule" fails to constitute a hardship for purposes of the ripeness analysis).  Maryland's claim would become ripe if CMS were to enforce provisions of the SHO Letter and impose sanctions on Maryland following a hearing in accordance with the statutory and regulatory guidelines. See 42 U.S.C. §§ 1397ff(c), (d); 42 C.F.R. §§ 457.203, 457.204.  To date, that has not occurred.

Recently New Jersey sued HHS over promulgation of the SHO Letter for the same reasons as the Plaintiffs here. See New Jersey v. United States Dep't of Health and Human Servs., Civ. Action No. 07-4698, 2008 WL 4936933, at *1 (D.N.J. Nov. 17, 2008).  New Jersey's SCHIP plan covers children in families with incomes up to 350% of FPL. Id. at *4.  Thus, New Jersey argued, as does Maryland here, that its claim was ripe because of the threat of corrective action in the SHO Letter. Id. *9-10.  The District Court held that New Jersey suffered no hardship because the threat of corrective action "was speculative at best and not of the direct and immediate character as that faced in Abbott Laboratories." Id. at *10.  New Jersey's claim against HHS was not ripe.

Plaintiffs face no immediate dilemma under the SHO Letter guidelines.  They do, however, face a certain amount of uncertainty and delay associated with exhausting their administrative remedies.  While this may be aggravating, it does not make the claims ripe for review.

**III. Jurisdiction in the District Court**

Even if the Court were to find Plaintiffs' claims ripe, Defendant points to a second jurisdictional hurdle: SCHIP's judicial review scheme precludes federal court review of any non-final agency determination, and, most importantly, limits that review to the federal appeals court.  Plaintiffs argue that their claim is not subject to the statutory review scheme because their claim is a facial challenge to the process by which CMS promulgated the requirements in the SHO Letter, rather than a challenge to the merits of any particular administrative decision.  Thus, Plaintiffs claim that their collateral challenge falls outside the statutory review scheme.

The SCHIP statute incorporates by reference the administrative and judicial review provisions available to Medicaid under 42 U.S.C. § 1316. See 42 U.S.C. § 1397gg(e)(2).  Under

§ 1316, a state that is dissatisfied with a final agency determination of a state plan may "file with the United States court of appeals for the circuit in which such State is located a petition for review of such determination." Id. § 1316(a)(3).  While district courts generally are presumed to have jurisdiction to review agency rulemaking actions, "when there is a specific statutory grant of jurisdiction to the court of appeals, it should be construed in favor of review by the court of appeals." Natural Res. Def. Council v. Abraham, 355 F.3d 179, 193 (2d Cir. 2004); see also Aquavella v. Richardson, 437 F.2d 397, 402 (2d Cir. 1971) ("Where the Medicare Act establishes procedures for review of the Secretary's decision, a court may not review that decision by any other means.").  The issue here is whether the language of § 1316 excludes review in the district court where a plaintiff brings a pre-enforcement challenge on an issue collateral to a plan determination.

Courts have allowed plaintiffs to circumvent the administrative review process when the plaintiff's claim is collateral to the claim for benefits and the plaintiff would be irreparably injured by the erroneous termination of benefits. See, e.g., Bowen v. City of New York, 476 U.S. 467, 483 (1986) ("[C]ases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate.") (quoting Matthews v. Eldridge, 424 U.S. 319, 330 (1976)).  Such circumvention of the administrative process is not permitted, however, where a claimant "alleg[es] mere deviation from the applicable regulations in his particular administrative proceeding." Id. at 484.

Plaintiffs argue that their claim is collateral and not subject to the review provisions in 42 U.S.C. § 1316 because, Plaintiffs claim, § 1316 only governs review of a particular state plan. Thus, Plaintiffs claim jurisdiction in the district court.  Based on McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479 (1991), Plaintiffs argue that a statute prescribing review in the appeals

courts does not preclude jurisdiction in the district courts where the claim is a general collateral challenge to the agency's procedures.

In that case, the Court determined that aliens wishing to challenge the Immigration and Naturalization Service's ("INS") administration of an amnesty program could sue in federal district court, despite an applicable statute that prohibited judicial review of the agency's final determination of amnesty status. See Haitian Refugee Ctr., 498 U.S. at 484-86.  The aliens in Haitian Refugee Center were in an unusual bind: review of INS' determination was only available in the federal appeals court when the immigrant was ordered deported, which was not the review that INS undertook in the amnesty determinations.  If review in the federal district courts were also precluded, "judicial review of such individual determinations was completely foreclosed." Id. at 486.  The Court held that the plaintiffs could challenge INS' procedures in district court because, "if not allowed to pursue their claims in the District Court, respondents would not as a practical matter be able to obtain meaningful judicial review of their application denials or of their objections to INS procedures." Id. at 496.  Because it was "most unlikely that Congress intended to foreclose all forms of meaningful judicial review," id., the Court found that the district court had jurisdiction to hear the claims.

Here, the SCHIP statute does not foreclose meaningful judicial review of Plaintiffs' claims.  Under 42 U.S.C. § 1316(a)(3), incorporated into SCHIP by § 1397gg(e)(2), Plaintiffs may challenge CMS's final determinations in the Court of Appeals.  Despite Plaintiffs' claims to the contrary, the validity of agency policymaking can be reviewed under § 1316. See, e.g., West Virginia v. Thompson, 475 F.3d 204, 209-10 (4th Cir. 2007) (reviewing claim that CMS Administrator promulgated Medicaid waiver criteria without required notice-and-comment rulemaking).  Here, Congress has clearly established a scheme that directs review to the appeals

courts, see 42 U.S.C. § 1316(a)(3), and even if Plaintiffs' claims are collateral, the appeals courts

can hear and adjudicate those claims.[5]  Plaintiffs have shown no reason why this Court should

find that Congress intended anything other than direct appeal to the appeals courts under the

SCHIP statutory review provisions.

## IV. APA Review

Plaintiffs face a final jurisdictional barrier that precludes review of the merits of their

claims.  Defendant argues that under the principle of sovereign immunity the federal government

and its agencies are immune from lawsuits unless they have consented to them.  Plaintiffs have

sued under the Administrative Procedure Act, 5 U.S.C. §§ 500-706,[6] but the APA only

authorizes an action for review of final agency action in the district court "to the extent that other

statutory procedures for review are inadequate." FCC v. ITT World Commc'ns, Inc., 466 U.S.

463, 469 (1984) (citing 5 U.S.C. §§ 703, 704).  Defendants argue that the SCHIP statute's

judicial review mechanism provides for federal review of agency action in 42 U.S.C. § 1316(a),

thus, Plaintiffs' suit under the APA is barred.[7]

Plaintiffs' response is similar to their argument in support of jurisdiction in the district

court—that the SCHIP review statute is not an adequate procedure for review because it provides

only for review of CMS's determination of a particular state plan, not of the regulations

---

[5]     Plaintiffs' claims are arguably more than just collateral to their individual interests in expanding their respective SCHIP programs.  The Supreme Court has found that so-called procedural challenges to agency determinations can be "inextricably intertwined" with a plaintiff's claim for benefits, and thus all aspects of the claim "should be channeled first into the administrative process which Congress has provided for the determination of claims for benefits." See Heckler v. Ringer, 466 U.S. 602, 614 (1984).  This simply provides further support for Defendant's argument that jurisdiction rests in the appeals courts.

[6]     The APA waives sovereign immunity for claims of "legal wrong [sustained] because of agency action." 5 U.S.C. § 702.

[7]     In their Amended Complaint Plaintiffs also claim jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1346(a)(2). See Am. Compl. ¶ 4.  Neither statute provides a waiver of immunity.  Section 1331, the federal question statute, is not a waiver of sovereign immunity. See Doe v. Civiletti, 635 F.2d 88, 94 (2d Cir. 1980) ("Section 1331 is in no way a general waiver of sovereign immunity.  Such a waiver, if it exists at all, must be sought in the statute giving rise to the cause of action.").  Likewise, Section 1346(a)(2), also known as the Little Tucker Act, does not provide jurisdiction because "the Act has long been contrued [sic] as authorizing only actions for money judgments and not suits for equitable relief against the United States." Richardson v. Morris, 409 U.S. 464, 465 (1973).

governing that determination.  Thus, Plaintiffs argue, they may sue under the APA because §

1316 does not provide adequate recourse for their claims.  For the reasons already described in

Discussion Section III, supra, the Court rejects this argument.

      Plaintiffs also argue that even if § 1316 allowed an appeals court to review whether CMS

improperly promulgated rules through the SHO Letter, the district court still has jurisdiction

under the APA because CMS has predetermined the outcome of New York's administrative

hearing on its request for reconsideration of disapproval.  Thus, Plaintiffs argue, the

administrative process is futile.  To support their claim of futility, Plaintiffs state that in its letter

to New York notifying the state of the upcoming hearing, CMS "reframed" the issues so as not to

present the validity of the SHO Letter as an issue. (See Arnold Decl. Ex. 12; Notice of Hearing,

72 Fed. Reg. 68,888 (Dec. 6, 2007).)  CMS's letter to New York states that the issues at the

hearing will be the specifics of New York's plan amendment and whether it adequately prevents

crowd-out in accordance with the reasonable procedures listed in the SHO Letter. (See Arnold

Decl. Ex. 12.)  New York, however, wishes to challenge the process by which CMS promulgated

the standards listed in the SHO Letter, and New York now claims that it cannot receive an

administrative hearing on that issue.

      Plaintiffs are correct that agency predetermination or overwhelming bias can excuse the

requirement of exhaustion of the administrative remedy. See Gibson v. Berryhill, 411 U.S. 564,

575 n.14, 578 (1973) (state administrative remedies held inadequate because of impermissible

bias and prejudgment).  But even if this court agreed with the Plaintiffs that CMS had

predetermined New York's claim by "reframing" the issues for the hearing,[8] it does not follow

---

[8]     It is not clear that New York's argument that it cannot address at the administrative level its complaints
about how the SHO Letter was promulgated has value.  At oral argument, Defendant stated that New York could
make such a challenge at the administrative level and then again at the Court of Appeals. (See Tr. 15:25-16:10;

that Plaintiffs do not have an adequate remedy for judicial review in the appeals courts under §
1316.  Nothing would prevent Plaintiffs from taking this same predetermination argument to the
appropriate appeals court and having it heard there.  Reading the language of § 1316(a)(3), this is
exactly the action that Congress intended an aggrieved party to take.  Even if CMS's
administrative review process is flawed—and this Court specifically does not pass judgment on
that issue—the SCHIP review statute still governs, and thus Plaintiffs are precluded from suing
under the APA. See, e.g., Bowen v. Massachusetts, 487 U.S. 879, 903 (1988) (noting that
Congress did not intend the grant of jurisdiction under the APA to replace special statutory
review procedures for specific agencies).

## CONCLUSION

The Court does not reach the merits of Plaintiffs' claims because Plaintiffs have not
exhausted their administrative remedies.  It is not yet clear how CMS will interpret and apply the
guidelines in the SHO Letter.  Additionally, Plaintiffs suffer no hardship from the withholding of
judicial review at this time.  For these reasons and the reasons previously mentioned, Plaintiffs'
claims are not ripe for review.  Additionally, the SCHIP judicial review statute, 42 U.S.C. §
1316(a)(3), incorporated by 42 U.S.C. § 1397gg(e)(2), establishes jurisdiction over this claim in
the federal appeals courts, rather than the district courts.  Finally, Plaintiffs are jurisdictionally
barred from suing under the APA because § 1316(a)(3) provides an adequate method of review
in the appeals courts.  Accordingly, Defendant's motion to dismiss under Federal Rules of Civil
Procedure 12(b)(1) is GRANTED, and the Plaintiffs' motion for summary judgment is DENIED.
Plaintiffs' Amended Complaint is DISMISSED without prejudice.  The Clerk of the Court is
directed to terminate this matter.

---

16:19-17:08.)  In fact, New York made this argument in its administrative hearing brief. (See Nov. 25, 2008 Turner
Letter Ex. A.)

Dated: New York, New York
     December 15, 2008

SO ORDERED

PAUL A. CROTTY
United States District Judge